IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASE NO.: 1:26-cv-03892

CHRISTOPHER MICHAEL ALBERTS,
Address filed under seal;
MICHAEL NEAL ASBURY,
Address filed under seal;
JASON BRIAN BARRETT,
Address filed under seal;
BRADLEY STUART BENNETT,
Address filed under seal;
KENNETH JAY BONAWITZ,
Address filed under seal;
JOSHUA DAVID DRESSEL,
Address filed under seal;
ZVONIMIR JURLINA,
Address filed under seal;
BENJAMIN JOHN MARTIN,
Address filed under seal;
SPENCER OFFMAN,
Address filed under seal;
BRETT ALAN OSTRANDER,
a/k/a BRETT ALAN ROTELLA,
Address filed under seal;
KERRY WAYNE PERSICK,
Address filed under seal;
THOMAS ROBERTSON,
Address filed under seal;
ELIEL ROSA,
Address filed under seal;
KIMBERLY SABBAGH,
Address filed under seal;
JEREMY RYAN SORVISTO,
Address filed under seal;
RAY STANTON,
Address filed under seal;
KIMBERLY ANN SYLVESTER,
Address filed under seal;

Plaintiffs,

v.

UNITED STATES OF AMERICA,
950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

Defendant.

_________________________________/

## COMPLAINT PURSUANT TO THE FEDERAL TORT CLAIMS ACT

The Plaintiffs, Christopher Michael Alberts, Michael Neal Asbury, Jason Brian Barrett, Bradley Stuart Bennett, Kenneth Jay Bonawitz, Joshua David Dressel, Zvonimir Jurlina, Benjamin John Martin, Spencer Offman, Brett Alan Ostrander, Kerry Wayne Persick, Thomas Robertson, Eliel Rosa, Kimberly Sabbagh, Jeremy Ryan Sorvisto, Ray Stanton, and Kimberly Ann Sylvester (hereinafter collectively referred to as the "J6ers"), by and through their undersigned counsel, hereby file their Complaint against the Defendant, the United States of America, and allege as follows:

### Jurisdiction and Venue

1. This Court has subject-matter jurisdiction pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (FTCA) and 28 U.S.C. § 1331 (federal question).

2. Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1402(b) because most of the acts and omissions giving rise individually to each of the Plaintiffs' claims occurred in this District, where the supposed infringements occurred at the Capitol and prosecutions were initiated, investigated, and litigated.

### Exhaustion of Administrative Remedies

3. Pursuant to 28 U.S.C. § 2675(a), the J6ers timely filed administrative claims with the United States, the Federal Bureau of Investigation or other appropriate federal agencies and they have fully exhausted all administrative remedies required by the Federal Tort Claims Act



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

("FTCA"). More than six months have elapsed since the presentment of the SF-95 claim forms without final disposition by the agencies, or the claims were denied.

**Parties**

***Plaintiffs***

4. Christopher Michael Alberts is a citizen of the Commonwealth of Virginia.

5. Michael Neal Asbury is a citizen of the State of Tennessee.

6. Jason Brian Barrett is a citizen of the State of South Carolina.

7. Bradley Stuart Bennett is a citizen of the State of North Carolina.

8. Kenneth Jay Bonawitz is a citizen of the State of Florida.

9. Joshua David Dressel is a citizen of the State of Missouri.

10. Zvonimir Jurlina is a citizen of the State of New York.

11. Benjamin John Martin is a citizen of the State of California.

12. Spencer Offman is a citizen of the State of Colorado.

13. Brett Alan Ostrander is a citizen of the State of North Carolina.

14. Kerry Wayne Persick is a citizen of the State of Texas.

15. Thomas Robertson is a citizen of the Commonwealth of Virginia.

16. Eliel Rosa is a citizen of the Federative Republic of Brazil who was granted political asylum in the United States and is domiciled in the State of Texas.

17. Kimberly Sabbagh is a citizen of the State of New York.

18. Jeremy Ryan Sorvisto is a citizen of the State of Michigan.

19. Ray Stanton is a citizen of the State of Indiana.

20. Kimberly Ann Sylvester is a citizen of the State of Maine.

***Defendant***



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

21. The Defendant, United States of America, is sued under the FTCA for the tortious acts and omissions of its employees, including Capitol Police, Washington, D.C. Metropolitan Police, Attorney General Merrick Garland, U.S. Attorney Matthew Graves, FBI Director Christopher Wray, and Assistant U.S. Attorneys Ashley Akers, Victoria Sheets, and Candace Wong, acting within the scope of their federal employment.

## **The Biggest Crime in American History**

***Prefatory Statement***

22. The J6ers are patriotic American citizens who witnessed, as did most of the nation, the reporting on the Presidential Election of 2020 (hereinafter referred to as the "Election"). As is explained below, each of the Plaintiffs knew and understood by what they saw and learned that the Election had been rigged and they were concerned that their country was being wrongfully taken.

23. On January 6, 2021 (hereinafter referred to also as "January 6th " or "J6"), the protesters who were in attendance on the Capitol grounds and/or building (hereinafter referred to as the "J6ers") innocently traveled to Washington, D.C. as they were anxious to learn whatever they could and to connect with like-minded patriots who had the same concerns and who were there to peacefully protest the rigging of the Election. For almost all of the J6ers, their involvement was peaceful as they stood in groups who were in prayer and/or who sang patriotic songs such as God Bless America .

24. Unfortunately, the events which started peacefully turned into mayhem. On the West side of the Capitol Building, Metropolitan Police began to bombard the crowds with teargas and percussion grenades. Ultimately, they used SG gas, and everything went from bad to worse,



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

resulting in four deaths and other injuries to J6ers, while the Capitol Police and the Metropolitan Police suffered only a few minor injuries, such as one who had a broken finger.

25. J6ers were waved into the Capitol Building by the Capitol Police, and for the most part, they acted peacefully.

26. Yet, after the events of the day, false news was circulated of 5 deaths of police officers and accusations that the J6ers were insurrectionists. Ultimately, the Garland DOJ prosecuted the J6ers in dreadful ways, in conjunction with the District Court judges and magistrate judges who worked together to wrongfully imprison and wrongfully try and sentence innocent J6ers and others.

27. In this regard, only one Magistrate Judge showed any connection with those responsible for the rigging of the Election. Other than that one individual, who may or may not have influenced the rest of the D.C. federal bench, there is no evidence that the judges of the court consciously knew that they were aiding and abetting the enemy. The wrongdoing done by the bench was probably far more innocent than many suspect, as it was the nature and purpose of the occurrences on January 6th.

28. What the federal bench and the rest of the American people did not know was that the events which occurred on January 6th did not begin on that date. In fact, the breaking of the windows of the Capitol Building and the inducing of the J6ers to enter the grounds and the building had been planned long before Election Day.

29. To understand what occurred, one must zoom out to the proverbial 30,000 feet and understand the historical and global context of what occurred. The population of the United States is approximately 4% of the world's population, and yet, it has approximately 27% of the global GNP. Following World War II, the United States has been the most powerful economy and military



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

force on Earth, and remains so to this day, despite foreign and domestic influences which are intended and determined to destroy the United States.

30. For many decades the government of the United States encouraged endless wars, exporting of our manufacturing base, and movement toward global governance.

31. As a result, foreign powers, especially China, prospered and fundamental institutions of the United States became infiltrated by both foreign interests and domestic actors whose interests aligned with global governance.

32. Over time, in the last decades, global interests have infiltrated and become more common and more involved in different governmental agencies, and normal American life, including the American educational system from K-1 through higher learning; the American traditional media; most of social media; aspects of big business; and certain churches.

33. Before Donald J. Trump came to office, although there were differences between the American political parties, each subscribed to these policies, supporting by example, the U.N., W.H.O., the World Economic Forum, and globalism. Donald J. Trump presented a fundamental change to "America First" and to "Make America Great Again," or "MAGA," and a majority of Americans responded to the call to conservatism and nationalism.

34. In effect, Donald J. Trump emerged to control the Republican Party which had its base disgorged, leaving that globalist minority known as "Republicans in Name Only" or "RINOs" as a minority. Meanwhile, the Democrat Party held the banner of globalism to the extent that its policies were extreme. For example, it embraced the U.N., W.H.O., the World Economic Forum, China, and open borders. In fact, it encouraged virtues of utopia, where all people are equal and programs such as being Woke, or embracing "Diversity, Equity, and Inclusion," or "DEI," were pitted against conservatism and making America First.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

35. As a result of the dichotomy between the ways of Donald J. Trump and the Globalists, the nation became emotionally divided where hatred toward Donald J. Trump actually was given an unofficial but well-known psychological designation in the MAGA counterculture of "Trump Derangement Syndrome," and while the conservatives are constrained by beliefs which required adherence to the doctrines of religion, the U.S. Constitution, and the rule of law, the Globalists, though greatly outnumbered, are not so constrained.

36. As Donald J. Trump was consolidating his base in the Republican Party, the Globalists rose in influence and control of the Democrat Party, giving them more than a base. It gives them a means of gaining and taking control of the United States.

37. At this juncture, the Globalists have not only infiltrated the Democrat Party, but they have infiltrated all aspects of government including members of our judiciary and the U.S. Department of Justice, and they are active.

38. While the social tide was changing in the United States, foreign states, primarily China, Venezuela, and Serbia, together with anti-American interests, such as George Soros, Bill Gates, and the World Economic Forum, encouraged their efforts to cause confusion among Americans which played into the divergence of values. DEI became the Woke philosophy with an appearance of legitimacy for ideas which sometimes defied common sense. For instance, Boards of Education in various counties permitted and sometimes encouraged young children who were normal, and capable of being influenced to believe that they were of the opposite sex. This liberalization grew to the point where male-to-female transitioners would participate in women's sports to break all kinds of records.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

39. For another example, of how the Left and the Right are incompatible. Where the Conservatives are in favor of equal opportunities for all races, the Globalists seek repentance from Caucasian males for bad acts supposedly of some of their ancestors.

40. In 2016, Donald J. Trump won the Presidential race. Instantaneously, false narratives were made and given credence, such as the "Russia Collusion" accusations against President Trump. Some Globalist FBI agents considered a plan to have a special prosecutor appointed to be an "insurance policy," the appointment of Mueller who spent $30 million investigating, came up empty. Instead of unearthing Russian collusion and other crimes, Donald J. Trump was proven to have been law abiding.

41. However, the 2016 election of Donald J. Trump did lead to a great deal of social unrest and during the four years of his first term, a large percentage of Americans became susceptible to believing in positions contrary to the American way. These people formed a base in our society which foreign interests were able to wittingly and unwittingly enlist.

42. Worse were systems by those who governed China, Venezuela, Serbia, and others who developed machines with programs by which the outcome of the Election could be manipulated and determined.

43. Before 2020, the election equipment had been partially utilized, but in 2020, the foreign governments and all of their accomplices were set to rig the Presidential Election, and that is exactly what occurred. The election was rigged, and all who participated directly were guilty of conspiring to overthrow the government of the United States by force, which was sedition pursuant to 18 U.S.C. § 2384; which was also the inciting, assisting, and engaging in insurrection against the authority of the laws of the United States a conspiracy to commit insurrection pursuant to 18 U.S.C. § 2383; which was also adhering to the enemies of the United States and giving them aid



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

and comfort by participating in the takeover of the United States to commit conspiracy to commit treason pursuant to 18 U.S.C. § 2381.

44. In the case at bar, the general meeting of minds of groups which already existed, where the members of the groups, such as the D.C. Metropolitan Police, the Capitol Police, the lawyers who were part of the DOJ, the prison officials, and others who worked together for the common purpose of defeating the United States of America, or to cover up the rigging of the 2020 Presidential Election were guilty of sedition, insurrection, and treason.

45. As the enemies of the United States who participated in the massive foreign interference of the United States Presidential Election had made great infiltration of American Society, judges, attorneys, and other groups perhaps thought that they were doing a good thing by attempting to defeat the interests of the United States, but they were doing wrong, and acting against the interests of the government of the United States, which at the time was led by President Donald J. Trump.

***The Rigged Presidential Election of 2020***

46. This Complaint concerns a part of the planning, execution, and follow-up of the most widespread, most pervasive, most deep-seated, and overall, the greatest anti-American conspiracy in history by American citizens and other domestic participants, who worked cohesively for the best interests of foreign powers and to take over the government of the United States, not through overt military invasion, but rather by the insidious and surreptitious infiltration of the election system of the United States. The Americans who participated in this planning and execution of the planned events were participating in nothing less than a conspiracy to commit sedition, insurrection, and treason.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

**The Development of the Enemy's Capability**

47. Following World War II, the United States became an avid opponent of tyranny and Communism, contrary to other nations including China and Venezuela, which had become adversaries to the United States before the turn of the 21 st Century.

48. In the early 2000s, the leader of Venezuela, Hugo Chavez, developed coding for voting machines by programmers located in Serbia which could control the results of elections which were tabulated on machines made in China for the companies of Sequoia and Smartmatic.

49. In the year 2000, in Florida, ballots for the Presidential Election used chads which ultimately led to a failure of public confidence in punch voting machines and a substitute was in demand.

50. Meanwhile, the President of Venezuela, Hugo Chavez, was extremely unpopular and had been developing voting equipment which could be programed to cause the tabulation of the votes to be manipulated. In August of 2004, voting equipment was implemented in Venezuela for a recall election of President Chavez. Due to the machines, instead of being removed from office, Chavez won with 58% of the vote. By 2006, the machines programmed by Serbians for the Venezuelans had made their way to the United States where they were implemented for the 2008 Democrat primaries.

51. Over the next 14 years, the corrupted election equipment was sold to county clerks and other election officials throughout the United States. Contrary to what the companies, Smartmatic USA Corporation, Dominion Voting Systems, ES&S, and others, said, the machines were not "air gapped," meaning unable to communicate with other computers. In fact, the ES&S tabulators actually had phone chips, as cell phones do, on the motherboards and Dominion equipment was connected through VPN connections.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

52. After Donald J. Trump won the Presidential Election in 2016, and it was clear he was going to change the status quo in terms of ending perpetual wars and shifting power from those in the government who controlled decisions to the office of the President, deep state individuals, especially some in the Democrat Party, and foreign governments, including a number in the EU, Britain, and others, perpetrated a fraud on the American people accusing President Trump of collusion with Vladimir Putin. When that attack on the Trump government of the United States failed, accusation after accusation causing impeachment and criminal charges to be brought were all part of the plan to return the government to one more friendly and cooperative to the goals of China, the EU, and Great Britain.

53. Ultimately, the direction of the free world, in fact, the whole world, was to rest on the question of whether Donald J. Trump would be reelected in 2020. As it was obvious that Donald J. Trump would have trounced his opponent, Joseph Biden, who campaigned from his basement, and had a rally where 6 cars showed up, it became necessary for the foreign actors and domestic insurgents to use all efforts to rig the 2020 Presidential Election.

54. As a result, in 2020, the United States witnessed the "Summer of Love," which was a plan to implement civil unrest in Left-wing cities, to which paid activists were employed.

55. Moreover, in the autumn of 2019, a virus had been released from a laboratory in Wuhan, China. After the population of Wuhan was greatly infected, all commercial flights to all other cities in China from Wuhan were stopped. However, flights to the United States and Western Europe were encouraged. In this way, China intentionally attacked the United States with a biological weapon, knowing that it would cause massive deaths and a great change in the course of the 2020 U.S. Presidential Election.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

56. As a result of the pandemic, states caused the rules to change, often illegally, and mail-in ballots were permitted to an extent which could change the results of the Election from ballot harvesting and other methods of cheating. The machines, though, had the power to determine the results of the elections by ginning up more votes than could ever be needed.

57. The rigging of the 2020 Presidential Election involved ballot harvesting and applying ballots in various races which were not provided by voters, either in person or by mail, but rather, were extra ballots prepared by criminals who put the ballots through the tabulators. Also, election equipment, such as the tabulators, although proclaimed by their manufacturers to be "air gapped," were connected to data centers which manipulated the vote tallies, either through actual phone chips on the motherboards of the tabulators or through virtual private networks.

58. On the evening of November 3, 2020, Election Day, in 4 swing states, Donald Trump was ahead, and for no known reason, even though the counting of ballots had never been previously stopped in any state, in the 4 swing states, the counting was stopped. Then, while the counting was supposedly not occurring, there were additional votes counted over an instant, causing the graphs of the voting in each of those swing states to show a straight vertical line for Biden. As a result, the following morning, in each of the 4 swing states, Joe Biden was suddenly ahead. In all 4 swing states, the graph was very similar where Joe Biden received approximately 97% of the vote, which was not only statistically impossible, but it was obvious to most that something untoward had occurred.

59. Those who were not blinded by hatred toward Donald Trump were able to see instantly that the election results had been manipulated.

60. More evidence of the election fraud emerged including the video from a camera which had been on the ceiling of the counting room in Fulton County, Georgia. There, the counting



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

was stopped late on November 3, 2020, because of false reports of a broken water main. In fact, contrary to the excuse to stop the counting in Fulton County, Georgia, no water main broke or was in need of repair. After it was thought by the public that everyone left the counting room, 4 people remained behind and they reached under the tables which were aproned to conceal what was under them. The 4 people in the room pulled hidden suitcases out from under the tables. They opened the suitcases which were filled with unfolded (therefore not mailed) ballots which they then proceeded to put through the ballot tabulators over and over again.

61. Those who looked objectively at these issues were not fooled and they knew that the election system of the United States had been manipulated to give false conclusions of the tallies.

***Groups of Conspirators***

62. The individuals who created the theft of the Election involved leadership and actors who were engaged in ballot harvesting, manipulation of the adjudication of votes, and mainly in regard to the programing and manipulation by computers of the Election tallies. All of those individuals were seditionists and insurrectionists, and the American citizens who participated were traitors to the United States.

63. Over the last decades, more and more people have been swayed to help the foreign interests who are attempting to defeat the United States. For instance, the educational system of the United States is, to a great extent, now controlled by Globalist Woke leadership, which is politically engaged against the Trump government, which is the government of the United States.

64. This does not make all members of such groups seditionists, insurrectionists, or traitors. However, once 2 or more Americans agree to take action against the interests of the United States, and one of the group performs an act in furtherance of their anti-American activities, they

are part of a conspiracy to commit an insurrection, and they are guilty of a conspiracy to commit treason.

65. In this regard, there are numerous actors who may have never met or conferred with the architects of the insurrection against President Donald Trump, but who acted in concert for the same ends. These include the group of individuals who planned the events of J6 or participated in the planning and execution of the events, and the prosecution of the aftermath.

66. When the police acted in concert against the J6ers, they were acting as conspirators to effect the foreign takeover of the United States by going along with the plan. In this regard, the FBI placed 274 agents and informants on the grounds of the Capitol to cause protestors to enter the Capitol Building. Those events of J6, especially those who were inducing the J6ers to enter the building, went all the way to the top, including Attorney General Garland and Director of the FBI Wray, who were acting as co-conspirators against America, making them traitors to the United States.

67. The Assistant U.S. Attorneys who pursued the J6ers with a vengeance because the J6ers supported President Trump also were their own group of co-conspirators who committed treason.

68. The efforts of those who orchestrated the violence and the walking into the Capitol Building on January 6 th were done so effectively that sensible law-abiding individuals, such as the chief judge of the District of Columbia, in Washington D.C. who laid down the way that J6ers' cases should proceed, were apparently convinced that the J6 Defendants in her courts were the insurrectionists who stormed the Capitol Building. It is difficult to blame her for her reactions to the events which were perpetrated to fool the whole of the American public. It fooled the judiciary, too.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

69. As such, at best, the Federal District Court Judges and Magistrate Judges who went along with the wrongful conduct were playing into the hands of the true insurrectionists who had planned J6 well in advance of that date. There was no reason for the judges, at that point, to even imagine that someone had previously planned to break the windows of the Capitol Building, to enter the building, and to have 274 FBI agents and informants present to induce the crowd to proceed toward the Capitol Building and to enter it.

***The Planning of Related Events Relating to the Rigged Election***

70. The covert infiltration into our election system would not have been complete without finding ways of curtailing those of the U.S. population who were expected to question the results of the Election and possibly generate an effective opposition to those who rigged the Election.

71. Part of the plan was to identify and limit the effectiveness of those who could upset the proverbial applecart of the devised election rigging. In that regard, plans were made to prosecute American citizens in authority and their attorneys who would possibly undermine the new government, the Biden government which was to be put into place. As a result, certain individuals, such as Tina Peters, Stefanie Lambert, Matthew DePerno, and others were prosecuted for alleged election-related crimes where the prosecutors had to twist the law because no crimes were actually committed. Those victims of the conspiracy were attempting to preserve the evidence or maintain the truth of what had occurred. They were heroic American patriots, not criminals.

72. Moreover, the companies which manufactured and/or sold the corrupted election equipment would file lawsuits against anyone who criticized their machines. Ultimately, lawsuits



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

were filed against patriots such as Michael Lindell, Patrick Byrne, Joseph Oltmann, the Trump Campaign, and many more.

73. Of utmost importance, all the rest of the opposition to the preposterous idea that Joe Biden emerged from his basement to be the victor with more votes than Barack Obama received needed to be nipped in the bud with slogans such as calling allegations of election fraud the "Big Lie," getting all lawsuits claiming election fraud dismissed before any evidence was presented.

74. Some who were falsely put in trusted positions, but who were actually moles waiting to be utilized, such as William Barr, the Attorney General of the United States, suddenly took positions contrary to Donald Trump. William Barr, for instance, just prior to his appointment as Attorney General, had been a partner of the law firm Kirkland & Ellis, which represented Staple Street, which had purchased Dominion. He made public pronouncements that he did not see any indications of election fraud. Unfortunately, this was trickery, as he gave the impression that the Department of Justice looked for such fraud and was not able to find any. In fact, he was being deceptive in that he failed to also advise that he never looked.

***J6 was a Psy-Op***

75. Of all the plans to take over the United States by infiltrating our election systems, one of the greatest was to commit a psychological operation, a "psy-op" against the protestors who the seditionists, insurrectionists, and traitors knew would be traveling to the Capitol Building in Washington, D.C. on January 6, 2021, the J6ers.

76. Although the foreign intervention in the election, itself, is not the subject of this Complaint, the conspiracy to wreak havoc at the U.S. Capitol on January 6 th , and use those events to cause an aftermath of harm to those patriots who attended at the U.S. Capitol on that fateful date



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

was planned in advance and executed according to plan as part of the general scheme to take over America.

77. The Globalists knew that those true to Donald Trump would be traveling to the U.S. Capitol to attend a protest planned for January 6, 2021, as they were the ones who saw and understood that the Election had been rigged. They were the equivalent to the "Early Adopters" who are the first to buy products with new technologies. Without Early Adopters buying products with new technologies, they would not succeed, and likewise, without the protestors who were early in accepting the truth of the rigged Election, the general public's opposition to the election rigging could not succeed. The psy-op was genius.

78. Long before January 6th, in fact, going back at least to September of 2020, active participants in what has been called the "Deep State" with various Non-Government Organizations ("NGO"), including Globalists, Patrick Young, Lisa Fithian, Maria Stephan, and Erica Chenoweth, along with hundreds of others actually knew January 6th was the date that the votes of the Electoral College would be counted and that Biden would be named as the winner of the election at the Capitol that day. These traitors conducted Zoom meetings to plan how the Globalists were to turn a peaceful protest of the conservative J6ers into the peaceful events into the appearance of a riot.

79. Those seditionists, insurrectionists, and traitors, as early as August or September of 2020, long before the Election, itself, actually plotted to break some of the windows of the Capitol Building so that their compatriots and foreign participants would enter the Capitol Building to unlock and open the doors of the Capitol so that the anticipated protestors outside would be herded into the Capitol Building.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

80. The plan was a trap to identify and destroy the tip of the spear of opposition to the election rigging. It was a psy-op designed to stifle public outcry of the rigging of the Election, itself.

81. Others were involved, such as Nancy Pelosi, who as Speaker of the House of Representatives was responsible for the safety of the membership. When offered 10,000 National Guard, she rejected any help. She later admitted her responsibility.

82. These Globalists borrowed from the gamebook of Adolf Hitler, who, 28 days after he was appointed Chancellor of Germany on January 30, 1933, had his storm-troopers burn down the equivalent of Germany's capitol structure, the Reichstag. By doing so, he was able to take absolute power and became the Fuhrer within 60 days of his appointment as Chancellor.

***The Rigging of the Election Had Been Obvious to the J6ers***

83. After the Election, the Americans who supported Donald J. Trump could see that the Election had been rigged. To them it was obvious as no state in the country had ever stopped the counting of ballots after the counting began. Then, on election night of 2020, in 4 swing states in which Trump was ahead, the counting stopped (supposedly by coincidence), and in the morning, when the counting re-commenced, Biden was in the lead in each state, with a staggering percentage of the votes which came in after the counting was suspended. For instance, in Michigan, after the polls closed, instantaneously, Donald Trump received 5,968 votes while in that fraction of a second, Joe Biden received 141,258 votes.

84. In Arizona, 22,093 mail-in ballots were received the day before they were supposedly mailed.

85. In Fulton County, Georgia, the J6ers saw the video from the camera which had been mounted on the ceiling of the ballot counting room.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

86. In Pennsylvania, the commonwealth mailed out 1,823,148 ballots and received 1,462,302 back. Yet, it counted 2,589,242 mail-in ballots, which were approximately 4:1 in favor of Joe Biden.

87. There is actually a wealth of evidence, at this point, but the point is that very early after the Election, people who favored Donald J. Trump began to file lawsuits, but they lacked standing. Approximately 60 lawsuits were dismissed without any judge examining any evidence.

***The Untoward Events Including Breaking of the Windows of the Capitol All were a Great Success for the Globalists and Foreign Interests***

88. All went according to plan. President Trump encouraged protestors to go to the Capitol. The trap was set in what would prove to be the greatest and largest conspiracy in the history of the United States.

89. Many American patriots, including the J6ers, are citizens of different states who traveled to Washington, D.C. on or before January 6th in general support of President Donald Trump.[1]

90. At their own expense, they each traveled to Washington, D.C. and found accommodation, so that they could attend speeches and rallies and gather at the U.S. Capitol to attend additional speeches and to assemble, pray, sing, learn, and protest their grievance of witnessing what seemed to be the demise of our country.

91. With all of the trappings in place, the plans for January 6 th were successful. The J6ers were cajoled, directed, and forced by GS gas and other insults to their bodies to enter the Capitol Building.

[1]Note that motivations varied widely, and some plaintiffs were motivated more by a need to raise awareness regarding various issues including public health overreach and/or election integrity generally.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

92. Many other incidents occurred, including the beating to death of Rosanne Boyland, the deaths of 2 J6ers as a result of concussion grenades being launched at them, and the horrendous death of Ashli Babbitt.

93. The circumstances of her death appear to have been pursuant to another more specific plan to make the "riot" there was a need for horrible things to occur. The film director and photographer John Sullivan just happened to be present with his crew to film the shooting, where supposed SWAT team members were present and who then apparently changed their clothing after their parts in the performance were concluded.

94. The 274 FBI agents and informants who were present in the crowds were successful in keeping hidden as to their true identity, and they succeeded in moving the crowds forward and into the Capitol Building, where they became susceptible to being charged with misdemeanors and potentially felony charges, as they later were.

95. The psy-op worked like a charm where the American people, including the judges in the D.C. federal courts, were outraged by the conduct which they understood to have been started by the J6ers.

***Pipe Bomb Fairy Tale A "Gallows" Constructed with Government Permission, and A Scaffold Commander Urging Protestors to Move Forward .***

96. Upon arrival at the Capitol on January 6th, the J6ers found themselves in a confusing setting, with no signs regarding scheduled events and few visible law enforcement officers. A cheaply constructed "gallows" with a hanging noose had been erected by never-identified persons with apparent government permission.[2]

---

[2]Note that the gallows qualified as an installation and required a permit for placement on the Capitol Mall. The installation took more than an hour to set up, during morning hours before large crowds arrived.

97. Although there were sections of minor fencing erected on the grounds early on J6, that fencing was mostly removed by afternoon, and the vast majority of the J6ers freely strode upon the Capitol Grounds without any obstructions or indications that they were not permitted to go there.

98. Capitol police officials in league with the general conspiracy to harm the protestors later falsely testified at trials, at the direction of the Garland DOJ, that the Capitol was ensconced in near-fortress-like security.

99. Within minutes of the beginning of Congress' scheduled electorate voting proceedings, government officials announced that "pipe-bombs" had been found at nearby Republican and Democratic National Committee headquarters. It was the supposed finding of "pipe bombs," and not any conduct by any J6ers, that first caused proceedings at the Capitol to pause.[3] The story of pipe-bombs was constantly changing[4] and involved agents of the Capitol Police, Vice President-Elect Kamala Harris, and the Secret Service. The pipe-bomb announcement triggered evacuations, closures, and shelter-in-place orders which ultimately culminated in a six-hour delay of Congress. All of this was later wrongfully blamed on the J6ers.

***The Afternoon Unfolded According to Plan***

[3]From another J6er's statement of facts: At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters. United States v. Tommy Allan , Case 1:21- cr-00064-CKK Document 1-1 Filed 01/20/21 Page 4.

[4]Christopher Wray's FBI fabricated or doctored video and released fabricated slowed-down, deliberately-grainy footage of the "pipe bomber" to the public so as to prevent 'solving the crime' (while Wray's FBI was purportedly offering a large reward for the supposedly-elusive 'bomber'). The "pipe bombs" themselves resembled stock dummy devices with less-than-one-hour kitchen timers. Private journalists later showed that Capitol Police bomb squad members knew precisely where to look for the "bombs"—obviously having foreknowledge. The FBI is known to have made several phone calls to The Blaze Media seeking to stop The Blaze's reporters from continuing their investigation.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

100. Not only did the seditionists, insurrectionists, and traitors in the Deep State and certain NGOs plan to break the windows of the Capitol Building, to have agents go into the Capitol through the broken windows, and to open the doors of the Capitol so that protestors who would be on the Capitol grounds could be directed into the Capitol building, but the FBI infiltrated the crowds which surrounded the Capitol with a united plan to move the crowds forward and ultimately into the Capitol Building. They had 274 agents and others under their control in place to accomplish this.[5]

101. Then, around 1:00 pm on January 6 th , many of the Plaintiffs witnessed undercover FBI agents and CIs, etc. shouting to “Go! Go! Go!” commanding and directing the crowds to move forward, toward the Capitol Building. One instigator nicknamed the “scaffold commander” positioned himself on a scaffold tower with a megaphone, shouting at the thousands of protestors to move closer and enter the Capitol. Another never-identified instigator, wearing a red “MAGA” cap with a price tag still affixed, broke and smashed the first window of the Capitol on the West side, to allow infiltrators to climb through the windows. That was according to the plan of the seditionists, insurrectionists, and traitors who rigged the 2020 Presidential Election and then participated in and planned the events of January 6th, as a psy-op to dissuade organized challenges to the rigged election.

102. The identity of the instigators has been well known to Wray’s FBI for years; and those instigators have been under Wray’s and Garland’s protection.[6] Also, the paucity of law enforcement security on January 6 th was deliberate.

---

[5]In furtherance of their plan, the FBI kept secret the fact that they had 274 agents and confidential informants at the Capitol until September of 2025.

[6]Another similar example involves a mysterious man wearing a gas mask who pushed J6er Will Pope into the Capitol at the east side’s carriage doors. Just as with Scaffold Commander, MAGA-hat guy and the pipe bomber, Garland’s DOJ prosecutors claimed they possessed no information about the man who pushed Pope inside the building (making Pope the first J6er to breach the east side). But after three years and much diligent research by Pope, DOJ admitted



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

103. As events unfolded on the Capitol's west side, Capitol police officers on the east side engaged in trickery with crowds of protestors, promising crowds (sometimes over megaphones) that police would try to help protestors approach more closely to the Capitol doors. When J6ers saw barriers removed on the east plaza, the protestors rushed forward, thinking officers had approved their advancement to the steps of the Capitol. Notwithstanding the obvious entrapment, the Plaintiffs were later charged with crimes for doing so.

104. When Capitol Police on the Capitol's west side repeatedly used force and possibly lethal force[7] on the J6ers, the festive or pensive milieu quickly changed. Metropolitan Police bombarded the crowds of peaceful protestors who had been praying and singing songs like God Bless America were suddenly hit with percussion grenades, teargas, and rubber bullets, notwithstanding that they did nothing to provoke such an attack. Moreover, the Capitol Police caused bloody injuries to J6ers which further enraged the crowd and led to an escalation of violence in reaction and in self-defense.

105. During the events of that day, federal law-enforcement officers, including but not limited to officers of the Municipal Police Force and other federal agents, deployed chemical irritants (including pepper spray and tear gas), batons, flash-bang devices, and other less-lethal munitions against the Plaintiffs and the crowd without justification and in a manner that was excessive, unreasonable, and in violation of the Plaintiffs' rights.

106. Worse, at approximately 2:24 pm, the Metropolitan Police were low or out of their teargas and percussion grenades. They were down to a box of CS Gas canisters. CS Gas is so horrific in its effects that it is a crime to use it in war. It causes severe inability to breathe, panic,

that the gas-mask wearing individual was known to the government and that the individual possessed a federal security clearance. See https://x.com/FreeStateWill/status/2006853257902305719 (accessed 1/2/2025).

[7] Capitol and Metro police officers, including Shauni Kerkhoff and Anthony Campanele, used "less than lethal" weaponry such as pepper ball guns in a manner that was lethal under the law, rules and training.

high anxiety, and raw anger. A Metropolitan Police officer aimed a shot of a CS Gas canister at scaffolding on which some J6ers had climbed, but the wind caught the canister and took it to a line of Capitol Police, causing that line to break. Then the rest of the supply of CS Gas was shot into the crowds of protestors.

107. As a direct and proximate result of unlawful use of force, the Plaintiffs suffered injuries including chemical burns to eyes and respiratory systems, contusions, lacerations, and exacerbation of pre-existing conditions.

***The Largest General Search Warrants in American History***

108. Soon after January 6 th , Attorney General Garland, U.S. Attorney Graves, and FBI Director Wray, in furtherance of the conspiracy to cause the protestors grave harm, and in furtherance of unseating the government of the United States with Donald J. Trump, President, violated Fourth Amendment limitations in their investigations of J6ers. These acts were all acts of sedition, insurrection, and treason. These federal officers crafted and used the largest and most general search warrants in history to identify every cell phone at the U.S. Capitol on January 6th. The warrants were so general that they didn't even try to state suspicion that any individual committed any specific crime, as the U.S. Constitution requires. Rather, the warrants simply listed a menu of ten-to-twelve possible crimes (including crimes which never occurred such as murder) and alleged that possessors of cell phones were either perpetrators or witnesses of such crimes. These federal officers used these unlawful search warrants to find and identify the Plaintiffs, despite having no probable cause at the time of the issuance of the warrants.

***Government-Funded Vigilante Stalkers***



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

109. Wray's FBI also funded and provided illegal material support to a private vigilante group, "the Sedition Hunters," who worked to identify and investigate J6ers by both legal and illegal means. Among other things, Wray's FBI violated court orders by providing Sedition Hunters with court-protected discovery. J6ers such as Lyons and Williams were identified by this secretly-government-funded vigilante group. J6er Allan was stalked by Sedition Hunters who repeatedly tried to get Allan fired from his job. J6er Abual-Ragheb was also stalked and harassed by Sedition Hunters, as were some of the Plaintiffs in this Complaint.

110. In support of the conspiracy to harm the J6ers, the FBI hid its support for Sedition Hunters for years, until after all J6er prosecutions ended and it was too late for J6ers to challenge illegal searches, stalking and harassment.[8]

***Savage, Militarized, Pre-Dawn SWAT-Style Tactical Arrests Over Misdemeanors, Even for Those Whose Lawyers Said They Would Self-Surrender.***

111. In most ways the J6 protest demonstrations were similar to hundreds of other rallies and protests at the Capitol over generations. Under well-settled state and federal law, demonstrators at capitols and legislative assemblies were to be allowed to speak freely and be given avenues for expressing and demanding redress.[9] Even if accused of trespassing or other misdemeanors, protestors must be given multiple warnings and opportunities to depart or comply with commands.[10]

---

[8]See Ken Silva, "Online Sleuths who Hunted J6ers were FBI Informants," Headline USA, Jan. 21, 2026, https://headlineusa.com/online-sleuths-who-hunted-j6ers-were-fbi-informants-new-docs- reveal/

[9]See D.C. Law, Ch. 3A § 5–331.03. Policy on First Amendment assemblies. "It is the declared public policy of the District of Columbia that: (1) Persons and groups have a right to organize and participate in peaceful First Amendment assemblies . . . and to engage in First Amendment assembly near the object of their protest so they may be seen and heard. . ." (2) "MPD shall not engage in mass arrests of groups that include First Amendment assemblies or that began as a First Amendment assembly unless MPD: . . . (B) Has issued an order to disperse . . ." See also ACLU, Demonstrating in D.C.: Know Your Rights (2025); Metropolitan Police Department, First Amendment Demonstrations (2021).

[10]See, e.g., Adderley v. Florida , 385 U.S. 39 (1966) (upholding trespassing convictions for student protestors at a jail; but unanimously stating that such protesting at a legislative capitol would be a defense to trespassing charges);

112. FBI Director Christopher Wray and Attorney General Merrick Garland directed that FBI agents be diverted from serious, violent and sexual crime investigations to focus on misdemeanor January 6 th investigations.[11] In many cases, J6ers were subjected to early morning paramilitary arrest-raids despite previously contacting FBI through attorneys to arrange peaceful meetings or surrenders.

113. Prior to January 6 th , most FBI agents had never arrested anyone for misdemeanors (as such offenses are generally initiated by citations). However, in furtherance of the conspiracy to commit insurrection and sedition, Wray and Garland implemented the "shock and awe" program. They directed that armored FBI and paramilitary SWAT-style tactical teams with military equipment descend on the homes of J6ers who were accused of being misdemeanants. Wray and Garland directed that the raids be conducted in a terrifying manner, with explosives and battering rams and teams of agents displaying masks, helmets, body armor, and semi-auto and automatic rifles.[12]

114. Wray's agents smashed and tore off the Plaintiffs' doors and gates, using flashbang grenades to traumatize the Plaintiffs. Wray's agents also commanded that local police assisting in the terror raids turn off their body cameras, often in direct violation of local police policies. That was done so that there would be no evidence of how they treated the J6ers.

***Overzealous Prosecution As "National Security"***

115. Garland, Graves, Wray and the other federal officials gave countless public statements describing the J6 demonstration in the course of their employment and accused the

---

Edwards v. South Carolina , 372 U.S. 229 (1963) (ruling that the First Amendment forbade state government officials to force a crowd to disperse when they are otherwise legally marching in front of a state capitol).

[11] Note that such staffing decisions are administrative, rather than prosecutorial, decisions.

[12] Upon information and belief, no accused J6er (out of more than 1,500) offered any violent resistance or obstruction during these arrests and abusive raids.

J6ers of attacking the Capitol, Congress, and even democracy, itself.[13] Those officials peppered their pleadings, complaints and arguments with national security justifications and false defamatory language.[14] In accordance with this "national security" artifice, these officials spent the next four years feverishly preventing J6ers from arguing or even invoking the protections of the 1 st Amendment.

116. Each J6 criminal prosecution began with government motions for protective orders, based on fake 'national security' grounds. The motions prevented J6ers and even judges from discovering the DOJ's concealed deceptions and fabrications, and they prevented the public from assisting J6ers. The DOJ falsely proclaimed that the locations of overhead cameras at the Capitol (which millions of people had seen while touring the Capitol) were so top secret that "national security" would be jeopardized if J6ers were able to share surveillance camera footage with the public.

117. The United States designated much of the discovery "sensitive" so that J6ers could only view it in the presence of their attorneys. This prevented many J6ers from putting on a defense because they lived at great distances from their attorneys.

118. The officials' true reason for demanding the protective orders was to keep the public from being able to identify undercover operators in the J6 crowds, which would have revealed the true scope of government entrapment and government distortion.

***The "Capitol Siege" Section and The Application of Military Language And Techniques to J6 Investigations.***

[13] Confirmation hearing, January 2021. When nominated, Mayorkas said if confirmed, he would do "everything I can" so that such an assault on the legislative branch and symbols of democracy would not happen again.

[14] See Luke Barr and Alexander Mallin, "AG Garland testifies Jan. 6 insurrection was 'most dangerous threat to our democracy," ABC News , May 12, 2021 ("Attorney General Merrick Garland told the Senate Appropriations Committee on Wednesday that he has not seen a more dangerous threat to democracy than the "invasion" of the Capitol on J6, which he called in written testimony a "heinous attack" and "intolerable assault.")

119. The United States named the DOJ unit prosecuting the J6ers the "Capitol Siege Section," using terminology rooted in military strategy with no criminal-law meaning.[15] They established a website for the "Siege" section.[16] That unit, which was operating to support the sedition, insurrection, and treason against the President of the United States, ironically loaded its charging documents with military language, ironically referring to the J6ers as the "insurrectionists" and focused on "breaches" of "perimeters," and "storming" the Capitol. DOJ pleadings constantly referred to the demonstration as "the attack" on the Capitol.

120. Pursuant to their plan against the government of the United States, Graves, Garland, and other federal officials turned J6 prosecutions into acts of partisan warfare. They invited DOJ lawyers who politically opposed Trump and MAGA conservatives to relocate to D.C. and "join this mission" because they "believed in the defense of democracy."[17] Those prosecutors viewed their investigations, not as justice inquiries into crimes, but as a "criminal inquiry into efforts to stop the peaceful transfer of power."[18] They were used by the true seditionists, insurrectionists, and traitors who rigged the election and then assisted in squelching any accountability in their effort to take over America.

***Involvement of the "National Security Division "[19] :***

[15] A siege refers to a military operation in which armed forces surround a place, usually a fortified city or stronghold, with the goal of cutting off essential supplies and forcing the enemy to surrender.

[16] https://www.justice.gov/usao-dc/capitol-breach-investigation-resource-page (now defunct).

[17] Ryan J. Reilly, "Jan 6 prosecutors describe 'shocking' 'guttural' week after Trump's pardons," NBC News, Jan. 24, 2025, https://www.nbcnews.com/politics/justice-department/jan-6- prosecutors-describe-shocking-guttural-week-trumps-pardons-rcna188970 (accessed 10/1/2025).

[18] Ryan J. Reilly, "As Jan 6 probe expands, officials worry DOJ resources are at a breaking point," NBC News, July 29, 2022, https://www.nbcnews.com/politics/justice-department/jan-6-probe-expands-officials-worry-doj- resources-are-breaking-point-rcna40208 (accessed 10/1/2025).

[19] Note that the DOJ's "National Security Division" has a stated mission which strays markedly from a pure prosecutorial mission: "The mission of the National Security Division is to protect the United States from threats to our national security by pursuing justice through the law. The NSD's organizational structure is designed to ensure greater coordination and unity of purpose between prosecutors and law enforcement agencies, on the one hand, and



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

121. Garland, Graves, and the other DOJ officials collaborated with the "National Security Division's Counterterrorism Section" on many J6 prosecutions, treating the cases as counterterrorism efforts.[20] Garland, Graves, and other officials explicitly proclaimed that J6 verdicts were obtained through the "National Security Division's Counterterrorism Section."[21] J6 convictions were described as "battlefield victories." DOJ spokesmen proclaimed that the DOJ was bringing "accountability to [J6ers] who attacked our democracy on January 6." The United States' use of the Joint Terrorism Task Force invoked national security weaponry over matters that had nothing to do with terrorism.

***Selective Targeting and Prosecution of J6ers***

122. Over the years, similar or even greater intrusions by demonstrators at the Capitol had been punished with $25 or $50 fines, even for protestors who forcefully occupied Capitol spaces and refused and resisted orders to leave or remove them. However, the officials in this case selectively prosecuted the Plaintiffs herein with unique charges never applied in similar circumstances, vindictively escalated to life-crushing felonies for the vast majority who insisted on trials.

123. Similarly situated individuals, those who engaged in violence, property destruction, or disruption of government functions during 2020 protests, were not prosecuted with comparable vigor or at all. That selective enforcement was based on the Plaintiffs' political viewpoints and

intelligence attorneys and the Intelligence Community, on the other, thus strengthening the effectiveness of the federal government's national security efforts."

[20]For example, in a January 6, 2025, press release on the San Diego U.S. Attorney's Office's role, GARLAND's DOJ stated: "These cases are being prosecuted through a collaboration led by the U.S. Attorney's Office for the District of Columbia and the Department of Justice National Security Division's Counterterrorism Section."

[21]For example, GARLAND's November 7, 2023 press statement that "This case is being prosecuted by the U.S. Attorney's Office for the District of Columbia and the Department of Justice National Security Division's Counterterrorism Section."



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

was orchestrated at the highest levels of the DOJ and FBI who participated in the sedition, the insurrection, and the treason to take over the United States.

124. Even past demonstrators who had disrupted the precise, identical proceedings on prior[22] January 6th dates had been given $50 fines. Three protestors arrested on Jan. 6, 2017 got $50 fines for disrupting the identical certification ceremony. There were no claims of Secret-Service "restricted areas" for such demonstrators, despite the presence of VP Biden.

125. There were even demonstrators who committed the precise, identical conduct of picketing or parading at the Capitol alongside and surrounded by J6ers, who never feared arrest because they were anti-Trump, pro-Biden protestors. For example, a pro-government extremist demonstrator named Patricia Eguino was never arrested by the Biden DOJ because she was a Democrat, despite Ms. Eguino brazenly holding political pickets on January 6, 2021, on the upper east terrace of the Capitol. Those around Ms. Eguino were prosecuted; Ms. Eguino was not.

126. Even demonstrators at the Capitol who forcefully or violently disrupted official proceedings in years past were given $50 fines, if prosecuted at all. Several notorious pro-Democrat protestors have been detained many times each for obstructing congressional proceedings, but were never prosecuted for 20-year felonies.

127. The officials herein turned a routine Capitol protest and 6-hour delay[23] of Congress into the largest and most expensive investigation in American history, with an overarching aim of

---

[22]See Zoe Tillman, "Protesters Arrested As Congress Certifies Trump's Victory," Buzzfeed News, January 6, 2017 https://www.buzzfeednews.com/article/zoetillman/protesters-arrested-as- congress-certifies-trumps-victory (accessed 1/10/2026) (saying protestors Renaldo Pearson, Tania Maduro, and Ryan Clayton "were each charged with one count of disruption of Congress, a misdemeanor that carries a maximum penalty of six months in jail." "The protesters were released Friday evening after posting and then forfeiting $50, a process under District of Columbia law available for certain low-level misdemeanors that resolves the charges.")

[23]Note that other protests at the Capitol have shut down Congress for much longer periods. For example, the Kavanaugh confirmation protests in 2018 stopped and disrupted proceedings for days. The May Day protests of 1970 also disrupted Congress for days. The Bonus Army occupation of 1932 shut down congressional proceedings for many days.

chilling and suppressing the expression of particular viewpoints and grievances. The officials fabricated evidence, concealed and withheld exculpatory evidence, made knowingly false statements in affidavits, pleadings,[24] and official proceedings related to the Plaintiffs' prosecutions, and exaggerated, concocted and manufactured threats and injuries, to secure wrongful charges, convictions and sentencings.

128. Note that the systematic targeting of a class of people due to affiliation with a politically unpopular or ousted ideology is administrative rather than prosecutorial conduct. Reno v. AADC, 525 U.S. 471 (1999). The participation of silencing dissent of the rigging of the Election was a carrying out of the aims of the conspiracy to commit sedition, insurrection, and treason by all involved.

129. Moreover, the conspiracy was committed by learned judges who were onboard to make sure that the sentences for J6ers were by far the harshest in U.S. history for political protesting, rioting, or demonstrating of any kind. Indeed, the longest prison sentences for J6ers were many times longer than those for any comparably-situated political demonstrator or rioter in history, and the 1st , 2nd, and 3rd highest individual misdemeanor fines in U.S. history were all imposed on J6ers.[25] Perhaps, some judges should be investigated and prosecuted for their horrendous conduct. No recommendation as to judges is being made, but treason is treason, and

---

[24]The Statement of Facts presented by the government in Tommy Allan's case is illustrative: "Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. . . At least one of the subjects carried a handgun with an extended magazine." Each of these statements is false. The most serious injury to any officer was a broken finger. The most common injury was "pain." No officers died as a result of injuries from J6. No member of Congress was ever in the same room as any demonstrator. No J6er was ever accused of entering the Capitol with a firearm. United States v. Tommy Allan , Case 1:21-cr-00064-CKK Document 1-1 Filed 01/20/21 Page 5-6 (emphasis added).

[25]J6er Rebecca Lavrenz now holds the all-time record with a $103,000 fine. The second heaviest fine in history for a misdemeanor was levied on another J6er, Brady Knowlton ($75,000). Third place seems to be a tie with a criminal defendant named Robert J. Brenna Jr. (New York) who paid a $25,000 fine in 2003 for violating the Clean Water Act (the highest until January 6. J6er Paul Johnson's $25,000 fine apparently tied Brenna's 2003 fine for third place.)

donning black robes should not protect anyone from being charged with treason if it is a crime committed.

130. Wray's FBI illegally placed J6ers on Terrorist Watch Lists and "SSSS" flight restrictions which subjected them to extra security measures during air travel, including strip searches.

131. The United States de-banked and facilitated the debanking of J6ers so that J6ers were denied access to credit institutions. The United States also secretly directed and facilitated the deplatforming of J6ers from social media.

132. Acts such as spreading disinformation, imposing a program of shock-and-awe[26] pre-dawn paramilitary SWAT-style raids to terrify and traumatize arrestees (causing numerous suicides, attempted suicides and miscarriages), setting up a snitch line to maximize arrests and social division, staging deployments of explosives against accused misdemeanants,[27] certifying the world's most expansive general search warrants in history without probable cause,[28] materially supporting private vigilante groups to hunt down suspected J6 demonstrators, throwing out settled pretrial detention standards to keep nonviolent J6ers behind bars without convictions,[29] placing

[26]See Scott Pelley, "Inside the prosecution of the Capitol rioters," 60 Minutes, March 22, 2021 https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03- 21/ (accessed 5/19/2025) (Acting US Atty Michael Sherwin explained that "our office wanted to ensure that there was shock and awe …. And it worked because we saw through media posts that people were afraid to come back to D.C. because they're like, "If we go there, we're gonna get charged."; Jonathan Turley, "How Prosecutors Turned January 6 Rioters into Martyrs," New York Post , Jan. 20, 2025, https://nypost.com/2025/01/20/opinion/how-prosecutors-turned-january-6- rioters-into-martyrs/ (accessed 5/18/2025) ("The Justice Department set out to send a chilling message to the nation. In an interview with CBS News a year later, Justice Department official Michael Sherwin indicated that they wanted to send a message with the harsh treatment of defendants.").

[27]See Burns v. Reed , 500 U.S. 478 (1991) (prosecutors do not have absolute immunity when giving legal advice to police regarding investigative stages of case, as such conduct is more administrative/investigative).

[28]See Kalina v. Fletcher , 522 U.S. 118 (1997) (certifying facts in an affidavit for probable cause was not entitled to absolute immunity—only qualified).

[29]In February 2021, the DOJ worked with Chief Judge Beryl Howell to create guidance for whether J6ers should be granted pretrial release. The "Chrestman 6" (or "Chrestman factors"). United States v. Chrestman (Case No. 21-mj-218). Howell granted the government's motion for review of a magistrate's pretrial release order, stayed the release, and ultimately ordered pretrial detention. The six factors were (1) felony or misdemeanor, (2) "the extent of the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Americans on watch lists, facilitating the de-banking of U.S. citizens, concealing and withholding the role and numbers of undercover government operatives and informants among demonstrators on January 6th, applying constrained 20-year-prison "obstruction-of-official-proceeding" charges to political demonstrators, punishing J6ers who refuse to plead guilty with retaliatory charges commanding 40-times-greater sentences, and threatening or arresting defense witnesses to prevent the J6ers from defending themselves are administrative, "national security," and investigatory conduct, not prosecutorial advocacy.

***Prosecutors***

133. Acting U.S. Attorney for D.C., Michael R. Sherwin, was responsible for organizing his Assistant U.S. Attorneys ("AUSAs") and pursuant to the plan to take over the United States, attempted to blame President Donald J. Trump for sedition, when he, himself, ironically, was actually the one who was guilty of the claim.

134. John Crabb Jr. was the Chief of the Criminal Division of the Office of the U.S. Attorney in D.C. and was the direct supervisor of Thomas Windom on the January 6th Detail. J.P. Cooney acted as Deputy Special Counsel to Jack Smith. These two commenced investigations against President Trump and "individuals within his orbit" regarding the leadup to J6, in their attempt to accuse Donald Trump of insurrection, and offered false testimony to the J6 Select Committee. One of the worst conspirators who conspired with Jack Smith as his deputy was Molly

---

defendant's prior planning," (3) whether the defendant used or carried a weapon, (4) evidence of coordination with other protesters (5) whether the defendant played a leadership role, and (6) the defendant's words and movements during the riot. This framework helped keep nonviolent J6ers in jail indefinitely; J6ers needed to plead guilty or be held through trial. It was the first time an entire category of defendants was subject to special bail rules that didn't apply to others. And the Chrestman factors added factors for pretrial release beyond what the Bail Reform Act required. And the Bail Reform Act, 18 U.S.C. § 3142, enacted during the tough-on-crime Reagan presidency, was itself controversial for expanding pretrial detention. See United States v. Salerno , 481 U.S. 739 (1987).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Gaston, who took pride in announcing that a grand jury had returned a true bill in August of 2023 against President Donald J. Trump.

135. Gregory Rosen was the Chief of the Capitol Siege Section, Breach and Assault Unit in the office of the U.S. Attorney for D.C. It was his office working in conjunction with the above-named conspirators. He worked together with Prosecutors Carlos Valdivia and Samuel White who, in a Taranto sentencing memorandum which they filed, described J6 as “a mob of rioters,” consistent with the needs of the seditionists, insurrectionists, and traitors to the United States. Their work was part and parcel of the destruction of the tip of the spear of objections to the election which had been rigged.

***Judges Joined the Prosecutors in Subjecting J6ers to Unprecedented Treatment.***

136. The most disappointing aspects of the takeover of the United States by foreign forces and Left Wing/Globalist extremists were the way that the vast majority, but not all, of the District Court Judges and Magistrate Court Judges were united between themselves in the District of Columbia to destroy the lives of the J6ers. All of their actions were done beyond the bounds of reason and were unwittingly in furtherance of the purpose of sedition, insurrection, and treason against the United States of America. This was a demonstration of how effective the Globalists were in misleading the public and the judges. It is completely understandable that a judge who saw and watched and then saw accounts of what occurred on J6 would think that the J6er on trial was evil. Unfortunately, the judges were all fooled into believing the scenario which appeared to be real, but was not.

137. Of all of the judges, though, there was one who knew or should have known the truth, U.S. Magistrate Judge Moxila A. Upadhyaya who was one of the most extreme in her anti-J6er rhetoric and rulings. She was surely a fox in the henhouse who had her own goals and agenda.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Prior to her being appointed as a Magistrate Judge, she was an attorney who represented the one who was the key to exporting election equipment and its insidious programing designed to control the results of the Election, the President of Venezuela, himself, Maduro. Maduro was her client. Her conflict of interest was not only real. It was extreme. The J6ers were 100% opposed to the one responsible for rigging the Election and that was Magistrate Judge Upadhyaya's former most important client.

138. Not all, but almost all of the D.C. District Court judges and the Magistrate Judges willfully acted under the color of law to deprive J6ers of their rights including due process and their First Amendment rights.

139. The judges of the D.C. District and Circuit were witnesses to the events of J6, because the U.S. Prettyman Courthouse is adjacent to the Capitol Grounds and the judges had watched the events from their courthouse windows.[30] Normally such personal observation of supposed crimes would require recusal or transfer of venue. Nonetheless, the judges uniformly denied motions to disqualify them or to change venue.

140. Forcing J6ers to defend themselves in D.C. meant that the proceedings were tilted in favor of the prosecution. Polls showed that D.C. residents regarded themselves as victims of J6ers and prejudged J6ers to be guilty. Polls also showed that D.C. residents wanted J6ers punished by life imprisonment or the death penalty.

141. Moreover, the residents' local elected officials had all made points of singling out J6ers for abuse. DC city officials had even held townhall lectures and park presentations against J6ers. The DC mayor had issued parking bans and requests for businesses to shut down in advance

[30] During closing arguments in the biggest J6 trial, the Proud Boys trial of December 2022-April 2023, prosecutors finished by drawing jurors' attention to the proximity of the courthouse to the action of J6. This was intended to impress upon the jurors a sense of personal fear and attachment to the facts of the case.

of J6. The DC mayor also ordered businesses to close early on the evening of J6. (Later, J6ers would be prosecuted under 18 U.S.C. §231 for adversely affecting commerce; and prosecutors even presented business managers as witnesses to the J6ers' supposed harm to the economy—bearing profit/loss data.)

142. The judges of the D.C. District also agreed with prosecutors that J6ers could never offer evidence regarding the improprieties of the 2020 presidential election. This was basic exculpatory evidence regarding innocent motive. But these judges' rulings did not stop the judges themselves from pronouncing, as supposed fact and law, that the 2020 election was properly won by Joe Biden as an aggravating factor at sentencings.

***The United States' Novel Theories of Law and Abuse of Statutes To Maximize Imprisonment of Plaintiffs.***

143. The United States, which had been taken over by foreign and domestic forces who continued the conspiracy of sedition, insurrection, and treason against the United States, used novel theories of law[31] to target the Plaintiffs for false charges such as "obstruction of official proceedings" and "entering and remaining in a restricted area."

144. While there are federal trespassing statutes which explicitly apply to the U.S. Capitol,[32] such statutes provide only a petty offense and plainly exempt mere presence in public

[31]For example, many J6ers who merely walked or stood in places were convicted of "disorderly conduct" based on a theory (the "raindrop theory") that Jan. 6 protesters shared equal guilt for rioting, like raindrops that join to create a flood. See, e.g., United States v. Rivera , 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field."). The government also used "Seditious Conspiracy" charges against Oath Keeper and Proud Boy leaders based on a notion that U.S. citizens protesting the outcome of an election qualified as an attempt to "overthrow" the government.

[32]40 U.S.C. § 5104(e)(2) Violent entry and disorderly conduct.--An individual or group of individuals may not willfully and knowingly-- (A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House; (B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House; (C) with the intent to disrupt the orderly conduct of official

areas where most J6ers walked and demonstrated. For Garland and Graves to act according to their plan, they chose to use an ill-fitting Secret-Service "restricted area" statute, 18 U.S.C. § 1752(c)(1)(B), to maximize penalties and imprisonments of the Plaintiffs. However, §1752 focuses on the authority of the Secret Service (SS) to create temporary restricted areas around certain federal protectees.

145. The use of the §1752 statute required constant deception and fabrication of claims and evidence by DOJ prosecutors. Knowing that the Secret Service had never formally "restricted" the Capitol on January 6th, and knowing that any designations or indications were insufficient, Garland and Graves' prosecutors retreated to a contrived argument that the Capitol Police had restricted the Capitol on January 6th on behalf of the Secret Service.[33]

146. While the D.C. Circuit later upheld this artifice,[34] at trials of J6ers, prosecutors presented a preposterously large, "restricted area" concept map around a single protectee (Vice President Mike Pence) (who was as far as a half-mile or more away from most J6ers at any given time).[35]

---

business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of-- (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress;

[33]At J6 criminal trials, GARLAND and GRAVES (DOJ) presented nothing but a memo announcing a construction closure on the west side and a series of emails announcing the scheduled movements of V.P. Pence as supposed evidence of the "restrictions."

[34]United States v. Neely , No. 23-3166 (D.C. Cir. Dec. 27, 2024) (affirming J6 defendant Darrell Neely's conviction under 18 U.S.C. § 1752(a)(1) despite the fact that the restrictions had not been designated solely by the Secret Service).

[35]Note that for a year, the first J6 indictments falsely alleged there were TWO Secret-Service protectees at the Capitol: Kamala Harris and Mike Pence. But it was finally revealed that Kamala Harris had been at the DNC headquarters during the time and not at the Capitol. Upon information and belief, government officials had secretly staged a false flag operation involving Kamala Harris and government-placed "pipe bombs" at the DNC. But for reasons unknown, these government officials had canceled the scripted pipe bomb event or altered their intended storyline. Of course, this means that for an entire year, the United States presented false statements and fabricated evidence to grand juries regarding the location of V.P.-Elect Harris. Throughout 2022, the DOJ returned to the grand juries to obtain superseding indictments to correct this false information. The Secret Service deleted all text messages relating to these matters so as to obscure the truth.

147. Garland and Graves' use of § 1752(c)(1)(B) yielded absurd results. For despite the Garland DOJ's concocted claim that the Capitol Police were proxies for the Secret Service in "restricting" the Capitol on January 6th, the Garland DOJ simultaneously argued that the Capitol Police had no authority to 'unrestrict' any area of the Capitol, such as by opening doors, opening barricades, or inviting J6ers into the Capitol.

148. Certain unknown officers of the Secret Service were also part of the conspiracy to knowingly and deceptively delete all text messages relating to the matters of January 6th, to prevent the Plaintiffs and the public from knowing the truth and to assure that the evidence was not available to those charged for violations of law.

149. As a result, many innocent J6ers (including many of the Plaintiffs) were wrongly convicted through trickery as well as entrapment.

150. Thus, each J6 criminal prosecution was a collection of planned absurdities and fabrications. In J6 trials, prosecutors were also part of the conspiracy. They asserted that the mere presence of whiffs of smoke or pepper spray or sounds of alarms ringing, or even the sight of rolls of plastic fencing lying on grass nearby were proof of the mythical "restrictions."

151. There is no way that the prosecutors, under Graves' supervision, did not knowingly deceive jurors and judges by emphasizing signs which were not seen by individual J6ers, but which had been erected and then taken down hours before J6ers arrived, or were hundreds of yards away, or lying on the ground.

***They Were Out to Destroy J6ers***

152. This was all part of the plan to repress the J6ers and the other waves of concerned Americans who would have followed. The plan was to cause as much harm to all J6ers, including the Plaintiffs, as possible, to destroy their lives in every way possible. The point was that to make



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

examples of the J6ers and blame them for being rioters and insurrectionists, they would lose all credibility and their freedom to continue to protest. This was the leading edge of stemming opposition to the rigged election. Worse, the plan worked.

153. While the J6ers were on the grounds, Metropolitan Police used percussion grenades, rubber bullets, teargas, and ultimately CS Gas on the J6ers, and sprayed them in the face with pepper spray as they pushed them into the Capitol Building.

154. Then, months later, instead of making peaceful arrests, where J6ers would have surrendered themselves voluntarily, even where J6ers offered through counsel to be voluntarily arrested, the conspiracy dictated to do the most harm possible by smashing in their front doors of their homes in the early morning hours and then to pull them all out of their houses sometimes in frigid weather in their underwear and then hold them at gunpoint. Parents who had to stand were almost paralyzed for hours while their homes were ransacked as they stood watching the red dots from the laser sights of the guns and rifles on the chests of their children .

155. The misuse of the court system was to an extent where the District Court Judges and Magistrate Judges in Washington, D.C. became either wittingly or unwittingly part of the whole conspiracy.

156. For those who were imprisoned, in many circumstances, they were put in solitary confinement for extended periods because they were J6ers. In many circumstances, prison populations were falsely told that the J6ers were white supremacists, and prison guards were falsely advised that the J6ers were responsible for the deaths of 5 police officers.

157. Every effort was made to destroy the lives of all J6ers possible and give them the harshest of all possible prison existences.

***The Government's Misuse of 18 USC § 1512(c)(2)***



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

158. Merrick Garland's Department of Justice also maliciously utilized a felony punishable by 20 years' imprisonment, "obstruction of an official proceeding" under 18 U.S.C. § 1512(c)(2) to punish J6ers who refused to immediately plead guilty to lesser charges, among other things.

159. From January 7, 2021, to January 20, 2025, Wray, Garland and Graves maliciously prosecuted many of the Plaintiffs with the bogus charge, "obstruction of an official proceeding" under 18 U.S.C. § 1512(c)(2), without probable cause.

160. The statute was drafted by Congress as part of the Sarbanes-Oxley Act of 2002 following the accounting and auditing fraud revelations involving Enron and Arthur Andersen LLP. The legislative intent of the Act was that it was supposed to apply to evidence-destruction, bribery, or witness tampering associated with corruptly influencing official proceedings, resulting in erroneous outcomes.

161. Conspiracist Garland's prosecutors deployed the statute as an extremely punitive disorderly conduct law and a tool for compelling innocent J6ers to plead guilty to crimes they didn't commit. Prosecutors admitted that they used the same evidence for §1512 prosecutions as they did for misdemeanor disorderly conduct prosecutions. However, they used the threat of §1512 prosecutions to punish J6ers who defended themselves.[36] Moreover, the chilling shockwaves of

[36] At least three dozen J6ers (at least 66 percent of all alleged misdemeanants who demanded trials) were charged with the bogus felony charges when they turned down misdemeanor plea offers. Tommy Frederick Allan; John D. Andries, Stephanie Baez, Richard Barnett were charged with misdemeanors; then superseded with felonies. (Sentenced to 45 mos.) Damon Michael Beckley, James Bonet, Larry Brock, Therese Borgerding, Dominic Box, Sara Carpenter, Jennifer Cudd started with two misdemeanors, which were quickly superseded with felony charges when Cudd indicated she would defend herself. David Davis, Derrick Evans, Simone Gold, Daniel Goodwyn, Derek Gunby, Brian Gunderson, Joseph Irwin, Leo Kelly, Deborah Lee, Larry Ligas, Kevin James Lyons, and Patrick Montgomery all had similar experiences. Darrell Neely was initially charged with 5 misdemeanors, then superseded with felony § 231 counts after declining plea offers (ultimately acquitted at trial of the felony § 231 count.). Michael Oliveras was charged with 4 standard misdemeanors on 12/8/21. A year later, after rejecting a plea, Oliveras was charged with a felony §111 assault charge, ultimately sentenced to 5 years. Nicholas Rodean was charged with misdemeanors on 01/29/21 and then indicted on March 19, 2021, with §1512 and felony destruction of property charges. Mark Sahady was charged with misdemeanors until rejecting a plea; then his misdemeanors were superseded with a §1512 charge.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

these vindictive charging decisions reverberated throughout the J6er community, causing many innocent J6ers to falsely plead guilty to crimes they didn't commit.

162. The Supreme Court recognized the United States' improper use of §1512 on June 28, 2024, striking down the application of § 1512(c)(2) except in cases where "the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in an official proceeding." Fischer v. United States, 603 U.S. 480 (2024).

***Garland's DOJ Weaponized the Use of Vindictive Superseding Indictments To Punish J6ers Who Insisted on Their Constitutional Rights.***

163. The vast majority of J6ers were initially prosecuted for misdemeanors. However, there were only 23 misdemeanor J6 trials. This is because (1) the vast majority (over 66%) of J6ers who insisted on misdemeanor trials were denied such trials. Rather, they were charged with bogus

Grayson Sherrill was charged with 4 standard misdemeanors on 04/06/21 which were then superseded on 12/15/21 with several felonies. Hatchet Speed was charged with 4 standard misdemeanors, then hit with §1512 charge after rejecting a petty misdemeanor plea offer. Christopher Spencer was charged with 4 standard misdemeanors on 02/23/21 which were superseded with a §1512 charge on 03/10/21. Yvonne St. Cyr was charged with two misdemeanors on Feb 12, 2021, offered a probation plea deal and hit with two felony §231 charges in May 2022 upon rejecting an offer. St. Cyr was convicted on all counts by jury in March of 2023 and sentenced to 30 months in prison. John Strand was charged with two misdemeanors and then with additional §1512 counts. He was offered a misdemeanor "entering and remaining" deal but rejected it. (Co-Defendant Simone Gold accepted and got 60 days). Strand got 32 months in prison. John George Todd III was charged with the four misdemeanors for two years and then, just nine days before trial after rejecting a plea offer, was charged with a 20-year-felony, 18 U.S.C. §111(b) assault causing bodily injury (officer cut his own finger inside the Capitol while tugging at Todd's tiny fiberglass flagpole). Later, prosecutors added a §1512 obstruction charge after Todd asserted privilege to testify before grand jury. Todd was ultimately sentenced to a 5-year prison term. Anthony Robert Williams was charged on 3/24/21 with 4 misdemeanors; then superseded on 5/26/21 with §1512 and ultimately sentenced to 5 years' imprisonment. After Fischer nullified Williams' conviction, DOJ vindictively superseded again with felony §231 charge on 12/18/24. There are also a handful (e.g., Nicholas DeCarlo, Nicholas Ochs, Robbie Norwood, and Williams (above)) who briefly overturned their felony convictions (due to the Supreme Court's Fischer decision) and then were poised for release or retrials on misdemeanors—only to be charged with other superseding felony charges. This list is substantially larger than the number of J6ers who were allowed to have misdemeanor trials (reported to be around 23). See Michael Kunzelman, "To plead or not to plead? That is the question for hundreds of Capitol riot defendants," AP News , Jan. 5, 2024, https://apnews.com/article/capitol-riot-anniversary-sentencing-data- c0a60a2ba68a70645bd5f9e5bcc45324 (accessed 10/25/2025).

superseding felonies, and (2) other J6ers, aware of the DOJ's insidious practice, falsely pled guilty to crimes they did not commit in order to save their lives and careers.

164. J6 criminal defense lawyers frequently reported that their J6 clients were offered "petty" misdemeanor offers, meaning the J6ers were invited to plead guilty to offenses punishable by under 6 months' jail time. However, when the J6ers rejected such offers, as a matter of course, they were punished with 20-year-felony charges.[37]

165. No previous court case (including those which reversed convictions and struck down prosecutions) had ever considered anything near a 40-to-1 ratio of vindictive charge escalation.[38] Even twice is abusive, let alone 40 times!

***A Machine for Generating Guilty Pleas***

166. Above all, the government's practice of steep charge escalation was a machine for generating guilty pleas, including false guilty pleas. It wasn't long before J6ers began to pronounce that they were being railroaded into pleading guilty to crimes they did not commit, being forced to submit to avoid the threatened lengthy prison sentences.

---

[37] See, e.g., Josh Gerstein & Kyle Cheney, "Two federal prosecutors were placed on leave hours after describing Jan. 6 as an attack by 'a mob of rioters.'" Politico , Oct. 30, 2025, https://www.politico.com/news/2025/10/30/sentencing-memo-january-6-attack-00631013 (accessed 11/21/2025) (saying "defense attorney Carmen Hernandez said Taranto was only facing charges over the 2023 incident because he turned down an offer last year to plead guilty to misdemeanor charges related to the J6 riot."). See also the September 2024 interview of Brian Korte on the Brian Lupo show "Inside J6 w/J6er Brian Korte," Inside J6 with Brian Lupo , Sept. 18, 2024 (https://rumble.com/v5fgsfp-inside-j6-w-j6er-brian-korte.html (accessed 11/24/2025) (saying J6er Brian Korte pled to 4 standard after being threatened with prosecution under §1512).

[38] Compare North Carolina v. Pearce , 395 U.S. 711 (1969) (invalidating two convictions: Pearce, convicted of assault with intent to rape and sentenced to 12 years and then later given an 8-year term without credit for time served after winning an appeal; and Rice, sentenced to 10 years for burglary but then given 25 years after winning his appeal). Blackledge v. Perry , 417 U.S. 21 (1974) (finding due process violation where defendant sentenced to 6 months for misdemeanor assault was given 5-7 years for felony assault with a deadly weapon with intent to kill (over the same facts), after appealing). Bordenkircher v. Hayes , 434 U.S. 357 (1978) (defendant rejected 5-year plea offer and was then indicted as career offender and sentenced to life imprisonment); United States v. Goodwin , 457 U.S. 368 (1982) (involving an offer of petty assault (up to 1 year), which became assaulting federal officer (up to 8 years), upon rejection of the offer).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***Misuse Of 18 U.S.C. §231 and Brady Violations To Conceal Economic Prosperity Brought by J6ers***

167. Prosecutors also maliciously misused the federal rioting statute, 18 U.S.C. §231, which criminalizes resistance to authorities during "civil disorders" which "affect commerce." Congress obviously contemplated that the statute would apply to typical riots with property damage, looting and arson in mind. Yet in J6 prosecutions, Garland's Justice Department concealed and withheld evidence that J6ers had boosted the local D.C. economy, bringing profitability to the city's hotel and restaurant industries which hadn't been seen for months prior and after.

***A Systematic Program of Vindictive Prosecution***

168. Under conspirators Garland and Graves, vindictive prosecution became a science. There were 23 misdemeanor J6 trials. However, at least 35 accused J6er misdemeanants who demanded trials were punished with felony charges instead. This means that at least 66% were denied their constitutional right to trials.

***The Biggest Mass Brady Violation in Legal History***

169. Although prosecutors are under constitutional obligations to disclose exculpatory evidence, conspirators, Garland, Graves, and their underling prosecutors knowingly withheld the most basic exculpatory evidence from accused J6ers, including evidence that refuted central features of their false allegations, including:

a. Evidence that the DOJ had been carefully planning the J6 event since at least August 2020[39] and had planted hundreds of undercover government operatives and

[39]See John Solomon and Steven Richards, "FBI Secretly Prepared for Disputed Election and Political Violence in 2020, Bombshell J6 Memos Show," Just the News , Feb 9, 2026 (saying the FBI conducted a tabletop exercise in

agents amidst the crowds on January 6, 2021.[40] The United States concealed the information for years. Then FBI Director Wray, in furtherance of the conspiracy to take over America, lied and lectured congressmen for accusing the FBI of planting informants or agents inside the massive crowd of Trump supporters on January 6, 2021. In a bold statement that directly contradicts multiple official sources, FBI Director Christopher Wray falsely testified before Congress in July 2023 that he "does not believe" undercover FBI agents were present at the U.S. Capitol on January 6th. Those lies were finally revealed in September 2025 when facts showed there were 274 undercover FBI at the scene; after hundreds of J6ers had been misled into falsely pleading guilty to crimes they did not commit.

b. Evidence showing the United States' claims of "140 officer injuries" were bogus and exaggerated, and that the most serious injury suffered by any officer on J6 was a broken finger.

c. Evidence from pre-event and post-event meetings involved acknowledgement of exculpatory and material facts (including wrongdoing and excessive force by police which stoked J6 violence).

---

summer 2020 that led to development of strategies like undercover informants and mass prosecutions for minor crimes that it would later use with the Jan. 6 Capitol riot).

[40] Documents were declassified on September 25, 2025, which revealed that there were some 274 undercover plainclothes FBI agents among the crowds on January 6. This withheld evidence led criminal defendants (and defense attorneys) to falsely plead guilty or counsel J6ers to falsely plead guilty. In furtherance of their conspiracy to rig the 2020 Presidential Election and to take over the government of the United States, Former FBI Director WRAY lied and concealed this information for years and lectured House Republicans for accusing the FBI of planting informants/operatives/agents inside the massive crowd of Trump supporters on January 6, 2021. In a bold statement that directly contradicted multiple official sources, FBI Director Christopher Wray testified before Congress in July 2023 that he "does not believe" undercover FBI agents were present at the U.S. Capitol on January 6.

d. Evidence (including the presence of hundreds of armed, filming, recording, plainclothes agents on J6).[41]

e. Evidence from a team of undercover Capitol P.D. officers positioned above the west front lines, filming the action below. These officers would go into the Capitol, and at the end of the day they filmed curfew arrests. However, the government has not produced everything they recorded.

f. Evidence of officers committing police brutality against J6ers on a massive scale, which would have altered the United States' public J6 narratives.[42]

g. Evidence of the presence of large numbers of Antifa and Black Lives Matter rioters who instigated aggressive and offensive conduct for which innocent Trump-supporting J6ers were accused.

h. Text messages and other communications by U.S. Secret Service about the events of January 6th, including "pipe bomb" claims, the movements of Trump, Pence, and Harris, and the falsity of restricted areas at the Capitol.

170. The nondisclosed evidence that J6 prosecutions had been staged, set up, and pre-planned in advance in wargaming and tabletop exercises months in advance was also concealment

[41] As it turns out, hundreds of plainclothes FBI agents filmed J6 events and recorded their and others' expressions, excited utterances and present-sense impressions which would have been exculpatory for many J6ers. Upon information and belief, these withheld recordings would have likely shown that the Capitol grounds were not as restricted as government trial testimony had claimed. Yet these many recordings were hidden and withheld from J6 defense counsel.

[42] One notorious example involves footage of officers kidney punching a J6er over a dozen times as the J6er cried in anguish. The officer hurt his hand. The full footage was initially posted on http://Evidence.com. Then on Christmas Night, Dec 25th, 2021, at 9pm, the footage was removed, and an edited version replaced it. The video abruptly ended before the beating. The notes by the investigator stated unambiguously that "The BWC was rattled, causing the Body Worn Camera to be shut off." Then, a NEW video popped up, where the beating had ended, but the BodyCam footage resumed. See also https://x.com/FreeStateWill/status/1693613732633460866 (accessed 6/3/2026) (showing the second gap in McAllister's footage occurred in the tunnel as he and Lt. Bagshaw were beating the defenseless Victoria White in the head. For both gaps, McAllister's camera did not beep (as normal) when the recording resumed less than a minute later (thus showing the footage was likely edited by prosecutors after obtaining the video from officers).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

that the J6 prosecutions were a conspiracy, administratively planned, in advance rather than legitimate acts of court advocacy in response to crimes. Not only did this withheld evidence keep J6ers from proving entrapment, but the evidence showed planning to entrap J6ers, in advance, by the United States and its officers.

171. As a consequence of the United States' withholding this exculpatory evidence, many defense lawyers counseled J6ers to falsely plead guilty. Those J6ers who went to trial, including some of the Plaintiffs, became wrongly convicted of crimes they did not commit.

***DOJ's Pattern of Vindictive Escalation of Charges and Penalties For the Plaintiffs Who Tried to Defend Themselves***

172. As described above, some of the Plaintiffs were initially charged with just misdemeanors. However, when they rejected petty-misdemeanor (i.e., up to 6 months' imprisonment) plea offers and exercised their right to trials, the Garland Justice Department punished them with felonies in retaliation and without probable cause. In most cases the Garland Justice Department charged alleged misdemeanants with 20-year felonies. This 40-to-1 ratio was the most extreme ratio of escalation ever registered in any case in the history of federal courts.[43]

173. Almost all J6ers who demanded trials received prison sentences. In fact, the majority of J6ers who were initially charged with misdemeanors found themselves facing additional felony charges when they exercised their constitutional right to trials. This occurred

[43] No previous court case (including those which reversed convictions and struck down prosecutions) had ever considered a 40-to-1 ratio of vindictive charge escalation. Compare North Carolina v. Pearce , 395 U.S. 711 (1969) (invalidating two convictions: Pearce, convicted of assault with intent to rape and sentenced to 12 years and then later given an 8-year term without credit for time served after winning an appeal; and Rice, sentenced to 10 years for burglary but then given 25 years after winning his appeal). Blackledge v. Perry , 417 U.S. 21 (1974) (finding due process violation where defendant sentenced to 6 months for misdemeanor assault was given 5-7 years for felony assault with a deadly weapon with intent to kill (over the same facts), after appealing). Bordenkircher v. Hayes , 434 U.S. 357 (1978) (defendant rejected 5-year plea offer and was then indicted as career offender and sentenced to life imprisonment); United States v. Goodwin , 457 U.S. 368 (1982) (involving an offer of petty assault (up to 1 year), which became assaulting federal officer (up to 8 years), upon rejection of the offer).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

amongst a jury pool composed of more than 90% Democratic voters where the jury conviction rate for J6ers was 100 percent. Prison sentences for J6ers who demanded trials on felonies averaged two years longer than sentences of J6ers felons who pled guilty.

174. This landscape of steep charge escalation and punishment led many J6ers to denounce the prosecutions and publicly proclaim they were wrongly convicted. In response, the DOJ threatened further retaliation against them.

175. Judges such as Chief Judge Beryl Howell explicitly agreed with the government's retaliatory charging of J6ers who turned down plea offers. Chief Judge Howell even excoriated a federal prosecutor who failed to add felony charges against a J6er who insisted on a misdemeanor trial.[44]

***The Government Turned J6 Sentencing Hearings Into Pageants of Exaggeration, Fabrication, and Blood Lust***

176. The Government demanded seizure of every penny crowdfunded for legal defense, as punitive fines. J6ers had difficulty finding public defenders who would zealously defend them. Moreover, in every case where J6ers sought to raise funds for their defense, the prosecutors demanded that every penny raised for legal defense be seized and turned over to the government.

**The DOJ Monitored Social Media, Seeking to Silence and Punish Attempts by the Plaintiffs and Their Attorneys To Alert the Public Regarding These Injustices.**

177. Under the Constitution, an accused has a 1st, 5th (due process) and 6th Amendment (fair trial/counsel/defense/confrontation) right to alert the public regarding injustices in the federal courts. Accused persons also have a constitutional right to plead for help in defense. The public

[44]In the case of United States v. Todd , Chief Judge Howell scolded a prosecutor for making her have a trial on misdemeanors. When the federal prosecutor responded that the DOJ had searched for felony charges to bring against Mr. Todd, Chief Judge warned the prosecutor that he was "running out of time."



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

also has 1 st and 6 th Amendment rights to be informed of injustices and to donate funds to fight injustice. However, Garland's Department of Justice scoured through J6ers' social media posts to identify memes, statements, podcasts, or interviews by each J6er regarding the prosecutions. Prosecutors filed pleadings to punish those J6ers who tried to alert the public regarding their treatment. Federal prosecutors even filed documents to sanction criminal defense lawyers who alerted the public about the unjust prosecutions.

178. The rigging of the 2020 Presidential Election which was followed by DOJ prosecutors imprisoning J6ers and attempting to keep the wrongful arrests, fines, and imprisonment secret from the public was in furtherance of the true insurrection which had rigged the election.

***Fabricated Sentencing Enhancements to Increase J6er Sentences***

179. In almost every trial where any J6er testified in his own defense (often because the J6er was forced to, because the DOJ systematically intimidated defense witnesses or precluded J6ers from presenting defense arguments unless the J6ers took the witness stand), the Government claimed the J6er lied during the testimony—invariably pointing at some subjective question—and then demanded a two-point sentencing enhancement for 'committing perjury.'

***Property Returned Damaged, Broken and Missing.***

180. Upon their release from the malicious charges, the Plaintiffs sought the return of property which had been seized by the FBI during their cases. The FBI returned their property damaged, missing and/or broken. The FBI returned cell phones and computers to J6ers with hard drives and files destroyed or missing.

181. The hard drives and SIM cards were missing probably because the Government withheld, hid, or destroyed them. Those drives and SIM cards contained images and videos taken



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

on January 6 th which refuted and debunked the Government's bogus narratives. Thus, these acts of damage and theft constituted Brady violations as well as takings and/or negligence.

182. All of these items were fully functional and in good condition prior to the FBI's seizures.

***The AUSA Prosecutors Who Were Part of the Conspiracy To Commit and Cover-up the Insurrection and Treason***

183. The following are some of the prosecutors who conspired to act beyond the bounds of the law, to bring injustice as the way of the U.S. District Court in the District of Columbia:

a. Merrick Garland, the U.S. Attorney General who supervised, guided and directed the grave national injustice herein described.

b. Matthew Graves (U.S. Attorney for D.C.), who implemented and imposed these abuses in the District of Columbia.

c. Greg Rosen, Chief of the Capitol Siege Section who oversaw the Capitol Siege Section, supervising hundreds of abusive prosecutors and J6 investigations. He supervised more than 1,000 prosecutions, trained and managed over 200 prosecutors and staff, and coordinated the abusive investigation and litigation from grand juries through trials and appeals.

d. Jeffrey Nestler, an Associate Deputy Attorney General at the U.S. Department of Justice, used blatant perjury in his rigged J6 trial of Oath Keepers. Mr. Nestler also concealed and withheld the evidence that would have exposed government perjury during the trial.[45]

[45] Blaze Media's October 2023 investigation found that witness David Lazarus's trial testimony was contradicted by extensive Capitol CCTV footage. Although Lazarus claimed to witness a hostile encounter between Officer Dunn and Oath Keepers, analysis showed Lazarus was in a Senate office building when the encounter began and did not arrive at the scene until three and a half minutes after the last Oath Keepers had left the area. Officer Dunn's testimony also



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

e. Jocelyn Ballentine supervised numerous abusive and malicious J6 prosecutions. Ms. Ballentine and Assistant US Attorney Jason McCullough approached Proud Boy leader Enrique Tarrio with a cooperation deal around October 2022 in which the government promised Mr. Tarrio's immediate release if Tarrio would falsely say that Donald Trump had directed the Proud Boys on J6. Ms. Ballentine is presently pursuing wrongful prosecution against an innocent black man to cover up the role of the government in the government's "pipe bomb" affair.

f. Brendan Ballou, an Assistant US Attorney (AUSA) who prosecuted several J6ers with sadistic zeal. Mr. Ballou fought for jury instructions that said there were no First Amendment rights at the U.S. Capitol.

g. Ashley Akers prosecuted dozens of January 6th defendants, with a focus on exaggerated claims of "assault" on law enforcement officers. She perfected the art of vindictively prosecuting accused misdemeanants with felonies when they demanded trials. She presided over the Chris Quaglin investigation, where agents told a J6er he would never see his family again unless he testified against fellow J6ers.

h. Kyle M. McWaters was a leading orchestrator of escalated 20-year-felony charges against J6ers who turned down misdemeanor plea offers. Mr. McWaters refused to dismiss a false § 1512 conviction of J6er Hatchet Speed even after the Supreme Court struck down the use of the statute as a disorderly-conduct substitute. i. Michael Gordon, an AUSA who used his status to abuse J6ers. In at least one case Mr. Gordon argued that J6ers who carried flags were committing assault with a deadly weapon because a plastic flagpole

appears to have been inconsistent. Initially, he claimed Oath Keepers had de-escalated the situation, but his later accounts portrayed them as aggressors.

might poke someone's eye out. j. Sean Murphy, a particularly cruel prosecutor who vindictively and relentlessly prosecuted such J6ers as Stephanie Baez with a bogus §1512 charge when Baez insisted on her right to a trial. Even after the Fischer decision, Mr. Murphy refused to drop the false charge against Baez. Ms. Baez was hospitalized from stress and suffered several miscarriages during the ordeal. Ms. Baez was finally acquitted of the vindictive bogus charge at trial. k. Sam White vindictively charged J6ers such as Derek Gunby with false "obstruction of official proceeding" charges when they wouldn't plead guilty to misdemeanors. l. Alexis Loeb, like others in the conspiracy, used her position to vindictively increase charges against J6ers who wouldn't plead guilty. As former Deputy Chief of the Capitol Siege Section, Ms. Loeb played a senior leadership role in coordinating the section's abusive and malicious prosecutions. m. Lisa Monaco, deputy Attorney General from April 2021 to January 2025, publicly framed January 6th as an "attack on our democracy." Ms. Monaco emphasized the heavy use of inapplicable felonies like 18 U.S.C. § 1512(c)(2) ("obstruction of an official proceeding") for many non-violent entrants. Under Ms. Monaco's direction, J6 prosecutions peaked before the 2022 and 2024 elections. Ms. Monaco also tried to pressure J6er James Giannakos into falsely saying the Proud Boys had followed Donald Trump's directions on January 6th. n. Barry Disney vindictively and maliciously added two 20-year felony charges (§1512 and §111(b) "assaulting an officer, causing bodily injury") against a J6er when the J6er testified before the grand jury in his defense. (The bogus "assault" charge was fabricated upon an officer's finger cut when the officer pulled on the J6er's fiberglass flagpole on J6.) o. Samantha Miller used Brady violations and false police testimony to obtain convictions



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

against a J6er. p. Francisco Valentini stalked social media accounts of J6ers and their lawyers to punish those who criticized the unjust prosecutions.

184. These prosecutors overcharged many participants in the J6 protest and weaponized the Justice Department by holding defendants in pretrial detention, lengthy delays, and denying due process and exculpatory evidence to J6ers.

***The District Court Judges Who Participated***

185. The following are some of the District Court judges who participated to act beyond the bounds of the law, to bring injustice as the way of the U.S. District Court in the District of Columbia:

a. Judge Beryl Howell was the chief judge of the District of DC until mid-2023. Judge Howell worked hand in hand with federal prosecutors in the escalation of misdemeanor cases into felony cases when J6ers demanded trials. Judge Howell also aided federal prosecutors in concocting diminished rights to pre-trial release for J6ers in plain contradiction of settled appellate precedent. In fact, she inserted herself to overrule all decisions from Magistrate Judges in at least 17 different courts to overrule decisions where Magistrate Judges followed the law to release J6ers who were charged with J6 offenses based on criteria of law which did not apply. This included cases involving, but not limited to Tom Ballard, Richard Barnett, Jeffrey Scott Brown, Lisa Eisenhart, Eric Munchel, Scott Fairlamb, Doug Jensen, Cody Mattice, Timothy Hale-Cusanelli, Ronald McAbee, Brian Mock, Ethan Nordean, Christopher Quaglin, Zachary Rehl, Thomas Sibick, Jack Whitton, and Christopher Worrell. Judge Howell was the main protagonist who led the judges of the District Court of the District of Columbia, and knowingly and intentionally was intent on removing Donald J. Trump from office by concealing the rigging of the Election. Her



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

conduct and that of the judges who follow in this section need to be examined by the Department of Justice and if applicable, they should be prosecuted for their complicity in the conspiracy to commit treason.

b. Judge Emmet Sullivan who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

c. Judge Trevor McFadden who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

d. Judge Rudolph Contreras who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

e. Judge Reggie Walton was particularly cruel in imposing supposed "COVID"-related mask and vaccine restrictions on J6ers. Judge Walton knew that prospective jurors who disdain mask and COVID vaccine rules tended to be skeptical jurors who might also be skeptical of the bogus J6 prosecutions. So Judge Walton prohibited unvaxxed jurors, in order to tilt trials in favor of the prosecution.

f. Judge Amit P. Mehta presided over numerous J6 prosecutions and ruled for the government on most pretrial and post-trial motions. Judge Mehta also pronounced that J6er motivations were lies because the 2020 election was "clearly" not stolen.

g. Judge Royce C. Lamberth claimed that "no evidence ever emerged" supporting Donald Trump's election criticism—despite ruling repeatedly that J6ers could never present such evidence.

h. Judge Amy Berman Jackson referred to J6ers' election integrity motivations as "the lie that the [2020] election was stolen" despite repeatedly denying J6ers the opportunity to show their good faith regarding the issue. i. Judge Tanya Chutkan, who



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

handled Trump's federal election case and many J6 sentencings, described the protest as a riot fueled by "baseless claims of a stolen election" despite Judge Chutkan's denial of every attempt to support the stolen-election claims with evidence. Because the issue of "corrupt intent" was an element required for conviction under 18 U.S.C. §1512 obstruction, this denial of opportunity to present evidence was a fundamental due process violation. Moreover, the government's withholding of such evidence was not just a discovery violation but a Brady violation. j. Judge Timothy Kelly helped the government conceal evidence of FBI misconduct, including evidence that Agent Nicole Miller and her team destroyed evidence, unlawfully recorded attorney/client communications and sought to break up the marriage of J6er Zachary Rehl. k. Judge Thomas F. Hogan made it public that the J6ers committed an "insurrection that was probably the worst thing that's happened to our democratic way of life in our history." He continued ruthlessly with his bias.

***The Magistrate Judges Who Participated***

186. The following are some of the Magistrate Judges who conspired to act beyond the bounds of the law, to bring injustice as the way of the U.S. District Court in the District of Columbia:

a. Magistrate Judge Moxila A. Upadhyaya processed many J6 cases while applying the tilted rules of the other judges of the District (e.g., protective orders to prevent public awareness, pretrial rulings precluding the 1 st amendment and entrapment defenses, evidentiary rulings allowing prosecutors to show evidence of violence throughout the Capitol while narrowing J6ers' evidence to things immediately seen). Magistrate Judge



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Upadhyaya presided over J6 cases despite having previously represented clients who were deposed or were major players in Dominion Voting machine litigation cases involving the 2020 presidential election.

b. In fact, it is on information and belief that she personally represented the president of Venezuela who was the one who perpetrated the scheme of rigged election equipment on the United States. She had been asked to disqualify herself, and she always refused. Judge Upadhyaya had been the personal attorney for the head of the snake selling computer election results in America. She stayed on cases knowing full well that she was deeply conflicted out and was one of the harshest and worst judges of all. She also stays as Magistrate Judge on the matter of Dominion Machines v. Byrne, and she is so totally conflicted, it leads to a conclusion that she is aware and intentionally acting wrongfully. Her position leads to a conclusion that she is acting in furtherance of the wrongful rigging of the Election, making her probably guilty of participating in a conspiracy to commit sedition, insurrection, and treason.

c. Magistrate Judge Zia M. Faruqui presided over numerous J6er arraignments. At one misdemeanor J6 trial, Magistrate Judge Faruqui instructed a jury that all of the statutes involved were constitutional and that there were no First Amendment rights at the U.S. Capitol. Judge Faruqui imposed the heaviest fine in U.S. history for a misdemeanor, $103,000, upon a J6er who strode through open doors into the Capitol and walked around for under 10 minutes.

***Other Damages***

187. As a direct and proximate result of the Government's tortious conduct, each of the Plaintiffs suffered and continues to suffer losses in excess of $1 million, including but not limited

to medical expenses, lost wages and income, pain and suffering, severe emotional distress, loss of liberty, reputational harm, and other consequential damages.

188. The Plaintiffs also suffered loss of consortium with their spouses. Husbands and wives abandoned them during these malicious prosecutions.

189. At least six J6ers committed suicide due to the trauma,[46] and many others attempted suicide during the ordeal.

**The Atrocities Which Occurred In Prison**

190. When J6ers were incarcerated in jails and prisons they were subjected to additional abuse. J6ers were forced to surrender DNA samples, even if held on mere nonviolent misdemeanors. J6ers who refused to submit to experimental COVID-19 vaccine injections were denied attorney visits and held in solitary confinement for extended periods. They were also denied haircuts and shaving privileges.

191. J6ers were also denied access to their discovery to prepare for trials. In some cases, defense attorneys who came to the jails in D.C. or Alexandria to show or provide digital discovery or video files to J6ers were turned away by jail authorities multiple times. And in some cases, incarcerated J6ers were never allowed to see their discovery—the evidence against them—until they were in trial.

192. J6ers were denied medical care and treatment throughout the federal prison and jail system. J6ers such as Bart Shively and Christopher Worrell were denied cancer treatment, causing their cancers to grow out of control. Mr. Shively died shortly after his release from prison.

[46] J6ers Mark Aungst, Chris Stanton, Jord Meachum, David Kennedy Homol, and Matthew Perna took their own lives during the prosecutions.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

193. The FBI also monitored attorney-client communications of J6ers and used information gathered in such illicit surveillance to strengthen their prosecutions against J6ers.

**A Case In Point**

194. For purposes of explanation, one J6er has been chosen to explain what happened to innocent people on J6 and thereafter. Ryan Zink was a campaign photographer for his father, a candidate for Congress.

195. The Zinks made their way around the Capitol to the east side, following massive crowds. Shortly after 2 pm, the Zinks heard a megaphone interaction between Capitol Police officers and protestors wherein a Capitol Policeman promised to see if he could get approval for the crowd to move forward to the steps of the building. Minutes later the barricades were removed and the Zinks saw exuberant crowds rush forward to the east Capitol steps. Ryan saw a police officer literally waving people forward.

196. Ryan livestreamed as he and his father joined the crowd moving forward. Ryan hyped up the drama for his livestream audience, saying into his phone, “We’re storming the Capitol!” When the Zinks got to the upper east balcony they witnessed a young man kicking at windows. Ryan loudly shouted at the crowd to let police do their jobs and arrest the man. Seeing that the Zinks were protecting them, the officers asked Ryan to help give them space and record the incident. Moments later, the officers abandoned the arrest of the window kicker and moved away toward the main door. The Zinks eventually followed after the officers to photograph and livestream the scene at the door. When Ryan saw violence near the Capitol entrance, he and his father quickly made their way down the steps and back to their hotel.

197. Just days later, Ryan was awakened by flash bang grenades at his home in Amarillo, Texas. A large tactical team of counterterrorism officers kicked in his door and raided his rented



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

property. He was charged with a 20-year felony, "obstruction of an official proceeding," and two misdemeanors. Although a local magistrate judge ordered Ryan released on pre-trial conditions, prosecutors and judges in D.C. teamed against him to appeal the ruling.

198. Ryan spent the next month in various jails, poisoned with rotten food and losing forty pounds from illness and distress.

199. As Ryan prepared for trial, he noticed that the DOJ deprived him of important discovery including the photos and video he had taken with his campaign camera. The DOJ provided only his Facebook livestream images, in which Ryan had dramatized the J6 events with hyperbolic "We're storming the Capitol!" statements.

200. At trial, the officer who thanked Ryan and asked Ryan to record the event lied on the stand and said Ryan had gotten in his way on the balcony on J6. The officer who waved crowds forward to the Capitol testified that he was waving only at another officer.

201. Oddly, prosecutors provided a couple images from Ryan's campaign camera in discovery. However, prosecutors withheld hundreds of other photographs. During trial when Zink's attorney asked Judge Boasberg to order the prosecution to provide the seized camera footage, Judge Boasberg would not issue the order, saying Zink should have asked earlier, which he had. When Zink's counsel brought a flash drive to prosecutors for prosecutors to transfer the nondisclosed camera files, he untruthfully advised that the files had been deleted.

202. Later, at closing argument, a federal prosecutor told jurors that Zink had lied on the witness stand about being a campaign photographer on J6 and even told the jury that the (missing) camera images did not substantiate Ryan's defense.

203. Upon cross-examination, government witnesses admitted that no one inside the Capitol building could have possibly heard anything Ryan Zink had said to his livestream audience



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

on his cellphone. Jeff Zink testified that even he could not hear what Ryan was saying to his livestream audience amid the roar of the crowd. Nonetheless, Mr. Zink was convicted of "obstructing an official proceeding" of Congress for making a few hyperbolic remarks into his cell phone while outside the Capitol.

204. Prior to sentencing, the Supreme Court invalidated the use of the § 1512(c)(2) "obstruction of an official proceeding" statute as a punishment for political demonstrators. Thus Ryan faced sentencing for only two misdemeanors by the time of sentencing. Nonetheless, prosecutors requested maximum, consecutive sentences for the misdemeanors. Chief Judge Boasberg sentenced Mr. Zink to 90 days in jail, an outrageous sentence for a first-time offender who merely livestreamed his experience outside the Capitol and helped officers on J6.

205. Ryan Zink continues to suffer long-term injuries from the ordeal and his wife suffered several miscarriages due to emotional distress.

## Specific Allegations As To Each Plaintiff

206. In each of the Plaintiffs' cases, the J6 criminal proceedings terminated in the Plaintiffs' favor, either by dismissal, acquittal on key counts, or executive clemency that nullified the convictions and restored the Plaintiffs' rights.

207. The prosecutions were initiated and pursued without probable cause, with actual malice, and for the improper purpose of politically persecuting the Plaintiffs because of their support for President Donald J. Trump and their exercise of constitutional rights. The following summarizes each Plaintiff's prosecution and its termination in their favor:

### Christopher Michael Alberts

208. The Plaintiff Christopher Michael Alberts lives in Amelia, Virginia. On January 6, 2021, he was thirty-three years old and lived in Pylesville, in Harford County, Maryland. He served

in the Virginia National Guard from 2005 to 2011 and was deployed to Iraq for a year in 2007 and 2008. He drove a tow truck for a living. He has post-traumatic stress disorder, and he was once struck by lightning and takes muscle relaxers for what it did to him. He wears hearing aids.

209. Mr. Alberts drove himself to Washington for the President's rally. Before the trip he met up with a convoy that was organizing buses, and on the morning of January 6 he got to the Ellipse at about 10:30 a.m. He went to assemble and to hear the President speak. Because of his work he was used to carrying a sidearm and wearing a vest, and he carried his pistol that day in a holster on his right hip, with a spare magazine in a second holster on his left hip. He never touched or drew it.

210. He left the rally before it ended and walked with the crowd to the Capitol. According to the government, he was among the first few hundred people on the grounds. He walked up the sidewalk and the steps and stayed on the northwest corner of the grounds. The crowd behind him grew fast.

211. On the northwest side Mr. Alberts saw a man pushed off the steps by police. Officers were firing pepper balls into the crowd, and he was hit by several of them. One munition hit him in the groin. Officers also threw a riot-control stinger grenade that went off next to his foot. He was sprayed with chemical irritant from head to toe. The stinger set off his post-traumatic stress.

212. At about 1:48 p.m. Mr. Alberts climbed up the Northwest Steps, and at about 1:54 p.m., he picked up a wooden pallet board to defend himself and others from excessive police force, including projectiles aimed at people's faces. He went up the staircase toward the upper west terrace. Officers beat him and ripped the pallet out of his hands. He was struck from behind in the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

back of the head. Pepper spray got inside his gas mask and he could not see. When he took the mask off, everything in the air hit him at once and he suffered asphyxia and near paralysis.

213. At about 2:10 p.m. Mr. Alberts was among the first people to reach the Upper West Terrace. He did not go inside the Capitol. After his eyes cleared, officers formed a line along the west side. He lectured the crowd about constitutional principles.

214. The line then pushed the crowd off the balcony and around the north side of the steps and down. He saw a man shot in the face with a less-lethal round. Near a choke point where the crowd was being funneled off the terrace, Mr. Alberts saw an old man pushed to the ground, and an officer fired a beanbag round into a man's face, which injured him badly. Mr. Alberts tried to render aid. Officers were striking people as they tried to get away. The crowd was pushed off the west side, and National Guard troops arrived.

215. He stayed on the grounds for several more hours. He was still there at dusk, off the steps and back toward the Peace Circle, when officers began clearing what was left of the crowd. He had a megaphone in his right hand. He had both hands up and was walking out when an officer came up behind him and grabbed his backpack.

216. Mr. Alberts turned his head to see who had hold of him and was hit in the head with a baton by an officer. Mr. Alberts fell to the ground, and an officer yelled "gun." He was handcuffed and held where he lay until a gun-response unit arrived. The officer later wrote, falsely, that Mr. Alberts had tried to run. The government's own account puts the arrest at about 7:22 p.m., when an officer noticed a bulge on his right hip, tapped it with a baton, and found the holstered pistol.

217. Officers took him to the Metropolitan Police Department's Fifth District station in northeast Washington and put him in a cell by himself. He was soaked from trying to wash the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

chemical spray off. He was given no phone call and no medical treatment for his head injuries. At some point he was read his rights. He told the officers that he had carried the pistol for personal protection and had not intended to use it to hurt anyone.

218. At about 1:00 a.m. on January 7, 2021, an officer transported him to the central cellblock. A homeless man was asleep in the back of the transport car. The officer put Mr. Alberts in with him, would not turn on the heat, and ran the air conditioning the whole way. Mr. Alberts was wet, his lips turned blue, and he shook. His boots had been taken from him. In the cellblock there were cockroaches everywhere, including in the food. He was given nothing to wash with, no pillow and no blanket.

219. About twenty hours after his arrest, on January 7, 2021, Mr. Alberts was brought before a magistrate judge on a complaint charging him with carrying or having a firearm on the Capitol grounds, 40 U.S.C. § 5104(e)(1)(A)(i). The magistrate judge released him on conditions. He left with his boots but without his cell phone, his wallet or his car keys, which were all at the Fifth District. He took buses across the city to get there. He got his wallet and keys back. His phone was kept as evidence, so he had no way to call anyone, and a police officer let him use his own phone.

220. On January 27, 2021, the government indicted Mr. Alberts in United States v. Alberts, No. 1:21-cr-00026-CRC (D.D.C.), assigned to Judge Christopher R. Cooper, on four counts: unlawful possession of a firearm on Capitol grounds, 40 U.S.C. § 5104(e)(1)(A)(i); entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); carrying a pistol without a license, D.C. Code § 22-4504(a); and possession of a large-capacity ammunition feeding device, D.C. Code § 22-2506.01(b). Two of the four were misdemeanors. He pleaded not guilty on February 25, 2021.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

221. Mr. Alberts would not plead guilty, and he demanded a trial. On May 14, 2021, the government retaliated by obtaining a superseding indictment that added six counts, among them assaulting, resisting or impeding officers, civil disorder, and two counts of physical violence on the Capitol grounds, with dangerous-weapon enhancements because of the holstered pistol that raised the exposure on those counts to ten to twenty years each. On November 10, 2021, the government obtained a second superseding indictment, and a third followed. By the day of trial he faced nine counts, six of them felonies, after starting with two felonies and two misdemeanors.

222. For the whole of his time on pretrial release the government kept a GPS monitor locked to his ankle. Mr. Alberts wore it for more than three years. It shorted out and burned him, and the scar from the burn and from the years of wearing it is permanent. Because he lived in Maryland and was charged in Washington, he had to check in by telephone every week with a pretrial officer in Maryland and with a pretrial officer in the District of Columbia, three people in all, when most defendants on release called in once a month.

223. Mr. Alberts says the defense did not receive much of the government's discovery until about six months before trial, and that at trial the court did not allow the defense to play certain video for the jury. When one clip of an officer thanking Mr. Alberts and asking him to help manage the crowd was shown, it was shown without sound. He was prohibited from arguing self defense and prohibited from mentioning the 1st amendment. He took the stand in his own defense and told the jury what had happened to him on the steps. On April 19, 2023, the jury found him guilty on all nine counts. The government asked that he be jailed on the spot.

224. At sentencing on July 19, 2023, the government asked for ten years. Over the defense's objection, Judge Cooper applied an enhancement for obstruction of justice on the ground that Mr. Alberts had committed perjury for saying his backpack contained bungie cords and MREs

because the items were always in his backpack. The court sentenced him to 84 months in prison, thirty-six months of supervised release and $2,000 in restitution, and over the government's objection allowed him to self-report.

225. In the Bureau of Prisons, Mr. Alberts was moved from a transfer center in Oklahoma, where he spent about a week, to a federal prison in Ohio, and from there to one in Michigan. Every time he was moved he was put in leg irons and his handcuffs were locked in a black box. He was placed in units with pretrial inmates, who threatened to stab him and the other January 6 prisoners, when as a sentenced federal prisoner he should have been housed apart from them.

226. Before he reported, he was told to bring his medical records and his medications and that the prison would either let him keep his medicines or prescribe new ones. Instead the prison took his muscle relaxers from him, and he suffered without them.

227. The prison also took his hearing aids. The stated problem was the charger. Chargers for tablets were kept in the medical unit, and unless he got to medical by 6:00 a.m. he could not have his hearing aids that day. If he did get them, he had to turn them in at 6:00 p.m., and he spent the nights unable to hear and with headaches and ringing in his ears. This went on for months. He complained to the lieutenant's office and could hear himself being discussed.

228. Eventually he was allowed to charge the hearing aids where the tablets were charged, and then guards who did not know he was permitted to have them kept taking them away again. His charger and cord were left behind in Oklahoma, and it was a long time before he got them back. A cyst on his neck went untreated. Only in Michigan was he finally given everything he was supposed to have.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

229. The Ohio prison had black mold, rusted pipes and pipes that backed up. The counselor there raised his monthly payment toward his restitution from an affordable amount to a high one, threatened to take away his commissary if he did not pay it, and did this before the payments were even due. The balance was paid off. The prison then sent him a letter saying the amount had not been paid, and then another saying it was settled.

230. Mr. Alberts was swabbed for DNA. The government took every firearm he owned. His cell phone was taken as evidence, and the property that was returned to him came back damaged or destroyed. He lost his job. He was banned from social media. Chime closed his bank account and held his money for a long time, and GoFundMe shut down the page that had been set up to help him. He was doxed, slandered in the press, and received death threats and hate mail. Upon information and belief, the government obtained his cell phone location data under a geofence warrant.

231. After the pardons on January 20, 2025, Mr. Alberts' appeal was vacated and the entire case was dismissed without his permission. Mr. Alberts never got to vindicate himself on appeal. He and his family paid the government about $2,500 in restitution and related amounts, and none of it has been returned. He has asked how to get his DNA out of the FBI's database and has gotten no answer.

232. Mr. Alberts's prosecution terminated in his favor. The government has not returned his firearms or made him whole for the money it collected from him. Upon information and belief, his DNA, fingerprints and the data taken from his phone remain in the government's possession.

**Michael Neal Asbury**

233. The Plaintiff Michael Neal Asbury lives in Knoxville, Tennessee. He was born and raised in East Tennessee. He is a Marine Corps veteran who served as a bandsman, trained



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

alongside the infantry, and still plays keyboards, bass and drums for his church. On January 6, 2021, he was forty-one years old, married, with a daughter of twelve and a son of ten, both in middle school. He had no criminal record. He was healthy, took no medication, and worked as a project manager building houses for a residential construction company in the Knoxville area, earning about $60,000 a year.

234. Mr. Asbury wanted to see the President's rally with his own eyes but did not want to go alone, and the friends who had talked about going could not get off work. On the evening of January 5, 2021, his cousin called and offered to go with him. Mr. Asbury picked his cousin up at about 8:00 or 9:00 p.m., and the two drove through the night, pulled over to sleep for a few hours, and drove into Washington on the morning of January 6. He wore his work clothes: his old Marine Corps boots, camouflage pants, a tan Carhartt coat his wife had given him for Christmas, and a camouflage balaclava he used for hunting and cold-weather work. He carried a backpack with nothing in it but bottles of water, and his phone.

235. The two men parked and walked to the Washington Monument, where the crowd was waiting for the President to speak. People around them were saying that when he finished everyone would walk to the Capitol to protest, and Mr. Asbury and his cousin decided to walk down early, ahead of the crowd. On the lawn on the west side of the Capitol he noticed two things: how few officers there were, and a set of bleachers built against a low wall that anyone could walk up and step off into the area the police were guarding. He told one of the officers that the officers were short-handed and that a lot of people were on their way. He stood up on the wall to watch the crowd coming in, and when the same officer said he would rather Mr. Asbury got down, he got down.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

236. A disturbance began off to the left, and the four or five officers in front of Mr. Asbury ran toward it, leaving the yard open. People began walking through. At the first set of steps he saw a young woman walking away from the building, looking down at her phone, when an officer ran up behind her, lowered his shoulder like a linebacker and knocked her down the steps, about ten feet from where he stood. He and his cousin went to help her up.

237. Mr. Asbury walked around the lawn for a time. He gave water to a woman who had been hit with chemical spray, and he could already smell gas in the air before he climbed onto the media tower in the middle of the lawn to watch. From there he saw an officer spray an older man in an old military uniform directly in the face. He saw officers lob gas and concussion grenades thirty or forty feet back into the crowd, behind the people at the bike racks, among the older people standing still, and every time one landed the crowd surged toward the building. He felt the blasts in his chest. One went off beside a man's head, and the man bled from the ear. He saw officers fire rubber bullets into the crowd. Then three or four grenades went off at once, the wind carried the gas back onto the officers, the officers withdrew toward the building, and the crowd took the steps.

238. Mr. Asbury came down from the tower and went up toward the Lower West Terrace, running along a handrail. A man had his hand on the rail, and rather than step on it Mr. Asbury dropped onto the ledge beside the rail, caught himself, and did a two-second shuffle to show he was all right. Those two seconds would later be played in a federal courtroom. At the mouth of the tunnel into the terrace a man he did not know, later identified in the government's papers as David Mehaffie, was calling out that people inside were hurt and needed to be brought out to the left side. At about 2:49 p.m. Mr. Asbury climbed the left archway and went into the packed tunnel. He shouted for the injured to move to the left, pushed uninjured people to the right, and pulled people out, among them a man who looked about seventy. At about 2:50 p.m. the crowd



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

in the tunnel surged against the police line in what the government would call a "heave-ho," and Mr. Asbury, locked in the middle of it, leaned into the man in front of him.

239. He came back out to the mouth of the tunnel and stood there about two minutes. A police riot shield that had been taken from an officer and was being used inside the tunnel came into his hands, and he passed it out of the tunnel to the crowd behind him. He went back in at about 2:53 p.m. and another shield was passed back to him on the way to the crowd. A stun gun came to him the same way, and he handed it to a man in a blue jacket.

240. On one of his trips into the tunnel, Mr. Asbury was sprayed directly in the face. At about the same time he felt a blunt object strike his head. He believes it was a baton; he did not see it or the officer who swung it. He could not see. He felt his way along the left wall of the tunnel to get out, and outside, someone poured water into his eyes until he could open them. By the government's account he was inside the vestibule doors at about 2:56 p.m., began leaving at about 2:57 p.m. after officers sprayed the crowd, and spoke with Mehaffie at the mouth of the tunnel at about 3:00 p.m. He went in a third time at about 3:02 p.m., reached the front of the line at about 3:04 p.m., was sprayed again, and was out by about 3:05 p.m.

241. After the tunnel had emptied Mr. Asbury offered the officers water, and one of them gave him a fist bump. He told the officers they were doing a good job and that he would try to calm people down, and he told the people shouting over his shoulder to calm down. An officer told him that if he could get everyone to sit down the gassing would stop, and Mr. Asbury told him that was not going to happen but that they would keep it peaceful.

242. At the entrance to the tunnel Mr. Asbury became repeatedly crushed under the weight of the crowds. He finally got free, found his cousin, and drove home to Tennessee.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

243. His eyes burned. For days he coughed and could not take a full breath, and the back of his neck broke out in a rash where the spray that had soaked into his clothes rubbed against his skin. He was sore all over. He spent about three days on the couch at home before he could do much of anything.

244. On January 13, 2021, a tipster who had been shown the video by one of Mr. Asbury's acquaintances reported him to the FBI. The FBI's seeking-information poster number 122 carried his photograph, and the FBI's Sedition Hunters posted him on February 13, 2021, as "122-AFO" under the hashtag "#SweatyTanCoat." Upon information and belief, a man Mr. Asbury had known since high school, whose wife and children Mr. Asbury and his wife had taken in and cared for over the years, told the FBI in March 2021 that Mr. Asbury had posted videos from the Capitol and that he wore a tan Carhartt coat.

245. According to the government's affidavit, four FBI agents came to Mr. Asbury's home on January 17, 2021, two of them masked, pulling into the driveway as his mother was leaving. It was cold, and he invited them in. They sat at his dining table with his wife and his mother present, he answered every question, and he does not recall being told he had a right to a lawyer. When an agent taking handwritten notes asked how close he had come to the door, he said about fifteen feet, meaning the door inside the tunnel. The affidavit the government filed two and a half years later said that he had told agents he "did not come closer than 15 feet to the building," and the government used that line to say he had lied; his wife and mother heard what he said. Agents kept Mr. Asbury and his family under surveillance from that interview until his arrest. A neighbor told him he had watched agents in an SUV across the street moving between the front and back seats taking photographs of the family.

246. On June 27, 2023, the government filed a criminal complaint against Mr. Asbury in United States v. Asbury, No. 1:23-mj-00146-GMH (D.D.C.), and Magistrate Judge G. Michael Harvey issued a warrant. On the morning of June 28, 2023, agents followed him to work. He was the construction manager over a subdivision in Lenoir City, Tennessee, and when his truck stopped in front of one of his houses, blue lights came on all around him. There were four vehicles and eight FBI and Tennessee Bureau of Investigation agents, and every one of them had an AR-15-style rifle pointed at him. He put his hands out the window, opened the door slowly from the outside, lifted his shirt, turned all the way around, and walked backward toward them until they told him to stop. They handcuffed him behind his back and put him in a car, and when he said the cuffs were uncomfortable an agent moved them to the front. A former client watched from her window and filmed it. On the drive to the marshals he thanked the agents for not doing it at his house in front of his children.

247. Mr. Asbury had agreed when an agent offered to take his wallet and keys to his wife. Two agents went to the house. His wife answered the door not knowing who they were, told them her children were upstairs, and tried to close it, and an agent put his foot in the door. They came in without being asked, told her she could be arrested if she did not cooperate, and pressed her again and again about whom her husband had gone to Washington to meet. He had gone to meet no one.

248. The agents took Mr. Asbury's phone. At the FBI office he was handcuffed to a wall for about an hour while agents questioned him. The marshals then put him in five-point restraints, wrists chained to his waist and his waist to his ankles, and walked him into the courtroom that way in front of his wife and mother. A magistrate judge released him on his own recognizance that



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

afternoon. He was in custody about five hours and in restraints for four or five of them. He was swabbed for DNA that day. His wife drove him back to get his truck.

249. On pretrial release Mr. Asbury had to get permission to travel. He had to call an automated line every night and, when his color came up, leave work early the next day to give a urine sample. The arrest was on the local news within days, with reports that he was charged with disarming police, which he was not, and he had to sit his children down and tell them he did not know what would happen. He understood from his charges that he faced about nine and a half years. He could not pay for a lawyer without putting the house up, and the court appointed a federal public defender. On July 19, 2023, Mr. Asbury and a co-defendant, Nathan Baer were indicted. It charged five counts: civil disorder, 18 U.S.C. § 231(a)(3); entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building or grounds, 40 U.S.C. § 5104(e)(2)(D); and an act of physical violence on Capitol grounds, 40 U.S.C. § 5104(e)(2)(F).

250. His public defender found videos of him pulling people out of the tunnel and shouting that people were getting hurt and to get out, and she played them for him. When he asked her to use them, she told him that *if the defense pushed back the government would add charges*, and she said it as though that was what she had been told. When he asked about a change of venue she told him there was no chance; none had been granted. He asked what more they could add to nine and a half years.

251. The government's offer was to dismiss the four other counts if he pleaded guilty to civil disorder, a felony, and as he understood it the sentencing range would be zero to six months. The felony turned, as it was explained to him, on a Safeway grocery store having closed early that



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

day. He had two children in middle school and $20,000 in savings. He took the offer. On March 20, 2024, Mr. Asbury pleaded guilty before Judge Contreras to Count One, civil disorder under 18 U.S.C. § 231(a)(3), and signed a statement of offense. When the court asked whether anyone had coerced him, he said no.

252. A few days before sentencing he learned that the government was asking for eleven to twelve months. He and his wife drove to Washington twice for court and spent about $4,000 on hotels and gas, plus the days off work. At sentencing on August 26, 2024, the government played video of the worst of the day's violence, much of it with Mr. Asbury nowhere in it, and then, after that footage, played the two-second shuffle on the ledge as though he had been celebrating what the court had just watched. None of the video of him pulling people out of the tunnel was shown. He told the court to punish him and not his family. Judge Contreras, citing deterrence, sentenced him to four months in prison, twenty-four months of supervised release with the first four months on home detention, $2,000 in restitution, a $100 special assessment, and sixty hours of community service. Mr. Asbury paid the assessment and did the community service through his church.

253. Mr. Asbury reported to the Federal Correctional Institution at Ashland, Kentucky, in late 2024 and was housed in R Unit, an open dormitory about the size of a small gymnasium above the chapel and the kitchen, with about 180 men in bunk beds in rows down the left, the right and the center. It was so hot in the dead of winter that the men kept the windows open. There were five toilets, and at times two of them worked. The sewer backed up more than once and left human waste across the bathroom floor. There were three pay phones for 180 men.

254. On his first day, before regular clothing had been issued, a guard stopped him in his intake clothes and told him that if he saw him in them the next day he would strip him naked. He said nothing and kept walking. Guards made him look after the men in the bunks around him



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

who were on K2 and stood in the aisles at night like sleepwalkers. Men boiled rice in a mop bucket with a heating element pulled out of a dryer and cooked sausages on an iron. There were days he thought about getting himself sent to the special housing unit to get out of the dormitory. His employer had kept his job open as long as it could, but a construction manager has to be on site every day, and when he went to prison the job was gone.

255. While he was away, the $20,000 he had saved went to keep the household running, and then it was gone. Friends put in about $20,000 more so the family could keep the house, and he still owes it. His father-in-law was preparing to move in to help pay the mortgage. His credit score fell from about 730 to the high 600s and the credit cards went unpaid. His daughter was seeing a school counselor twice a week; he learned later that she had spent most of a semester eating lunch alone in a bathroom, crying. From the arrest on he had gone from 170 pounds to 210. Facing what he believed was ten years away from his children, he had thought about killing himself rather than be a burden to them, and he had told his wife not to wait for him. He missed Christmas, weddings and family dates, with three telephones for 180 men to call home on.

256. The President pardoned Mr. Asbury on January 20, 2025. He was released from Ashland at about 2:00 or 3:00 a.m. on January 22, 2025, after about two months of a four-month sentence, and the man who had called him into the tunnel drove to Kentucky to pick him up. He served none of the home detention or supervised release, and the $2,000 in restitution was never collected. Mr. Asbury went with his daughter to the FBI's Knoxville office to collect his phone, and when he turned it on, a black screen with red lettering told him that files had been corrupted and asked whether he wanted to proceed. He has not turned it on since. On it were the photographs and videos of his children growing up, none of them backed up, and years of work: photographs of finished jobs, change orders, blueprints, subcontractor and prospective-client contacts. He has

rebuilt most of the subcontractor list from memory; the rest is gone. Since his release he has applied for twenty to thirty construction-management jobs, and each one gets to a certain point and then someone types his name into Google, so he runs crown molding and sets kitchen cabinets by the hour now, for about $1,000 a week, and keeps his history to himself on the job.

257. The Department of Justice took his page down after the pardon, but the local news stories are still the first thing anyone finds. He and his wife have been called terrorists, seditionists and racists online, by strangers as far away as France, and friends he expected to stand by the family did not. He relies on counseling through his church and still looks over his shoulder, waiting for the day someone decides to put him back in prison to finish his sentence. Mr. Asbury's prosecution terminated in his favor with the pardon of January 20, 2025. The government returned his phone in a condition that made it unusable and its contents inaccessible. Upon information and belief, his DNA and fingerprints remain in the government's possession.

**Jason Brian Barrett**

258. The Plaintiff Jason Brian Barrett lives in Longs, South Carolina, in Horry County. He was born in August 1975 and was forty-five years old on January 6, 2021. He served in the United States military. For more than twenty years he has owned and run a fencing company, building fences for homes and businesses around Myrtle Beach. He has children, and before his arrest he shared joint custody of them with their mother.

259. Mr. Barrett went to Washington for the President's rally on January 6, 2021, with his sister. What took him there was the 2020 election. He believed things had happened in that election that were not right, and he went to hear what the President had to say about it. On January 5 he posted a short video on social media about the trip. He wore a white and blue baseball cap, a dark green hoodie and a brown jacket, and he carried a light grey backpack.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

260. The two of them stood in the crowd at the rally. Before it ended they left for the Capitol, where they understood other rally events would take place. They ended up near the front. Gas and pepper rounds were landing in the crowd around them, and he wanted to get his sister away from it. They could not go back. There were too many people behind them. So they went forward and up.

261. According to the charging papers the government filed three and a half years later, the crowd came onto the West Plaza at about 1:00 p.m., and Mr. Barrett climbed over a short wall, picked up a blue "Trump 2020" flag, and helped other people over the wall. At about 1:12 p.m. Metropolitan Police Department officers arrived and set up a line of bicycle-rack barricades, and the government said Mr. Barrett stayed near the front of the crowd at that line.

262. What Mr. Barrett saw at the front was people being hit by police. People around him were being struck and beaten, and they had bloody faces and bloody heads.

263. A white police helmet was lying on the ground at the line. Mr. Barrett picked it up and moved it off to the side so that no one would trip over it. The government's complaint said that he "threw it in the general direction of security barriers and posts manned by police officers." That helmet became one of the two felony charges against him.

264. Mr. Barrett was pepper sprayed and tear gassed on the plaza, and he was hit by whatever else was being fired into the crowd. It was more than he had seen in the military. Then word spread that a woman had been shot inside the building, and after that everyone around him was trying to find a way down and out. Mr. Barrett never went inside the Capitol.

265. The two of them then tried to get back to their hotel. Their cell phones were dead, no one would help them, and they walked around the city for about two and a half hours before they found it. Then they went home to South Carolina.

266. The FBI later said that it found Mr. Barrett in open-source video and police body-camera footage from the plaza, labeled him "SUBJECT 1," and in about October 2023 matched him to the January 5 video on his social media account by the white and blue cap. On February 26, 2024, the FBI's Sedition Hunters posted a page about him under the hashtag #WestWrestler. Mr. Barrett had never heard of the group; he learned he was on its website during his intake call for this case in September 2026. Upon information and belief, the government also obtained his phone's location data through a geofence warrant. In May 2024 FBI agents approached him in person, in what the government called a consensual contact, to compare his face to the footage. He did not talk to them.

267. On August 23, 2024, Special Agent Benjamin Cundiff of the FBI's South Carolina Joint Terrorism Task Force swore out a criminal complaint against Mr. Barrett by telephone before Magistrate Judge G. Michael Harvey of the United States District Court for the District of Columbia. It charged two felonies, obstruction of law enforcement during a civil disorder, 18 U.S.C. § 231(a)(3), and assaulting, resisting, or impeding certain officers, 18 U.S.C. § 111(a)(1), and four misdemeanors: entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); engaging in physical violence in a restricted building or grounds, 18 U.S.C. § 1752(a)(4); and disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D). The complaint was sealed, and a warrant issued for his arrest.

268. On the morning of August 28, 2024, the day after his forty-ninth birthday, Mr. Barrett was driving toward his home with his daughter, who was about twelve. Federal agents were on their way to the house to arrest him. They saw him coming down the road and pulled him over. About thirty-five of them came out of armored vehicles. They knew his daughter was in the car.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

She has not been right since. It has been two years, and she still lives with what she saw that morning.

269. Agents took Mr. Barrett's phone. He was swabbed inside the mouth for DNA, and he spent somewhere between eight and twelve hours in custody. He said nothing to the agents and asked them nothing. That day he was taken before a magistrate judge in federal court in Florence, South Carolina, who set a $20,000 bond with conditions: he could not leave South Carolina without permission from the Probation Office, he could travel to Washington only for court, he could not drink to excess, and he could not possess a firearm, so he had to transfer his guns to someone else. He posted bond that evening. He waived a preliminary hearing in South Carolina and asked that it be held in Washington. The government gave his phone back later, and it has not worked right since.

270. The same day, the United States Attorney's Office for the District of Columbia issued a press release headed "South Carolina Man Arrested for Assaulting Law Enforcement and Other Charges During Jan. 6," naming him, his age and his town, and stating that the case was being prosecuted with the Counterterrorism Section of the Justice Department's National Security Division. The local television stations ran his name and picture about twice a day. Reporters went to his neighbors. The FBI's affidavit was posted online. The stories are still up, and they still say the charges are pending.

271. The case was docketed in the District of Columbia as United States v. Barrett, No. 1:24-mj-[number to be inserted]-GMH (D.D.C.), before Magistrate Judge Harvey, and it was later heard by Magistrate Judge Zia M. Faruqui. The government never sought an indictment. Instead it offered Mr. Barrett a plea deal that, as he understood it, carried fifty-four months in prison, and, he says, it told him that more felonies would follow if he insisted on a trial. He refused. He



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

demanded a speedy trial, and at a status hearing on or about November 12, 2024, Magistrate Judge Faruqui granted the request, with the next hearing set for February 11, 2025, and no trial before then.

272. Mr. Barrett's fencing business fell off by eighty to ninety percent after the arrest. He had built that business over more than twenty years. It has not recovered. For a long time he could not go anywhere without being recognized. People still come up to him and say, you're that guy. Some mean it kindly and some do not. He got hate mail.

273. Mr. Barrett gave up joint custody of his children. He did not believe the government or the courts would look fairly on him, and he did not want his children in the middle of it, so he let it go. His fiancée left him. He missed the birth of a cousin's second child. He has post-traumatic stress from January 6 and from the arrest, and his mental health has worn on his physical health.

274. On January 20, 2025, the President directed the Attorney General to seek dismissal with prejudice of all pending January 6 indictments. On January 21, 2025, Mr. Barrett's lawyer gave notice that he would move for dismissal. On January 22, 2025, the court granted the government's motion and dismissed the case against Mr. Barrett with prejudice. He was never indicted, never pleaded guilty, and was never tried or convicted. He has no record.

275. Mr. Barrett's prosecution terminated in his favor on January 22, 2025, when the court dismissed the case against him with prejudice on the government's own motion, two days after the proclamation of January 20, 2025. Upon information and belief, the DNA sample and fingerprints taken from him on the day of his arrest, and the data the government took from his phone, remain in the government's possession.

**Bradley Stuart Bennett**

276. The Plaintiff Bradley Stuart Bennett lives in Kannapolis, North Carolina. He grew up in North Carolina and for years made his home in Trinity, a town of about 6,600 people in Randolph County. On January 6, 2021, he was forty-one years old. He had no criminal record of any significance, a fact the government itself conceded when it asked to lock him up. He made his living as a self-employed wellness coach, and he ran a website on off-grid living and survival skills. He is a Christian.

277. Mr. Bennett believed the 2020 election had been stolen, and he said so on Facebook. On December 28, 2020, he posted that people should come to Washington on January 6 and that he would be there. By the start of 2021 he was spending his time between Florida and Texas, where his girlfriend lived in Kerrville. The two of them drove to Washington from Florida, arriving on or about January 5, 2021, to hear the President speak the next day.

278. On the morning of January 6 Mr. Bennett went downtown early and saw the sights. He went to the Ellipse for the President's speech, which began at about noon, and he heard the President tell the crowd to march to the Capitol peacefully and patriotically. Before the speech was over, he and his girlfriend walked with other protesters down Pennsylvania Avenue toward the Capitol. The people around them were singing and carrying flags.

279. He reached the Capitol grounds near Peace Circle at about 11:50 a.m. There were officers on the grass, plastic fencing around the grounds, and signs that read Area Closed. Other people in the crowd went through the police line at Peace Circle, and Mr. Bennett and his girlfriend followed behind them toward the building. He stood in the crowd on the Lower West Terrace for about an hour. He watched officers fire tear gas and chemical irritants into the crowd, and he saw the police line on the terrace give way. A friend near him was hit in the face by a flash-bang. Mr. Bennett did not throw anything, did not touch an officer, and did not touch a barricade. The

government conceded in writing, in its first filing against him, that he never physically attacked law enforcement.

280. Mr. Bennett climbed through the scaffolding on the west front to the Upper West Terrace and recorded a short video of himself on the way up. At about 2:23 p.m. he walked into the Capitol through the Senate Wing Door with the building's alarm sounding. It was hot and crowded inside. He went south to the Crypt, where at about 2:27 p.m. he joined a group of people in prayer, and then east through the Rotunda to the foyer of the East Rotunda Door. He left through the Senate Carriage Door at about 2:50 p.m. He had been inside for less than half an hour. He took nothing and broke nothing, and no one arrested or detained him that day.

281. Mr. Bennett went back to Texas, and by March 2021 he was living with his girlfriend in Kerrville.

282. Four people reported Mr. Bennett and his girlfriend to the FBI. One of them sent the FBI a screenshot of a text message exchange, and the others sent his social media posts, which included photographs and video from inside the Capitol. Upon information and belief, the government also obtained location data for his cell phone from Verizon, through a geofence warrant or cell-tower records, placing him at the Capitol on January 6. The government obtained a criminal complaint and an arrest warrant against him on March 19, 2021.

283. On March 23, 2021, FBI agents came to Kerrville and arrested Mr. Bennett's girlfriend, and on April 12, 2021, Mr. Bennett surrendered to the United States Marshals in Charlotte.

284. He was taken to the Mecklenburg County jail. He was swabbed inside the mouth for DNA, fingerprinted, photographed and tested for tuberculosis. He was held alone the entire



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

time he was in Charlotte, and on some days the jail did not feed him. He then waited in custody to be moved to Washington.

285. A grand jury returned an indictment on April 21, 2021, in United States v. Bennett, No. 1:21-cr-00312-JEB (D.D.C.), assigned to Judge James E. Boasberg. It charged Mr. Bennett with six counts: obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2), a felony carrying up to twenty years; entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); entering and remaining in the gallery of Congress, 40 U.S.C. § 5104(e)(2)(B); disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G). His girlfriend, who had walked into the building with him and walked around it with him, was charged with four misdemeanors and no felony. The obstruction count was his alone.

286. On April 28, 2021, the government filed a memorandum asking that Mr. Bennett be jailed until trial as a flight risk. On April 30, 2021, the court ordered him detained pending trial.

287. Mr. Bennett spent the next weeks being moved from jail to jail in shackles. He was almost always shackled, and always when he was transported. He was held in the District of Columbia and at the Northern Neck Regional Jail in Warsaw, Virginia. He was put in solitary confinement more than once and was kept isolated much of the time. Guards clanged the doors and made noise on purpose to torment the men inside. He was never once let outside for exercise. Food was withheld from him again and again. In Virginia he went thirty days without laundry, and he developed a severe rash across his back. He was sick for much of his confinement. He asked to see a doctor for parasites and for blood-sugar problems and was never allowed to see one. At some



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

jails he was given clippers to cut his hair; at others he had nothing. He sprained his right ankle in custody trying to move while restrained, and the ankle has never been right since.

288. On June 4, 2021, the court approved Mr. Bennett's release to home confinement with electronic monitoring, with no objection from the government that had told the court five weeks earlier that no condition could hold him. He was let out of the Northern Neck jail on June 7, 2021. His sister drove from North Carolina to Virginia to pick him up and took him to their uncle's house in Trinity, where she was made responsible for him. He had been in custody for fifty-seven days. He stayed on home confinement with an ankle monitor for months after that, and then on pretrial supervision, reporting to a probation officer, for as long as the case lasted.

289. Somewhere in the government's materials Mr. Bennett was labeled a domestic terrorist. Before trial his lawyers moved to keep that label, his finances and his gun ownership away from the jury. On October 4, 2023, Judge Boasberg granted that part of the motion, noting that the government said it did not intend to use the label at trial.

290. Mr. Bennett wanted a trial but in February 2022 his girlfriend pleaded guilty to a single count of parading in the Capitol under 40 U.S.C. § 5104(e)(2)(G), and she was expected to testify against him. He fired his first lawyer in December 2021 and for a time could not find one who would take the case. The felony charge stayed on him for nearly three years while trial dates were set and moved. In late September 2023 the grand jury returned a superseding indictment against him alone, repeating the same six counts, and on September 29, 2023, he was arraigned again and again pleaded not guilty. Jury selection was set for October 16, 2023, then moved to January 16, 2024. He moved to dismiss the obstruction count as a selective prosecution, pointing out that the woman who had walked through the building beside him faced no felony. Judge Boasberg denied the motion on October 17, 2023.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

291. Twelve days before the jury was to be picked, on or about January 4, 2024, Mr. Bennett pleaded guilty before Judge Boasberg to the five misdemeanor counts: 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(B), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). He signed a Statement of Offense that day. The felony obstruction count was not dismissed. It was stayed, because the Supreme Court had agreed to decide in Fischer v. United States whether 18 U.S.C. § 1512(c)(2) reached conduct like his at all, and the count stayed over him while the Court decided. Sentencing was put off until after the decision.

292. On June 28, 2024, the Supreme Court held in Fischer that § 1512(c)(2) does not reach the conduct the government had charged against hundreds of January 6 defendants. On September 12, 2024 the judge finally dismissed the bogus 20-year felony charge—after Mr. Bennett was forced to file a motion.

293. Sentencing on the five misdemeanors was set for January 7, 2025. His lawyers asked for a short continuance because of the pardons the incoming President had promised, and Judge Boasberg refused, writing that speculation about how the incoming administration would proceed was not a basis for a continuance. The hearing was then reset to February 12, 2025, after a death in his lawyer's family.

294. Mr. Bennett was never sentenced. On January 20, 2025, the President granted a full and unconditional pardon to those convicted of offenses relating to the events at the Capitol on January 6, 2021, and the pardon covered Mr. Bennett's plea. His lawyer told the press in Charlotte that week that the pardons would restore his clients' rights, and that much of the damage had already been done.

295. The damage was real. Mr. Bennett's name, his photograph and the government's account of him ran in the newspapers in High Point, Charlotte, San Antonio and Kerrville, and the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

word terrorist was attached to him in public. The relationship he had been building a life around ended; by 2022 the woman he had gone to Washington with was his former girlfriend and a witness against him. He was self-employed before his arrest, and after it he had to start over, launching a new business from his uncle's house in 2022 while still under supervision. The personal property the government took from him was returned damaged or destroyed. He still cannot put full weight on his right ankle without pain.

296. Mr. Bennett's prosecution terminated in his favor with the pardon of January 20, 2025, before any sentence was imposed. Upon information and belief, the DNA sample, fingerprints and photographs taken from him in Charlotte on April 12, 2021, remain in the government's possession, along with the cell-phone location data and social media records the government gathered on him.

**Kenneth Jay Bonawitz**

297. The Plaintiff Kenneth Jay Bonawitz lives in Pembroke Pines, Florida. On January 6, 2021, he lived in Pompano Beach, in Broward County, and he was about fifty-five years old. He coached football for thirty years. He had never been arrested and had no criminal record. He is a large man, about six and a half feet tall and close to 300 pounds, and he carries a tattoo of a marlin on his chest.

298. Mr. Bonawitz had not planned to go to Washington. A group that was chartering an overnight bus for the President's rally asked him to come along because many of the people on the bus were older, and they wanted someone with them to look after them. He had gone to Washington the same way on December 12, 2020, for an earlier rally, where he sold Trump memorabilia. He went on January 6 to protect the older people in his group from Antifa or Black



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Lives Matter if trouble came. He was not a member of the Proud Boys or any other organization on January 6, 2021.

299. The bus left Pompano Beach on the evening of January 5, 2021, and arrived in Washington on the morning of January 6. At the bus departure area Mr. Bonawitz separated two young men who were pushing and intimidating older passengers.

300. Mr. Bonawitz got to the Capitol late. He arrived on the West Front at about 2:28 p.m., when the police line on the West Plaza was giving way, and he was on the grounds for about five minutes. He had a bus to catch. He never went inside the Capitol building. He carried a hunting knife in a sheath on his belt, as he did at home in Florida.

301. What he walked into looked to him like a war zone. Concussion grenades were going off. The crowd was being gassed and hit with pepper balls, and people around him were on the ground in agony. People in the crowd were saying that the police had shot a woman, or a woman and her daughter, and that the police were killing people. In an agitated state, Mr. Bonawitz struggled with crowds and some Capitol police officers. Officers briefly detained him and took the knife off his belt and let him go.

302. Officers emptied some six canisters of chemical spray into Mr. Bonawitz's face. Officers beat him with batons, kicked him in the head, and hit him in the face with a baton. When he got home he counted more than thirty baton bruises on his body, with two strikes to his head. As he walked off the grounds he told a reporter on camera that the D.C. police had maced him, hit him over the head with batons and kicked him in the side of the face, and he gave his name. Three days later, in Florida, he showed the bruises on a Facebook video. The government's own sentencing filing acknowledged that officers sprayed a chemical agent into his face. Then he walked to the bus and went home.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

303. On March 4, 2022, FBI agents came to Mr. Bonawitz's home in Pompano Beach and questioned him outside the house. He answered their questions. They left, and he heard nothing from the government for most of a year.

304. Mr. Bonawitz had lost the phone he carried on January 6, and he does not know what the government did with its location data. Upon information and belief, the government obtained his phone's location through a geofence warrant. He was given the nickname "#MAGAMarlin" by online trackers because of the tattoo on his chest, and his picture and that name were posted on the website jan6attack.com. According to the government's charging papers, a confidential source identified him from his tattoos, from his social media accounts, and from a Proud Boys meet-up flyer that circulated in South Florida in May 2022. He had joined that group *after* January 6.

305. On January 19, 2023, the government filed a criminal complaint against him in the District of Columbia. On January 26, 2023, a female officer telephoned Mr. Bonawitz and told him that he had a package waiting at the post office. When he showed up on federal property to collect it, four to six officers drew their weapons on him. One put a gun to his head and told him that if he moved his brains would be splattered on the wall. He was handcuffed and taken to the Broward County Main Jail in Fort Lauderdale on a United States Marshals hold.

306. On February 22, 2023, a grand jury returned an eleven-count indictment in United States v. Bonawitz, No. 1:23-cr-00055-JMC (D.D.C.), before Judge Jia M. Cobb. It charged him with civil disorder, 18 U.S.C. § 231(a)(3); six separate counts of assaulting, resisting, or impeding officers, 18 U.S.C. § 111(a)(1); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, and engaging in physical violence in a restricted building or



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

grounds with a deadly or dangerous weapon, 18 U.S.C. § 1752(a)(1), (a)(2) and (a)(4) with the § 1752(b)(1)(A) enhancement; and an act of physical violence in the Capitol grounds, 40 U.S.C. § 5104(e)(2)(F). Everything the government could charge was charged at the start. He understood that the counts together exposed him to roughly eighty years in prison.

307. The government moved to hold Mr. Bonawitz without bond and argued that he was a menace, a threat to the community, a domestic terrorist and a flight risk. He had never been in trouble in his life and had coached children in his community for three decades. He was ordered detained. The government filed its exhibit list for the detention hearing on March 10, 2023, and the hearing was set for March 13, 2023.

308. The Marshals moved him to Washington the long way. Over almost eighty days he was held in about twelve different facilities, some for a single day, and he was routed north past Washington to Philadelphia, then back down through Virginia before he was finally delivered to the District of Columbia jail. He was never in one place long enough to be registered for commissary or telephone privileges, so for weeks nobody in his family knew where he was. On the transports he was put in the "black box" restraint over his handcuffs. His wrists and ankles are large, and when a facility did not have cuffs that fit him the officers forced the standard cuffs and the box on anyway. At some stops he was put straight into solitary confinement.

309. Mr. Bonawitz spent a great deal of his pretrial detention in solitary confinement. While he was in solitary he had an asthma attack and asked to be taken to medical. Staff refused, and kept refusing, for about six days. At one facility he and another inmate were put in a cell with three exterior walls and a steam pipe running through it. He estimates the temperature inside at 100 degrees. He was kept there for days.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

310. At another point the facility placed five inmates who identified themselves as Antifa in the pod with the January 6 detainees. The jail staff knew who the men were. They had run their names, and they let the January 6 inmates know it. One of those inmates stabbed Mr. Bonawitz in the arm with a pen.

311. From the day of his arrest Mr. Bonawitz faced the full eleven-count indictment, with no prospect of release before trial. On August 17, 2023, he pleaded guilty to three felonies: civil disorder, 18 U.S.C. § 231(a)(3), and two counts of assaulting, resisting, or impeding officers, 18 U.S.C. § 111(a)(1), one for the two Capitol Police officers he tackled and one for a Metropolitan Police officer. The government dismissed the remaining four assault counts, the three weapon-enhanced § 1752 counts and the § 5104 count. He understood that he was taking a deal for about five years.

312. In October 2023, while he was in the District of Columbia jail waiting to be sentenced, Mr. Bonawitz gave an interview to a podcast. Other inmates had told him that interviews could raise commissary money. He described his encounter with the officers as a rugby match and said the January 6 prisoners were political prisoners. The government used the interview to argue that he had not accepted responsibility and asked for 71 months, the top of the guideline range. On January 17, 2024, Judge Cobb sentenced him to 60 months in prison, thirty-six months of supervised release, $2,000 in restitution and a $300 special assessment. He understood the judge to be adding time because he had denied parts of the government's account and because of his later association with the Proud Boys, which he had not belonged to on January 6.

313. The government took Mr. Bonawitz's phone when it arrested him. It has since been returned to him, but he has never turned it on and does not know what was done to it.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

314. Mr. Bonawitz's prosecution terminated in his favor with the President's pardon of January 20, 2025. The Office of the Pardon Attorney lists him among those who received a certificate of pardon under that proclamation. He was released from federal custody after the pardon, having spent nearly two years in custody from the day of his arrest. Upon information and belief, his fingerprints, his photographs and any DNA sample taken from him remain in the government's possession.

**Joshua David Dressel**

315. The Plaintiff Joshua David Dressel lives in Crystal City, Missouri, in Jefferson County south of St. Louis. On January 6, 2021, he was thirty-one years old. He is married, and he and his wife were raising four children, all minors at the time; the oldest, a boy of fifteen or sixteen, is adopted and has known no other father. Mr. Dressel owns and runs a small tree-service business. Before January 6 his criminal record consisted of traffic offenses.

316. Mr. Dressel is an experienced protestor who went to Washington on Jan. 6, 2021 to make his voice heard.

317. He drove to Washington with two other men, a contract tree climber who worked for his business and a friend. They reached the city early on January 5, 2021, and stayed the night. On the morning of January 6 they heard the President speak for a short while.

318. As he came up on the west side of the Capitol there were flash-bangs and commotion. The first thing he saw was a man being carried through the crowd by four people, one on each limb. The man was blue and not moving. Mr. Dressel got in front of the four and moved people out of the way until they reached an open spot and laid the man down. He believed the man was dead. He went back to his two companions, fifty or sixty feet away.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

319. Near them, bike-rack barricades had been stacked against a stone banister on a set of wet granite steps, and a man on the steps was waving people up. Mr. Dressel climbed the rack to see the view. A man climbing after him slipped when the rack rocked and split his forehead open on the granite above his eye; the blood got on Mr. Dressel's navy sweatshirt and can be seen in photographs. After that Mr. Dressel held the rack steady, helped people up, and helped people down. He told a man trying to pass a child up for a photograph no, and he told the elderly people on the ledge that they ought to get down, and they scolded him for it. The government's sentencing papers later said he "directed and assisted other rioters in scaling the banister." He helped people down as well as up.

320. Farther up the steps a female officer began firing pepper balls down at the people below, and Mr. Dressel stood in front of an elderly woman to shield her; neither was hit, and he helped her down. When the crowd fell back from the pepper balls he was pushed over a step and went down hard on his side. He limped the rest of the day, and the limp is visible on video. He was sprayed at least twice that day with chemical irritant aimed at groups of people, and he was shot at with projectiles without being hit. From the banister he saw two or three Capitol Police officers being grabbed and pulled in different directions by the people around them, and he thought things were about to get badly out of hand. The Statement of Offense he later signed says he entered the Capitol through the Senate Wing Door at approximately 2:14 p.m., with a large crowd, as alarms sounded. The doors were open when he went through them. He turned right, went down a hallway, and came into a large room with pillars, the Crypt.

321. The Crypt was full of people yelling, and the officers in it were plainly frightened. Mr. Dressel put his hands on people's shoulders and motioned for quiet. Then he heard a commotion toward the center of the room and went to it: four or five men were shouting at a single

officer with no helmet and no shield, whose voice shook as he said he had voted the same way they had but could not let them past. Mr. Dressel stepped in front of the men with his arms spread back, asked the officer his name, and told him, “My name is Josh. I’m going to calm these people down. Everything’s going to be OK.” The men tried to go over his arm and over his shoulder, and he pushed them back and pulled one of them back by his backpack. Behind the first officer a second officer with a rifle jerked the muzzle upward. Mr. Dressel thought of his four children at home, grabbed his companion, and got behind a pillar.

322. More than a year later, watching the discovery video with his wife and his lawyer, he learned two things. When he stepped aside, the men he had been holding were the front of the whole room, and the crowd went through the officers like water through a broken dam. And at the back of that crowd a man in black clothing, a black hood, gloves and a mask had thrown a fire extinguisher at his head while he stood between the crowd and the police. He had turned just in time, and it passed about two feet over him. He never felt it go by.

323. After the line gave way there was cheering and singing. Mr. Dressel took a ten- or twelve-second video of people singing on his phone; he did not post it, but one of the men he came with did, on Facebook. He was carrying three phones that day, his business phone, his personal phone, and a phone belonging to his brother’s company. In the next room people were throwing water bottles and debris at a closing door, and he went in and picked up the bottles and debris and threw them away. Then he told his companion this was not something they needed to be part of, and they walked out the way they had come.

324. At the exit a line of officers stood with their backs to the wall watching people file out. The man in front of Mr. Dressel was carrying a police riot shield. Mr. Dressel tapped him on the back, asked him what he was doing, told him they could not take things like that, pulled the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

shield out of his hands, and handed it to the officers on the right, one of whom helped pull it in. He asked the man his name; the man said "Spaz." Upon information and belief, the man was Dominic Pezzola. An overhead camera recorded the shield going back, and his lawyer told the sentencing court about it. The doors had been shut by then, and Mr. Dressel went out through a broken window beside them.

325. The Statement of Offense put his exit through the broken window at approximately 4:00 p.m. The government's own sentencing memorandum later put his exit from the building at approximately 2:38 p.m., about twenty-four minutes after he entered, and his departure from the grounds at approximately 4:00 p.m. Outside, he told people not to go in, and he washed pepper spray out of several people's eyes with water, the last of them a girl who had come with her mother and brother and began to hyperventilate. When the order came to leave, he left. Back at the hotel the chemical burn in his face and eyes lasted the whole night, even after he showered. The next morning he had bruising down his side from the fall and dark redness around his eyes. The three men drove home to Missouri.

326. According to the FBI's affidavit, the government's case began with a tip on or about January 7, 2021, from a longtime acquaintance who recognized Mr. Dressel in an MSNBC video from inside the Capitol; a second acquaintance identified him "with 100% certainty" from surveillance images, and an agent compared the footage with his Missouri driver's license photograph. Google location records for one of the phones he carried placed it on the Capitol grounds from about 2:18 p.m. to 4:12 p.m., and Facebook records showed a login that night from Landmark, Virginia. The government relied on a Facebook Messenger message he sent at 5:45 p.m. on January 6 saying he was among the "first 20 people or so to break into the Capitol." At 7:22 p.m. he wrote that he was "proud to say I was a voice of reason in there trying to stop the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

crazy" and "calm things down." Upon information and belief, he was also posted by the group that calls itself Sedition Hunters under a hashtag referring to a black backward hat.

327. Upon information and belief, members of his own family reported him. A photograph of him inside the Capitol that a cousin had texted him, uncropped and with the computer search bar still showing, turned up in his discovery, and he believes that cousin and the cousin's fiancée called the FBI hotline as soon as it opened. Agents questioned his neighbors before and after his arrest, questioned another cousin at his apartment, and brought that cousin in a second time to identify him. For six months he waited. He did not try to fly and did not try to buy a gun, because he had heard what happened to other people who did. More than once, at night, he and his wife saw a vehicle they could not make out parked outside the living-room window. At the end of June 2021 he traveled to Kansas City for a client, a chance to expand into a new market, and black SUVs sat outside the hotel two days in a row; an agent later told him the FBI had decided not to arrest him there.

328. He got home late, and the next morning, July 2, 2021, was his youngest son's birthday. At about 6:50 a.m. his son was outside walking the family's Rottweiler when about eight vehicles pulled up across the road, and the agents told the boy to go in and get his father. The boy woke him: the feds are here. Mr. Dressel put a shirt on, found his wife at the door scared and trembling, and told her not to say anything. The agents said they had a warrant for his arrest and a warrant for two of his phones; they were not going to arrest him that day, but if he did not hand over the phones they would, and because it was a holiday weekend he would sit in jail about four days. He asked to see the search warrant, and an agent told him he was taking too long, shrugged, said "this is how you want to do it," and then produced it. The agents came into the house and he handed over the two phones; one of them told him that Washington decides who gets arrested and

the field office decides how, and that they had looked at the evidence and did not think his case called for more. They told him he could not use his business telephone number, which his lawyer told him weeks later was not true, and he went a little over a month without his business number and lost the calls and the work that came with it.

329. A criminal complaint charging four misdemeanors had been filed on June 29, 2021, and a warrant issued the same day. Through his lawyer he arranged to surrender, and on July 13, 2021, he turned himself in to the FBI in St. Louis, where he was fingerprinted and processed and released the same day; a few days later he appeared by video before a magistrate judge in St. Louis and was released on pretrial conditions. When he walked out of the FBI building, reporters from several St. Louis stations came out from behind a corner and a large bush, put microphones in his face, and followed him down the street and across the road. His wife circled the nearby blocks looking for a place to pick him up where she and the children would not be on the news. Reporters were waiting at the house too, so the family drove past it and stayed somewhere else that night. He believes the media were tipped off.

330. On September 13, 2021, the government filed a four-count information in United States v. Dressel, No. 1:21-cr-00572-CRC (D.D.C.), before Judge Christopher R. Cooper, charging entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G). He was never accused of assaulting anyone, damaging anything, or taking anything. His pretrial conditions confined him to a list of counties in eastern Missouri around St. Louis, barred him from Washington, required call-ins, and required him to inventory his firearms and move them out of his reach. The Kansas City expansion was

lost. On home visits the pretrial officers looked in the closets and, as he saw it, looked over his children.

331. The prosecutor wrote to his lawyer that the government knew Mr. Dressel had been with a man it had not yet charged and wanted Mr. Dressel to turn him in. His lawyer told him that doing so would not help him and that refusing would hurt him. Mr. Dressel refused. He gave the man the prosecutor's email instead, and when the man decided to turn himself in, Mr. Dressel drove him to the FBI office. In the interview that followed the man described Mr. Dressel's actions that day as his own and told agents, falsely, that Mr. Dressel had paid for the trip. For a long time afterward the statements read to Mr. Dressel at his own hearings were that man's statements, because the government did not interview Mr. Dressel himself until the plea agreement required it, on January 4, 2023. The man was charged separately in 2023, and he and Mr. Dressel no longer speak.

332. The government sent its plea offer on April 20, 2022. Mr. Dressel and his lawyer signed the plea agreement and the Statement of Offense on May 4, 2022, and on August 18, 2022, he pleaded guilty by video before Judge Cooper to Count Four, parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G), with the government agreeing to move to dismiss the other three counts at sentencing. He felt he had no real choice, between the exposure, the cost of a trial in Washington, and a District of Columbia jury. His retainer was $10,000, and he and his wife put the cost of the case at about $17,000 with travel. His lawyer showed him the discovery but would not give him a copy, and he later clicked through numbered video files in a public archive until he found himself and recorded those clips on his phone.

333. In its sentencing memorandum of January 11, 2023, the government asked for forty-five days in jail, three years of probation, sixty hours of community service and $500 in



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

restitution. It said he had directed rioters up the banister, had been in the first wave into the Crypt, had deleted videos afterward, had minimized his conduct to the FBI, and had shown no remorse. Through the hearings the prosecutor's account, built on location data, had him inside the building for more than an hour. His lawyer pointed to the time-stamped video of him going in and coming out at more than one hearing, Judge Cooper told the prosecutor to fix it, and by sentencing it had not been fixed. When the judge asked the prosecutor for video of Mr. Dressel helping people breach the building, the prosecutor leafed through his binder and moved on to another point. That happened more than once.

334. Mr. Dressel was sentenced in Washington on March 21, 2023. He told the court he took full responsibility for going into the Capitol. His letter to the judge said his entry was regretful and that he did not feel morally justified, that no one had coerced him, that he did not see himself as a victim, and that his family had been left in a vulnerable place; it closed with a statement of his faith, that he does not think himself better than anyone, that he is flawed and needs grace and forgiveness, and that through Christ he has it. The Kansas City Star ran that line as its headline, as though it were an apology for January 6. Judge Cooper told him the letter was one of the best he had read from a defendant. He then found a lack of remorse, repeated several of the prosecutor's unsupported points, and sentenced Mr. Dressel to fourteen days in prison, a $500 fine, $500 in restitution and a $10 assessment, with no probation. The other three counts were dismissed.

335. A few weeks later, as he recalls it in late April or early May 2023, Mr. Dressel drove himself three and a half to four hours to the federal medical center in Springfield, Missouri, and walked in through the gates. That first night he had a kidney stone; the staff did not know whether it was his appendix and sent him to a nearby hospital, where he passed it. A guard on his last day before retirement showed him the chart that placed him in a domestic-terrorism category

and told him it meant extra checks, extra eyes and extra pat-downs, and it did. He was issued 3XL clothing from a box of bus clothes and shoes that did not match, one about three sizes bigger than the other, both with holes, and he had no pillow, no blanket, no deodorant and no toothpaste for days; he got those things from other inmates, and clean clothes came after four or five days. His telephone account was not set up for about four days, he was refused calls twice, and the distance was too far for his wife to visit. The portions on his tray were small, and he lost close to twenty pounds in twelve days.

336. He was strip-searched four times in twelve days. Once he was handcuffed and taken to an office and patted down in front of ten or twelve staff members who questioned him, insulted him and laughed at him, until one of them said they knew who he was and were just giving him a hard time, and sent him back. He was put in the overflow dormitory, the only dorm in an informally segregated prison that mixed white, black and Hispanic inmates. Because he had walked in rather than arriving on a bus he had no paperwork, and inmates told him he had thirty days to produce papers showing he was not a sex offender or an informant or they would "go to work." The inmates had never heard of anyone doing two weeks in federal prison and decided he was an undercover police officer; the man in the bunk beneath him threatened to beat and rape him, the protection he had been offered at first was withdrawn, and the men said they had permission. It stopped only when an inmate who happened to know his aunt vouched for him. Officers who pulled him aside in the hallway to tell him he was "high profile" only made the other inmates more certain. He was released after about twelve days.

337. The news coverage ran his name with his company's name beside it, so that a search for either one brought up the other. Within weeks his residential work, about half of his business, was gone. He cut his prices, let contractors go, sold equipment, and rebuilt the company around



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

property-management clients and general contractors, so that in time his total sales grew back and passed what they had been, at lower margins. He has not put his company's name on his trucks since, and he cannot advertise, because anyone who looks him up finds January 6. Ten or fifteen one-star reviews from accounts that had never hired him appeared after his arrest; one said he had skipped a tree job on January 6 to go be a domestic terrorist, and his wife got most of them taken down. Tenants at properties where he is scheduled to work have looked him up and called his clients to have him removed. During his twelve days in prison his teenage son ran the business.

338. His home address was published. The house in Festus sat close to the road, and cars slowed in front of it while people yelled at the family. He received about three death threats by text message. The family sold the house and moved. Relatives who reported him still do not speak to him, and he lost friends; when he tells people what he did that day, he can hear the doubt. His three younger children overheard that he was going to prison, and on a later traffic stop his daughter sat trembling in the car, afraid the government was going to take him back. He had not talked through any of this with anyone until he was interviewed for this case.

339. Mr. Dressel's prosecution terminated in his favor on January 20, 2025, when the President granted a full, complete and unconditional pardon to all persons convicted of offenses related to the events at the Capitol on January 6, 2021, excepting fourteen named individuals, of whom he was not one. He had served his sentence nearly two years before. The government has still not returned one of the two phones it took from his home on July 2, 2021. In 2025 an FBI agent telephoned him several times to say the file could be closed if he would come pick it up, and made jokes when he said he did not trust what might have been done to it. Upon information and belief, his fingerprints and any DNA sample taken from him remain in the government's possession.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

**Zvonimir Jurlina**

340. The Plaintiff Zvonimir Jurlina lives in Farmingdale, New York, on Long Island. He goes by Zeke. He was born in the United States to a family that came from Croatia when it was still Yugoslavia, and his father served in the United States Marine Corps. On January 6, 2021, he was thirty years old, single, with no children and no criminal record. He is blind in his left eye. He works as a roadside technician in his family's business, and he is an independent livestreamer who posts political commentary and documentary video on YouTube.

341. Mr. Jurlina had been to three earlier rallies for the President. He took the train to Washington on January 5, 2021, to support the President and to film what happened, and he stayed at the Moxy hotel. That night he was on the street with other supporters. A man set fire to a Black Lives Matter flag, and police moved in and stamped it out. Mr. Jurlina said out loud that the police would do that over a flag but had done nothing while cities burned. An officer heard him, shoved him several times, and then punched him in the face. Upon information and belief, the officer was a District of Columbia police officer. Mr. Jurlina has no video of the punch.

342. On the morning of January 6 Mr. Jurlina overslept and missed the President's speech at the Ellipse. He walked down toward the Capitol with his camera, saw the commotion, and went to film it. He streamed the day live in a twelve-part series on his YouTube channel, which was called Zykotik. He never went inside the Capitol. The government's own sentencing memorandum later said so.

343. Outside, on the Capitol grounds, he was gassed and pepper-sprayed. There was smoke, and he heard bangs that he took for flash-bang devices. Officers pushed the crowd back with batons and shields, and the people in front of him were crushed against one another while gas went off. He saw a man bleeding from the head after a baton strike. He saw officers pushing



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

another man backward off a ledge, the man scooting on his back, and he jumped in, lifted the man up and carried him away, because if the man had gone over he would have landed on his head and neck. That is on video. On the video Mr. Jurlina tells the man to leave and fight another day.

344. When things calmed down he moved to a grassy area near the television reporters and talked to his viewers. At about 4:50 p.m. a crowd pushed past the metal barricades around the media staging area outside the northeast corner of the Capitol. The reporters ran and left their equipment, and people in the crowd broke up cameras, tripods and lights. Mr. Jurlina went over with his camera. He picked a microphone with a German broadcaster's logo off the ground and did mock interviews with it, announcing "breaking news" and calling his stream the real news network. He was joking, and the joking is on the stream. He says he gave the microphone back to a reporter before he left, and two people saw him do it.

345. He went back to his hotel. That night, police kept people in the hotels near the Capitol and told them they would be arrested if they went out. Mr. Jurlina felt herded. The next day he took the train home to New York and the subway to Liberty Avenue.

346. On February 4, 2021, the FBI posted photographs of Mr. Jurlina from the media staging area and asked the public to identify him, listing him as 205-AOM. The FBI's Sedition Hunters gave him the hashtag "#mrmunsteraom." Mr. Jurlina is Slavic, and he took the name as a vampire joke at the expense of his ancestry. According to the FBI's affidavit, agents identified him through YouTube subscriber records for his channel, an account sign-up address in Hicksville, New York, telephone records, database searches and a DMV photograph, and cell-phone records placed a phone registered to him near the Capitol on January 6. Upon information and belief, the government obtained that location data through a geofence warrant. In the weeks after January 6, people in his livestream chat asked him about a spot next to the subway stop at Liberty Avenue

where he had gotten off at random, as if they knew where he had been, and black cars he did not recognize sat near his home. Upon information and belief, he was under surveillance before his arrest.

347. No agent ever called him or asked him to come in. In June 2021 Mr. Jurlina was on a cross-country trip in a van he had built out into a sleeper, livestreaming as he went and earning money from his viewers. He stopped in Austin, Texas, to see a friend who also streams. On June 25, 2021, the government filed a sealed criminal complaint against him in United States v. Jurlina, No. 1:21-mj-00502-GMH (D.D.C.), before Magistrate Judge G. Michael Harvey, charging the felony of destruction of property within the special maritime and territorial jurisdiction and aiding and abetting, 18 U.S.C. §§ 1363 and 2, and an act of physical violence on Capitol grounds, 40 U.S.C. § 5104(e)(2)(F). He did not know.

348. On Monday, June 28, 2021, Mr. Jurlina was livestreaming on a public street in Austin when he heard bicycle spokes behind him. Two Austin police officers on bicycles grabbed him from behind, told him to put his hands behind his back, and handcuffed him. They would not tell him what he was arrested for. More officers gathered around. The handcuffs were tight, and he believes the officer cinched them because of what he had said, and his wrists were bruised all the way around afterward. He was not read his rights until he made an issue of it, after he had already been talked to, and FBI agents came to the jail later that day. The warrant return was signed by a task force officer named Jeffrey Deane.

349. At the jail he was patted down, swabbed inside the cheek for DNA, fingerprinted, palm-printed and later shackled. He spent the night. The first holding area had no toilet in the cells. In the second, the floor by the metal toilet smelled of urine. When he asked for water, staff handed him a dirty cup with what looked like a dried blood stain in it. He refused it and asked for clean



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

water. There were bottles of water in plain sight, and he was told to use the fountain. He kept calling for water, and the staff laughed at him. Jail staff also pressed him several times to take an injection they said was not the COVID vaccine, and told him that if he refused he would be sent to a hospital. He refused.

350. Mr. Jurlina was angry about being arrested and made a show of it, performing for the camera in the cell and telling the officers that he was a woman and would not go into a cell with men. The jail sent in a psychologist. When he told her the question was a joke, the correctional officer beside her said, "Listen, boy, you be good to her or I'm gonna hurt you." The psychologist scolded the officer. Staff then moved him into a cell with a man who was making threatening hand gestures at another prisoner and talking about officials stealing his power. Upon information and belief, they put him there on purpose. He talked the man down and the two came out friends, and he saw the disappointment on the officers' faces. When the FBI agents came they asked him little and spent their time comparing him to the long-haired surfer from Fast Times at Ridgemont High, the one who has a pizza delivered to class. They kept it up the whole time he was there.

351. The pretrial services officer who interviewed him told him he had to answer her questions without a lawyer, and that if he did not answer he would not be released. He refused. A federal public defender was appointed, and the lawyer told him to answer so the process could move. He answered. On June 29, 2021, he appeared before Magistrate Judge Susan Hightower in the Western District of Texas, No. 1:21-mj-528, waived his Rule 5 rights, and was released, ordered to appear in Washington by Zoom on July 6, 2021, and told to leave Texas and go straight home to New York. The trip was over. Pretrial services also wanted a mental-health evaluation made a condition of his release, and his lawyer had to push back on it. On July 6, 2021, he appeared by video in the District of Columbia. The government did not ask for detention, and he was



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

released on personal recognizance. He hired private counsel because he was not going to take a chance on an appointed lawyer.

352. His conditions at first confined him to Nassau County, and he had to call and object before they were changed to the State of New York. Any trip required advance permission and the addresses, dates and departure times, reported to his supervising officer. He reported by telephone, then by a check-in email that eventually went to once a month. He was drug-tested, barred from Washington, D.C., told to stay away from other January 6 defendants, and barred from firearms. He drove from Long Island to Connecticut every week to help his elderly grandmother around the house and take her to the doctor, and at the start the supervising officer gave him trouble about those trips until his lawyer cleared it up. His grandfather died in Croatia while the case was pending. He could not get permission to go, and he missed the funeral.

353. The case then sat. Between September 2021 and February 2023 the parties continued the status conference nine times on consent, and no indictment or information came for more than twenty months. He understood that he was facing a felony and years in prison, and he assumed he would get two or three. He went to the gym every day because, blind on one side, he expected to be attacked in prison for his politics and was preparing for it. He feared a gag order and watched everything he said in public, because he knew that whatever he said would be used against him.

354. On March 14, 2023, the government filed a one-count information in United States v. Jurlina, No. 1:23-cr-00083-RCL (D.D.C.), before Judge Royce C. Lamberth, charging an act of physical violence on Capitol grounds, 40 U.S.C. § 5104(e)(2)(F), a Class B misdemeanor with a six-month maximum. The felony count from the complaint was not charged, and neither was theft of the microphone. Mr. Jurlina told his lawyer he wanted a trial. His lawyer told him that in a

normal case they would try it, but that no January 6 defendant was winning a jury trial in Washington and that he could get ten years if he lost. Mr. Jurlina signed the plea agreement on April 18, 2023, and pleaded guilty by video on April 19, 2023. He had to write a letter of apology for sentencing, which he describes as flogging himself.

355. The government's sentencing memorandum asked for fourteen days in custody as part of thirty-six months of probation, sixty hours of community service and $500 in restitution. It called his conduct an attack on the free press, said he had not expressed remorse, and cited a video he had posted after his arrest asking the President to pay his legal fees. On July 20, 2023, Judge Lamberth sentenced him to fourteen days of imprisonment, twenty-four months of probation, $500 in restitution to the Architect of the Capitol and a $10 special assessment, with supervision transferred to the Eastern District of New York. He was allowed to self-surrender. The written judgment was entered on August 17, 2023.

356. Mr. Jurlina served about two weeks at FCI Fort Dix in New Jersey. At intake he was stripped, and the search included a swipe between his buttocks. Correctional officers mocked him over the length of his sentence, telling him he was there for two weeks and would write a book, and over the January 6 case. He was given clothes and a room number and left to find his way. No toothpaste or deodorant came with the clothes. He had no meal card on his first day and did not eat. He was housed in a converted barracks room with about twelve other men, on a bunk whose springs were broken so that the metal underneath pressed into his back, and he could not sleep on it.

357. The men in the room learned he would be there only two weeks and talked, seriously, about sending him on a "mission" for them before he left. He did not know what they meant and laughed it off. One morning around 6:00 a.m. he woke to see another prisoner



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

sharpening a blade. He slept in his boots the whole two weeks so he could get up fast. Other prisoners, not staff, told him which television rooms he could not enter, and he relied on prisoners for advice about staying out of trouble. One gave him deodorant, and one gave him a Bible. He stopped telling other inmates why he was there and said instead that he was doing four years. When he was released, prisoners warned him not to take the bus money the prison offered, and he had family pick him up.

358. After the arrest his name, photographs, home address and family information were published and passed around. A local television station came to his family's house, interviewed his mother and showed the address. His court papers and clips of his stream circulated on Twitter and YouTube, and a video posted by a stranger presented him as a domestic terrorist. Strangers came into his family's shop because of the news coverage. He was stalked on the streets of New York City. During a livestream at a pride parade, viewers messaged him that a real-time photograph of him had been posted with instructions to confront him and run him out. He and a friend, another January 6 defendant, were swatted: armed police came into the house, ordered them to the floor and told them to walk backward toward the officers' voices. Upon information and belief, two women with left-wing ties were behind threats against him and his friends in Florida.

359. PayPal closed his account, citing its terms of service, after the case became public, and Airbnb and Lyft banned him. The PayPal ban cut off the donations that were his livestreaming income at the point when, in his words, he was taking off. The probation conditions made the streaming harder still. He spent more than $40,000 that he had saved for film school on his defense of what ended up a misdemeanor. He has had to cut back the roadside work for his family's business, which is how he earns his living, because small things on the road now set off reactions he does not trust behind the wheel.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

360. Mr. Jurlina has lived since with what he calls hyperarousal. A jury-duty notice in the mail sets it off. A misread text sets it off. He curls up on the floor with the feeling he describes as the one you get when you think about the day you will die. He has had thoughts of suicide, which he says were not serious. He drank more and leaned on marijuana to get through it. He does not trust doctors and has been afraid to see a psychologist, because he fears being recorded, dismissed or medicated into what he calls a zombie over his politics; his father has pressed him to go, and he intends to. He no longer trusts the police and is afraid to call them. His brother's death and his parents' divorce did not do to him what this did.

361. The President pardoned Mr. Jurlina on January 20, 2025. His name appears on the Office of the Pardon Attorney's list of certificate recipients. Nothing was mailed to him; he had to print the certificate himself. By then he had served the prison term and well over a year of his probation. The probation office kept emailing and calling him for electronic check-ins after the pardon, and told him he still had to report, until he sent them a picture of the certificate.

362. Mr. Jurlina's prosecution terminated in his favor with the pardon of January 20, 2025. The government returned his phone at the time of his arrest, and upon information and belief it copied the contents first. Upon information and belief, the DNA sample, fingerprints and palm prints taken from him in Austin remain in the government's possession.

**Benjamin John Martin**

363. The Plaintiff Benjamin John Martin lives in Madera County, California. He was forty-two years old on January 6, 2021. He had sold real estate in the Fresno area for more than twenty years and was one of the top producers in his market, and he hosted a podcast called The Real POV. He has lived with his partner for nine years. He has grown children, a daughter who



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

was in school in 2021, and a granddaughter. Before January 6 he had a 2018 misdemeanor conviction in Fresno County.

364. Mr. Martin decided to go to Washington only in late December 2020, and he went with his father. His father had been a Democrat most of his life and wanted to see for himself what his son believed and why. They were not part of any organization. They arrived on January 5, 2021.

365. On the morning of January 6 the two men went to the Ellipse for the President's speech. Mr. Martin's father was tired, and they left before the speech ended and were back at their hotel at about 2:15 p.m. so his father could rest. At about 2:30 p.m., in the hotel lobby, Mr. Martin learned that something was happening at the Capitol. He had told his listeners he would get footage of anything that happened, and he ran there. His father followed him but stayed across the street and never set foot on the Capitol grounds.

366. When Mr. Martin got to the Capitol he was out of breath and red in the face, and a woman stopped him and asked whether he had been pepper sprayed. He had not; he had been running. She gave him a bottle of water. He made his way to the north side of the building and the North Door, filming as he went. He interviewed a man in a baseball cap coming out of the building who told him that people were being let inside.

367. At about 3:11 p.m. Mr. Martin went in through the North Door, and others came in behind him. He walked up to an officer and asked for an interview. The officer said he could not give one. Within about two minutes, officers came around a corner and began firing pepper balls and spraying chemical irritant into the hallway, and they pushed the crowd, Mr. Martin with it, back out through the door. People fell and were trampled at the doorway.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

368. At the doorway an officer struck Mr. Martin's hand with a baton. A metal chair thrown by someone behind him struck him in the head, and it struck a police officer as well. He did not see who threw it. Mr. Martin stayed on the north side of the building for about another hour and a half, filming, and the chemical spray in the air got on his clothes and in his face. His phone ran out of storage, and much of what he filmed that afternoon was lost. At about 4:30 p.m. twenty or thirty officers came around the building and fired devices into the crowd that went off with loud blasts, and they cleared the North Terrace. Mr. Martin left. He was not arrested at the Capitol.

369. According to the affidavit the government later filed against him, the FBI's National Threat Operations Center received a tip on or about January 7, 2021, that gave Mr. Martin's name, date of birth and telephone numbers. On January 8, 2021, a Fresno-area news site published an interview in which Mr. Martin said he had been inside the Capitol and had tried to keep the peace. The FBI then obtained a search warrant for his Facebook account. He was later listed on the Sedition Hunters website under the names "#Puffalumper" and "Insider #1771."

370. On or about January 15, 2021, FBI Special Agent Connor Ledbetter came to Mr. Martin's house in Madera County while he was in the shower. The doorbell rang, then his phone rang, then the doorbell, then the phone, over and over. Mr. Martin spoke with the agent briefly and sent him one photograph, of a man dressed in black outside the North Door with writing tattooed on the back of his head. The agent said the FBI was not looking for him. Mr. Martin heard nothing more from the FBI for seven and a half months.

371. In 2020 and 2021 Mr. Martin had led a local group called the Coalition for Individual Liberties. Its members set up tables at a lawful distance outside stores and handed out flyers about mask and vaccine mandates, and he spoke at school board meetings. Before each event he notified the Fresno police and the county sheriff. The sheriff sent one car by; the Fresno police



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

often sent six. Upon information and belief, a Fresno police officer told Mr. Martin at a holiday gathering around the turn of 2021 that his only assignment for the past year had been to follow him.

372. On August 6, 2021, the government filed a criminal complaint against Mr. Martin in the District of Columbia charging entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D); parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G); obstructing officers during a civil disorder, 18 U.S.C. § 231(a)(3); and obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2). He was not accused of assaulting anyone.

373. The FBI did not arrest Mr. Martin on that complaint for almost four weeks. Agents knew his routine. Upon information and belief, they planned to come to the house at about 8:30 a.m. on September 2, 2021, after he dropped his daughter at school. That morning he dropped her off and went to play a round of golf with his eldest son instead. Agents followed them to the course and watched them play. They waited until he came home.

374. At about 2:30 p.m. Mr. Martin pulled into his driveway with his son beside him, saw a blue van there, and started to back out. About ten vehicles closed in around his car. Twenty to thirty FBI agents and Fresno police officers jumped out with their guns drawn and ordered him to put his hands out the window, and the red dots of their sights were on him and his son. His son was in his early twenties and had never been in trouble in his life. Mr. Martin was handcuffed in the driveway. He asked again and again what he was being arrested for and asked to see a warrant. Agent Ledbetter came over leafing through papers and said he did not have the warrant on him.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

No one ever showed Mr. Martin a warrant for his arrest or for the house that day, and none was left at the house.

375. The house belongs to Mr. Martin's partner, and she was home. When she answered a pounding at the door she found guns pointed at her through the screen. She asked for a warrant and was told to open the door. Later the agents handed her the keys to her car and told her it would be best if she left. She was afraid their daughter would come home into the middle of it, and she left.

376. In the garage was a gun safe with a manual combination lock. Agents could not open it, and the Madera County Sheriff's Office forced it open with hydraulic rescue tools. The safe was ruined. The agents were looking, they later told him, for plans and schematics of the Capitol. They found firearms in the safe, and that evening they obtained a second warrant to seize them. The FBI's later affidavit said Mr. Martin gave agents the combination and instructions for opening the safe. He did not. He did not have the combination. Two computers sat on a table in the house, and the agents left them. They took his iPhone, a jacket, a baseball cap and a headlamp, along with the firearms. The phone's screen was broken when it came back.

377. Mr. Martin was taken to the Fresno County Jail. At intake, in a tent outside the jail, staff told him to take a COVID-19 shot. When he refused, they told him he would be housed with inmates who had COVID-19, and he was. His blood pressure at intake was so high that the jail would not admit him, and he was taken to an emergency room, where he was handcuffed to the bed rails while doctors examined him and an FBI agent sat in the room. He was not booked until after midnight. He was held until about September 10, 2021.

378. On September 8, 2021, while Mr. Martin was in jail, the government filed a separate criminal complaint against him in the Eastern District of California, United States v. Martin, No.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

1:21-mj-00092-EPG (E.D. Cal.), before Magistrate Judge Erica P. Grosjean, charging possession of a firearm by a person convicted of a misdemeanor crime of domestic violence, 18 U.S.C. § 922(g)(9). The firearms charge was not added to the District of Columbia case. It was prosecuted separately in Fresno as United States v. Martin, No. 1:21-cr-00228-JLT-BAM (E.D. Cal.), before Judge Jennifer L. Thurston.

379. Mr. Martin was released to pretrial supervision in California. For about a year and a half he was on home confinement and wore an ankle monitor. He was drug tested every week for about a year, and he never failed a test. Officers came to search his home once a month, unannounced. About a year after his arrest the government obtained a warrant for his DNA, and he went with his lawyers to the United States Attorney's office in Fresno, where his mouth was swabbed.

380. In the District of Columbia the case proceeded by indictment and superseding indictment as United States v. Martin, No. 1:21-cr-00562-RC (D.D.C.), before Judge Rudolph Contreras. Mr. Martin refused to plead guilty and went to trial. On June 26, 2024, a jury convicted him on all six counts. After the Supreme Court decided Fischer v. United States, 603 U.S. 480 (2024), on June 28, 2024, the government dismissed the § 1512(c)(2) count. The government asked for thirty months in prison. On December 20, 2024, Judge Contreras sentenced Mr. Martin to thirteen months on the civil disorder count, twelve months on each of the § 1752 counts and six months on each of the § 5104 counts, all concurrent.

381. In the Fresno case, the court denied Mr. Martin's motions to suppress the firearms and to dismiss the charge on February 5, 2024. Judge Thurston found him guilty after a one-day bench trial on September 10, 2024, and on November 25, 2024, she sentenced him to thirty-eight months in prison. He appealed to the Ninth Circuit, No. 24-7203.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

382. The President pardoned Mr. Martin's January 6 offenses on January 20, 2025. On January 21, 2025, Mr. Martin's lawyers asked Judge Thurston to recognize that the pardon reached the firearms case, which grew out of the January 6 search warrant, or at least to give the Department of Justice time to say what the pardon covered. She refused. On January 22, 2025, two days after the pardon, Mr. Martin turned himself in to the United States Marshals at the federal courthouse in Fresno. He was handcuffed and shackled at the hands and feet.

383. The marshals took him that night to the Golden State Annex, a privately run detention center in McFarland, California. About two weeks later, on February 7, 2025, guards woke him in the middle of the night, and he was shackled again and driven by van to the Federal Correctional Institution at Lompoc. Woken suddenly one night, he fell from a top bunk; he told staff, and nothing was done or written down. At Lompoc the air conditioning and the heat did not work, at times there was no hot water, the water ran rust-colored, worms and insects came up out of the drains, and black mold covered the walls.

384. On February 14, 2025, the government opposed Mr. Martin's release pending appeal. About two weeks later it changed its position and agreed that the pardon raised a substantial question supporting his release. On February 28, 2025, a Ninth Circuit panel ordered him released on the same conditions he had been under before trial. Judge Thurston then disqualified herself from the case, and Chief Judge Troy L. Nunley signed the release order on March 5, 2025. Mr. Martin was released on or about March 6, 2025, after about forty-three days in custody.

385. On March 12, 2025, the government moved to vacate the firearms conviction and dismiss the indictment, on the ground that the offense came to light only through the January 6 investigation and falls within the pardon. It renewed that request in June 2026. The courts have not granted it. As of the filing of this complaint, the firearms conviction has not been vacated, the

appeal remains pending, and Mr. Martin remains on release under federal supervision, more than five years after his arrest.

386. Mr. Martin's real estate career is gone. By his account he earned more than $600,000 a year in each of the five years before his arrest; afterward his income went to nothing, and for years he did not have a car of his own. When he has flown since his arrest, upon information and belief because the government placed him on a watch list, he has been searched at security, his bags have been checked by dogs, and he has been searched again at the gate. His partner, who was ordered out of her own house at gunpoint, still flinches when the doorbell rings.

387. Mr. Martin's prosecution in United States v. Martin, No. 1:21-cr-00562-RC (D.D.C.), terminated in his favor with the pardon of January 20, 2025. The firearms prosecution that grew out of the same January 6 investigation has not terminated; the government itself has asked the courts to end it under the pardon, and they have not done so. The government has returned his phone and clothing but still holds the firearms taken from the safe, which his partner and her father have asked to have returned. Upon information and belief, the government also still holds Mr. Martin's DNA, taken by warrant and again on his entry into federal prison, and his fingerprints.

**Spencer Offman**

388. The Plaintiff Spencer Offman lives in Colorado. On January 6, 2021, he was thirty-one years old and lived in Novi, Michigan. He later moved to Seattle, Washington, where he was working when the government arrested him.

389. Mr. Offman flew to Washington, D.C. by himself on the morning of January 6, 2021, to hear the President speak. Toward the end of the speech he saw the crowd begin to walk toward the Capitol, and he went with it.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

390. On the Capitol grounds Mr. Offman was tear gassed three times. One of those times put him on his knees. His phone service cut out.

391. At 2:53 p.m. Mr. Offman went into the Capitol in the Senate Wing. He stayed near the spot where he came in and took what the government described as three flash photographs of the crowd. At 2:59 p.m. he walked back out. He was inside for about five minutes and sixteen seconds.

392. Mr. Offman went home. He was back in Michigan on January 7, 2021.

393. Under an unconstitutional general search warrant, Google reported to the FBI that a device associated with Mr. Offman's phone number had been in or near the Capitol on January 6, 2021. Upon information and belief, that warrant was the geofence warrant the government served on Google for the area in and around the Capitol, which swept in the location data of everyone whose phone was there that afternoon.

394. On May 19, 2021, FBI agents interviewed Mr. Offman in Michigan. He cooperated with them and told them they could contact him again. After the interview the FBI closed its investigation, and an agent called Mr. Offman and told him the case was closed.

395. For more than two years nothing happened. In April 2022, without telling Mr. Offman, the FBI reopened the case after a tipster sent it pictures from January 6, and agents went looking for more footage. Agents later went through the Capitol Police's surveillance video and picked him out of it.

396. On December 1, 2023, almost three years after January 6, an FBI special agent in Seattle swore out a criminal complaint against Mr. Offman in United States v. Offman, No. 1:23-mj-00333-MAU (D.D.C.), before Magistrate Judge Moxila A. Upadhyaya. The complaint charged four misdemeanors: entering and remaining in a restricted building or grounds, 18 U.S.C. §



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G). The magistrate judge issued a warrant for his arrest the same day and sealed the complaint until the warrant was executed.

397. In December 2023 agents arrested him in Seattle as he was walking into work. He was taken before the federal court in Seattle, in Case No. 2:23-mj-613 (W.D. Wash.), and on December 20, 2023, that court sent his case to the District of Columbia.

398. The case went forward in the district court as United States v. Offman, No. 1:24-cr-00066-TSC (D.D.C.), before Judge Tanya S. Chutkan. Mr. Offman pleaded guilty to a single count, entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1).

399. Before he was sentenced, Mr. Offman had to turn over his bank account records and other personal financial information to the government.

400. On July 12, 2024, Judge Chutkan sentenced Mr. Offman to thirty days of incarceration, six months of supervised release, sixty hours of community service, a $25 special assessment, and $500 in restitution (despite him damaging nothing). At the hearing the judge spoke about the danger of becoming complacent about January 6.

401. Mr. Offman reported to serve his sentence as ordered. The first time he showed up to turn himself in, he was told he would have to come back another day. He surrendered on November 17, 2024.

402. Mr. Offman served twenty-eight days. He spent them without daylight. Within an hour of his arrival, guards told him what would happen if he said the name of “that president guy”



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

even once, and that if they found out he was telling other inmates why he was there, he was going to the SHU – the segregation unit.

403. When his time was up, the facility let Mr. Offman out in the middle of Seattle, in the cold, with no phone. The government had taken his phone, and it has never given it back. He had to buy another one.

404. Mr. Offman has not been able to get back on his feet. He has had trouble finding a place to live, and he now lives in his car. He is still looking for work. He continues to be called names and accused of things in public, and he has received death threats.

405. The President pardoned Mr. Offman on January 20, 2025. At the time he was serving his term of supervised release.

406. Mr. Offman's prosecution terminated in his favor with the pardon of January 20, 2025. The government has never returned his phone. Upon information and belief, the fingerprints and any DNA sample taken from him after his arrest and during his incarceration remain in the government's possession.

**Brett Alan Ostrander**

407. The Plaintiff Brett Alan Ostrander lives in North Carolina. The government charged and tried him under the name Brett Alan Rotella. North Carolina issued him a driver's license as Brett Alan Ostrander in September 2020. On January 6, 2021, he was thirty-one years old. He is married and has three children, and he and his wife homeschool them. He has an associate's degree in engineering.

408. Mr. Ostrander and his wife had been to earlier rallies for the President, and to him January 6 was one more. He went to protest peacefully and to ask that the election results be checked before they were certified. He drove up with his wife and other members of his family.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

They stayed at a hotel outside Washington, drove into the city that morning and parked in a garage. They walked to the Washington Monument to hear the President, but they were too far back to hear much, and people around them listened on their phones. After the speech they walked toward the Capitol with the crowd, stopping on the way for the restroom and something to eat.

409. At about 2:24 p.m. Mr. Ostrander reached the West Plaza of the Capitol with his family. Tear gas came down on them there, on him and on his wife and the rest of his family.

410. At about 2:33 p.m. officers moved back toward the building, seemingly indicating the grounds were open to the public. Mr. Ostrander went up the southwest stairs with the crowd. At about 2:40 p.m. he reached the tunnel on the Lower West Terrace. Officers fired pepper balls at him as he came, again and again, and he turned his back so they would hit his jacket and not his face.

411. The crowd behind him pushed forward, and the people in front were pressed against officers. His wife was beside him. Mr. Ostrander tried to keep her safe.

412. An officer struck Mr. Ostrander's hands and fingers with a baton, over and over. Mr. Ostrander heard an officer tell the one with the baton to stop, that he was trying to help them. The blows did not stop. He was struck in the throat with the edge of a riot shield. Then an officer sprayed him in the face with OC spray at close range, so much that it felt like a whole can. It went into his mouth and down his throat, and he could not see or breathe.

413. Someone took hold of Mr. Ostrander and steered him back through the packed crowd and out of the tunnel at about 2:55 p.m. Outside, people sat him down and poured water into his eyes. That night, when he got into the shower, the water set the spray burning again over his whole body.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

414. Mr. Ostrander stayed near the tunnel for about an hour and a half searching for his friends and loved ones. When word came that someone had been shot inside, the group found one another, got back in the van they had come in, and left some time after 4:00 p.m.

415. Mr. Ostrander has had asthma most of his life and used an inhaler as a boy. Before January 6 he could hold his breath without trouble. Since the spray went down his throat in the tunnel, ten seconds is about as long as he can manage.

416. The FBI's Sedition Hunters picked Mr. Ostrander out in early 2021 and tagged him "#SleevelessRedTattoos." The FBI posted his photograph and asked the public to identify him as subject number 82. According to the government's own affidavit, at least three tipsters named someone else, and the FBI ruled those people out. The FBI got his Verizon records by search warrant, and those records put his phone in the area served by a cell site covering the Capitol at about 2:41 p.m. Upon information and belief, the government also obtained his phone's location data through the unconstitutional geofence warrant served on Google. On or about July 27, 2023, agents watched his home in Kannapolis, followed him and his family to an Aldi grocery store, and photographed him there to compare a tattoo on his arm with the pictures from January 6. Upon information and belief, that photograph, which shows his young children, was later published online with the news of his arrest.

417. That summer two men started a fight at the club where Mr. Ostrander worked, and one of them hurt another bouncer badly. A local police officer took Mr. Ostrander's information as a witness. Some time later the officer called him, said the police were seeking felony charges, and asked him to come to the station. Mr. Ostrander understood the call to be about the fight. He made an appointment and went in on August 29, 2023, in Mooresville, North Carolina, and his wife came with him. Officers took him to a back room. A man stood up, said he was with the FBI,

and told Mr. Ostrander he was under arrest. He was not allowed to see his wife or speak to her, and agents took her phone.

418. While he sat in custody, agents searched the family's home. His mother, who is nearly eighty, was there watching his two daughters. His wife was pregnant with their third child. Mr. Ostrander was on the telephone with his mother when the agents came through the door, and he was begging them not to shoot the dog. The family was kept outside while numerous agents went through everything they owned and photographed it. The agents said that if the safe was not opened for them they would cut it open, and when his wife got home she opened it. They left the basement torn up. The neighbors stood and watched it.

419. Mr. Ostrander spent the night in a jail cell by himself in the intake area. The first shift of guards would not let him make a telephone call. They told him it was because he knew the FBI would be coming for him in the morning, and they were worried someone might try to break him out. He asked for a Bible again and again, and he was never given one. The cell had writing in soap and toothpaste all over it, crickets and other insects crawled across the floor, and it looked as though no one had cleaned it in months. He got toilet paper and a sandwich. He was not allowed to shower. He lay down and cried.

420. When the second shift came on, one guard agreed to let him make a call, if she could stand there and listen. The agents had taken his phone and his wife's, and he did not know her new number. He remembered his cousin's number, and his cousin found his wife, who had to go buy another phone. The cousin passed the number back to him, and he finally reached her.

421. The next morning, August 30, 2023, an FBI agent and a deputy United States marshal drove him to the federal courthouse in Charlotte for his first appearance. He was released on his own recognizance. His mouth was swabbed for DNA and his fingerprints were taken. For



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the next seventeen months, until the pardon, he was under court supervision. He could not leave North Carolina, and he could not go into the eastern part of the state without permission. His supervising officer came to his home whenever he chose, and later to the camper where the family was living.

**422.** The criminal complaint, signed by Magistrate Judge G. Michael Harvey, charged Mr. Ostrander with obstruction of law enforcement during a civil disorder, 18 U.S.C. § 231(a)(3); assaulting, resisting, or impeding certain officers, 18 U.S.C. § 111(a)(1); entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); and impeding passage through the Capitol grounds or buildings, 40 U.S.C. § 5104(e)(2)(E). The case proceeded as United States v. Rotella, No. 1:23-cr-00303 (D.D.C.), before Judge Randolph D. Moss. Before the government had turned over its discovery, it offered him a plea to a felony assault charge with a prison term of several years. He turned it down and asked for a trial. The discovery came months later, after several hearings had come and gone. **By the time of trial the government was proceeding on six counts, with two counts under 18 U.S.C. § 111(a)(1) where the complaint had one.**

423. For about a year Mr. Ostrander drove to Charlotte once or twice a week to go through the video with his lawyer and to appear by video in the Washington court. He went to Washington for court several times, and each trip meant gas, a hotel, parking, and meals for his family.

424. Before trial Mr. Ostrander was told that if he took the stand and the jury convicted him, his testimony would be treated as false, and that it could raise his sentence and his security classification and send him to a harder prison. He did not testify. On September 11, 2024, the jury found him guilty on all six counts. On December 13, 2024, Judge Moss sentenced him to thirty-



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

eight months in prison, thirty-six months of supervised release, and $2,000 in restitution. At the sentencing hearing, the officer Mr. Ostrander had stood beside in the tunnel came in on his own and told the court that Mr. Ostrander had helped him that day, and asked that his sentence be reduced.

425. Mr. Ostrander was not taken into custody at sentencing. He waited at home to be told when to report to prison, calling the Bureau of Prisons every week to find out whether that day had come. He sat his children down and told them that Daddy might have to go away, and that he did not want to.

426. His wife carried their third child through the first months of the case. She developed preeclampsia. When their daughter was born she did not breathe for about four minutes. She lived, but she has always been small for her age, and for a while the doctors worried that she was failing to thrive.

427. The family sold its house, and the mortgage at about four percent that came with it, to pay the lawyer and the costs of the case. Mr. Ostrander, his wife, their three children and the dog have lived since then in a camper, moving from place to place. There is not room in it for five people, and it is hard to cook a meal. They stretch the food they can afford. What they owned is in a storage unit that now costs them $400 a month. At the end of 2024, after he was sentenced, his bank closed his account and held the family's money through Christmas and his children's birthdays, which all fall in the same few weeks. A bank employee told him, off the record, that accounts are closed for concerns about terrorism. Upon information and belief, that is why his was closed.

428. When Mr. Ostrander was arrested, his name and face were on several news stations and in many articles, which called him a domestic terrorist. Anyone who searches his name today



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

finds the Capitol. He has applied for work he is qualified for and been turned down again and again. A railroad in North Dakota that was hiring technicians put him through its screening, which he passed, and then stopped answering him. One of his uncles said that he and everyone else who was at the Capitol deserved to be lined up and shot. Some of his relatives died believing he was a terrorist. Over the course of the case he gained about one hundred pounds, and he has since been diagnosed with diabetes and high blood pressure.

429. The agents who searched the house took the family's phones and computers, his wife's electronics (although she was never accused of anything), his passport, and a firearm suppressor. In September 2023 agents searched his Samsung phone under a second warrant. After the pardon, Mr. Ostrander brought his certificate of pardon to the probation office and asked for the suppressor. The officer in charge refused to give it back until she heard from the judge, and he did not get it for a month or more. The government never handed back his passport. He had to file paperwork to get one. Brett Ostrander's wife had post pardem preclamcia which can kill the mother and child. When his youngest daughter was born she wasn't breathing; likely caused by stress from the situation.

430. Mr. Ostrander's prosecution terminated in his favor on January 20, 2025, when the President granted a full and unconditional pardon to persons convicted of offenses related to the events at or near the Capitol on January 6, 2021. Mr. Ostrander had not yet been called to report, and he never served a day of the prison sentence. The government held his suppressor after the pardon and has never returned his original passport. Upon information and belief, his DNA, his fingerprints, and the data taken from his family's phones and computers remain in the government's possession.

**Kerry Wayne Persick**

431. The Plaintiff Kerry Wayne Persick lives in Trophy Club, Texas, in Denton County, northwest of Fort Worth. He is married. He works as an investment analyst. In January 2021 he had a steady job.

432. Mr. Persick traveled to Washington alone for the President's rally on January 6, 2021. Before he left, his wife asked him to find some people to stay with once he got there, because she was afraid he would be attacked in the streets. On January 6 he went to the rally and heard the President speak. He meant to go back to his hotel afterward.

433. When the speech ended, the crowd around him started walking toward the Capitol, and Mr. Persick went with it. When he got there the grounds were crowded and loud. There was tear gas in the air, and he got a little of it. He was not otherwise hurt.

434. Mr. Persick walked up the steps and went into the building through a door that was standing open. He wore a red "Make America Great Again" cap, a dark jacket and a backpack. He walked through a corridor with other people for about five minutes.

435. While he was inside, his wife called him. "You better not be in the Capitol," she said. He told her it was peaceful where he was. She told him that what was on television looked very bad. Mr. Persick looked for a way out and left. He went back to his hotel and flew home to Texas the next day.

436. According to the affidavit the government later filed against him, someone sent the FBI an online tip on or about January 6, 2021, with a photograph of a man in a red cap and sunglasses. On February 24, 2021, an FBI agent reviewing the Capitol's video found a man who matched the photograph walking in a corridor inside the building. On March 24, 2021, a witness who said they had known Mr. Persick for about twenty years and had not seen him in about a year met with agents in person and identified him from two still images. The government also obtained

Mr. Persick's AT&T phone records by warrant. Mr. Persick had his phone with him on January 6, and upon information and belief the government also obtained his phone's location data through a geofence warrant.

437. In the months after January 6 Mr. Persick watched the news reports of arrests. He started calling lawyers and hired one. One day the lawyer called to tell him he had spoken with the FBI, that Mr. Persick was going to be charged, and that the government wanted him to turn himself in.

438. On May 13, 2021, the government charged Mr. Persick by criminal complaint, sworn before Magistrate Judge Zia M. Faruqui, with four misdemeanors: entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G). The complaint did not accuse him of assaulting anyone or of damaging or taking any property.

439. On or about Monday, May 17, 2021, Mr. Persick went to the federal courthouse in Fort Worth and met the FBI agents there, as his lawyer had arranged. The agents arrested him and walked him to the United States Marshals. The marshals photographed and fingerprinted him. Upon information and belief, they also took a sample of his DNA, and his release order required him to cooperate in the collection of one. They put him in a cell, and he sat there the rest of the day.

440. Toward the end of the day Mr. Persick was brought before Magistrate Judge Jeffrey Cureton. He was released on his own recognizance without posting money. He was put on pretrial



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

supervision, ordered not to communicate with other people charged over January 6, and directed to appear by Zoom in Washington. He had to give up his passport and his phone.

441. News of his arrest ran on the Dallas-Fort Worth television stations and in the local papers, which reported that he was the twenty-third North Texan charged over January 6. Reporters called his wife at her job, trying to reach him and to learn more about him.

442. On July 22, 2021, the government filed an information charging the same four misdemeanors in United States v. Persick, No. 1:21-cr-00485-BAH (D.D.C.). The case was assigned to Chief Judge Beryl A. Howell. Mr. Persick stayed on pretrial supervision for about a year. He appeared before the court three or four times, all by Zoom.

443. By then Mr. Persick had paid his lawyer about $40,000. His lawyer did not want to take the case to trial, and told him a trial would cost about three times as much and end the same way. Mr. Persick took the government's offer. He pleaded guilty to the one count of parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G), and the government dismissed the other three counts.

444. Mr. Persick went to Washington in person for sentencing on July 14, 2022. Thirty-one people had written letters to the court on his behalf. Mr. Persick understood that the government was asking for two weeks in jail. Chief Judge Howell did not send him to jail. She sentenced him to thirty-six months of probation, with the first ninety days on home detention, a $5,000 fine and $500 in restitution (despite no harm or injury to anything). He paid the $500 to the Architect of the Capitol.

445. Mr. Persick served the ninety days of home detention while he kept working. He had told his employer about the case, but not about the sentence, and his work did not suffer. About

a year after he pleaded guilty he was fired. He was out of work for about two years, until about September 2025.

446. Mr. Persick's bank closed his accounts. PayPal, Facebook and Lyft closed his accounts too.

447. When Mr. Persick flew, he was marked for secondary screening, known as SSSS. It happened more than once. Each time he was pulled out of line at the airport and searched.

**448.** Mr. Persick and his wife had been going through IVF, trying to have children, when he was charged. The case ran through those same years, and it became all but impossible for them to go on. The stress caused his wife to suffer a miscarriage during the time; and as a result they have no children.

449. The government returned Mr. Persick's phone months after he pleaded guilty. It has never returned his passport.

450. Mr. Persick's prosecution terminated in his favor on January 20, 2025, when the President, by Proclamation 10887, granted a full, complete and unconditional pardon to all individuals convicted of offenses related to the events at or near the Capitol on January 6, 2021. He was not in custody that day, but he was still on federal probation, with about six months of his three-year term left to run. The government still holds his passport. Upon information and belief, his DNA sample, fingerprints and photographs remain in the government's possession.

**Thomas Robertson**

451. The Plaintiff Thomas Robertson lives in Ferrum, in Franklin County, Virginia, about four hours' drive southwest of Washington. He was forty-seven years old on January 6, 2021. He is an Army veteran. From 2009 to 2011 he worked in Afghanistan as a Defense Department contractor training the Afghan National Army, and in 2011 he was shot in the right



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

thigh there. He went through about ten surgeries. The wound left him with a limp, and on days when he expects to be on his feet for hours he walks with a stick. His children are grown.

452. In January 2021 Mr. Robertson was a sergeant with the police department of the Town of Rocky Mount, Virginia. He had been a police officer for about twenty-five years. He was off duty on January 6. The Town of Rocky Mount fired him after January 6, and he will never work as a police officer again.

453. At about 2:00 a.m. on January 6, 2021, Mr. Robertson left Ferrum in his car with Jacob Fracker, another off-duty Rocky Mount officer, and a neighbor. They parked at the Franconia–Springfield Metro station in Virginia and rode the train into the city. They went to the President's rally near the Washington Monument and stayed until the speech was over. Then they walked with the crowd up the street to the Capitol.

454. The crowd at the Capitol was very large. Mr. Robertson went to the West Front. Officers were setting off flash-bang devices and smoke grenades in the crowd, and he put on a gas mask. Tear gas drifted over the crowd, and he was exposed to it. Mr. Fracker went into the building first, at about 2:14 p.m., through a broken window. Mr. Robertson went in a few minutes later, at about 2:16 p.m., through a doorway next to that window. The door was standing open.

455. Inside, Mr. Robertson turned right and walked into the Crypt, where he found Mr. Fracker in a large group of people. The two men walked around the Crypt and took a picture in front of one of the statues. Then they left through the same entrance. Outside, the neighbor they had come with was no longer where they had left him. They found him giving first aid to a man who had been shot in the face with a rubber bullet. Mr. Robertson asked a Capitol Police officer where the nearest Metro station was, and she told them. They rode the train back to Franconia–

Springfield and drove home. That night Mr. Robertson was sitting in his living room in Ferrum, watching on television, when the Senate came back into session.

456. Upon information and belief, the government obtained the location data from Mr. Robertson's cell phone through a geofence warrant and used it against him. His photograph and his case were posted on private websites that track people who were at the Capitol on January 6.

457. On January 13, 2021, an FBI agent telephoned Mr. Robertson and told him there were two misdemeanor warrants for him and that he should turn himself in. The warrants had been sworn out by a Capitol Police officer, and the charges were trespassing and disorderly conduct. Mr. Robertson met the agents at the Rocky Mount Police Department, his own department, and surrendered. They drove him to Roanoke. There he was put in leg irons and a waist chain, with his hands cuffed in front of him, and processed. He appeared before Magistrate Judge Robert Ballou of the Western District of Virginia and was released that night. A friend came to get him. His release conditions barred him from having any firearm or dangerous weapon, made him turn in his passport, and kept him in the state.

458. At about 9:00 a.m. on January 19, 2021, the day of his first appearance in the District of Columbia court, FBI agents came to execute a search warrant at his house. There were about fourteen of them, carrying M4 rifles. They shouted at Mr. Robertson and his wife to show their hands and get down, and then sat them at the kitchen table while they searched. The agents took the walking stick he had carried in Washington, his Samsung phone, two tablets and a laptop computer. They took firearms, among them his wife's handgun from her car, for which she held a concealed-carry permit, an antique muzzleloader that hung on the garage wall and did not work, and his two police-issued duty weapons, which he was scheduled to turn in to the department. At that time he was charged with two misdemeanors.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

459. On January 29, 2021, a grand jury indicted him in United States v. Robertson, No. 1:21-cr-00034-CRC (D.D.C.), before Judge Christopher R. Cooper. The indictment added the felony of obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2). He pleaded not guilty on February 2, 2021, and stayed on release.

460. On June 29, 2021, FBI agents searched Mr. Robertson's house a second time. His adult son, a soldier in the United States Army who was stationed in Germany, was staying there while he cleaned up a rental house that Mr. Robertson planned to let him live in when he left the Army. His son had never lived in that house. His son's own guns and ammunition were in his truck. Agents handcuffed his son. They asked him where his father's guns were, and he named the wrong one of the two neighbors who live within a mile of the house. Agents then went to both neighbors and asked them whether his son was a liar.

461. The next day the government moved to revoke Mr. Robertson's release, on the ground that firearm purchases made after his indictment violated his conditions. On July 7, 2021, he turned himself in again at the United States Marshals' office in Roanoke. On July 28, 2021, Judge Cooper ordered him held until trial. He asked for release again, including in October 2021 for home detention with GPS monitoring, and was denied each time. He stayed in custody from July 7, 2021, until January 20, 2025.

462. While Mr. Robertson was in jail, his lawyer told him the government would charge his son with making a false statement to the FBI unless Mr. Robertson pleaded guilty. His son told him to let them charge him. His son had to hire a private lawyer and was called before a federal grand jury. Upon information and belief, the grand jury returned no indictment, and his son was never charged.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

463. Mr. Robertson was held before trial in supermax conditions at the Central Virginia Regional Jail in Orange, Virginia. For about fifteen months he was kept in segregation, alone in his cell twenty-three hours a day. The jail said it was for his own safety, because he had been a police officer, but when he later reached federal prison he was put in general population and had no trouble there. He never went outside or saw the sun, and the only time he left the cell was one hour a day to shower, in handcuffs. He would put his hands out through the shower curtain to be uncuffed, shower, and put his hands out again to be cuffed before he could step out. He spoke to guards and to other prisoners through the door. When it was his turn to use the telephone, it was wheeled to his cell and passed through the door, and on busy nights he got one twenty-minute call. For fifteen months he did not shake another person's hand.

464. In October 2021, while he was in that cell, his father died. While he was in custody his daughter married and his first grandchild was born. His wife left him for another man. They could not get through the divorce papers while he was in prison, and they divorced after he came home.

465. Mr. Robertson would not plead guilty to a felony. The prosecutor told him the only plea the government would take would include a felony, though not jail time, and he refused it. On 1/19/22 a superseding indictment adding a felony §231 charge when Mr. Robertson and his codefendant Mr. Fracker moved to dismiss the bogus §1512 charge. The new indictment also turned the restricted-building misdemeanors into felonies under 18 U.S.C. § 1752(b)(1)(A) by calling his walking stick a "deadly or dangerous weapon" and saying he walked in a restricted area with such a weapon. On Mar 23, 2022, after Robertson continued to defend himself, he was again vindictively charged with a second superseding indictment under 1512(c)(1) for losing or destroying his cell phone. The government also demanded that Mr. Robertson be jailed before



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

trial simply for ordering some firearms (but never possessing them) at the beginning of the case while under misdemeanor charges.

466. The government did not give the defense the video it intended to use. It gave his lawyer, whom he paid $400 an hour, access to a database of thousands of hours of video and sent thousands of pages of documents, and the video was under a protective order. The first time Mr. Robertson saw any video of himself from January 6 was in the courtroom.

467. Jury selection began on April 4, 2022. It was only the second January 6 case to go before a jury. His wife traveled to Washington and sat in the courtroom every day. The government's first witness, a police officer, played about two hours of video from January 6. None of it showed Mr. Robertson. On April 11, 2022, the jury found him guilty on all six counts after a lengthy jury trial. (The jury was obviously torn, passing five jury notes before convicting.)

468. sentenced to 87 months. Fracker pleaded guilty to conspiring with his fellow officer to obstruct an official proceeding and was sentenced to one year of probation, with 59 days in home confinement. : obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2); tampering, 18 U.S.C. § 1512(c)(1); civil disorder, 18 U.S.C. § 231(a)(3); entering and remaining in a restricted building or grounds, and disorderly and disruptive conduct in a restricted building or grounds, each with a deadly or dangerous weapon, 18 U.S.C. §§ 1752(a)(1), (a)(2) and (b)(1)(A); and disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D). The only "weapon" charged was the walking stick—which was never used as a weapon.

469. On August 11, 2022, Judge Cooper sentenced Mr. Robertson to eighty-seven months in prison, thirty-six months of supervised release and $2,000 in bogus "restitution"—an outrageous sentence given that Mr. Robertson had breached nothing, damaged nothing and harmed no one. At that time the sentence was tied for the longest prison sentence among J6ers. A few



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

weeks later Mr. Robertson was moved to the Northern Neck Regional Jail in Virginia and held there a little under a month to wait for transfer to federal prison. He was then moved in shackles, by van, through several stops to the Federal Correctional Institution at Allenwood, Pennsylvania. On the road he was not allowed to use a toilet every time he needed one, and more than once he stepped out of the van with his legs pressed together.

470. At Allenwood Mr. Robertson worked for Federal Prison Industries in a test lab, putting furniture under loads to test it against industry safety standards. After a piece of a cell phone was found in the cell he shared with another prisoner, both men were sent to the special housing unit for ninety-nine days. The phone was not his. When two of his teeth went bad, the prison would only pull them, and they were pulled.

471. Mr. Robertson appealed, United States v. Robertson, No. 22-3062 (D.C. Cir.). On October 20, 2023, the court of appeals affirmed his obstruction conviction over the dissent of Judge Henderson, who found the evidence insufficient. On May 28, 2024, the court reissued its opinion and vacated the sentence, because the district court had raised it with enhancements for interfering with the administration of justice that did not apply to the certification of the electoral vote. In June 2024 the Supreme Court decided Fischer v. United States, which narrowed § 1512(c)(2).

472. Mr. Robertson was taken back to Washington for resentencing and held in the District of Columbia jail for about two months. The jail did not allow razors or nail clippers. Once a month a guard came by with clippers and cut his beard down as close as they would go. He kept his fingernails short by rubbing them on a piece of concrete block that had worn through. In the jails where he was held he was put in cells where earlier prisoners had smeared feces on the walls, and he was given paper towels and water to clean them. When prisoners on the upper tiers flooded



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

their toilets, the sewage came down, and he stood in it ankle-deep. The officers there made plain that they hated the January 6 prisoners.

473. On September 4, 2024, the obstruction conviction was dismissed and Judge Cooper resentenced him. Without that count his guidelines range was thirty-seven to forty-six months. By then he had been in custody for more than three years and he deserved release. The government asked for the same eighty-seven months. Judge Cooper sentenced him to seventy-two months, *more than two years above the top of the range*, in retaliation for successfully litigating the appeal. Mr. Robertson waited about another month in the District of Columbia jail and was then sent back to Allenwood. Mr. Robertson appealed the outrageous (re)sentence.

474. On January 20, 2025, at about 4:00 p.m., an officer at Allenwood told Mr. Robertson to pack his things and be out by midnight. He thought the officer was joking. He and four other January 6 prisoners were processed out in the captain's office, and at 11:58 p.m. he walked out the front door. Volunteers who had been driving through the prison parking lots looking for them took the men to a motel, and his family came to bring him home. He had been in custody for forty-two months. The first night home, he turned out the lights. There is no darkness in prison.

475. While his case was pending, and in prison, Mr. Robertson received hate mail, and some of it said the writers wanted him and his whole family dead. He was threatened on Facebook. He lost his social media accounts. His account at BB&T was frozen, upon information and belief after the government labeled him a domestic terrorist. He took his retirement earlier than he had planned and lost part of the pension he had earned over his career. The government held Mr. Robertson's phone, two tablets and laptop for about four years. When agents offered to give them back, he would not take them. Upon information and belief, the government did not destroy them and retains the data it took from them.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

476. Mr. Robertson's prosecution terminated in his favor on Feb 12, 2025 when the Court of Appeals ordered that the judgment of the district court be vacated and the case be remanded with instructions to dismiss the case as moot. On Feb. 13, 2025 the entire case was dismissed. Upon information and belief, the DNA sample and fingerprints taken from him remain in the government's possession.

**Eliel Rosa**

477. The Plaintiff Eliel Rosa lives in Midland, Texas. He was born on May 29, 1967, in a small town in Brazil, the son of an evangelical pastor, and on January 6, 2021, he was fifty-three years old. He married in Brazil in 1991 and has sons and grandchildren. In about 2002 he moved from São Paulo to Curitiba, where he worked for the city's mayor. Because of political persecution in Brazil, where the family's house was bombed, he and his wife came to Midland in 2016 at the invitation of friends who pastor a Mexican-American church there. The United States granted him political asylum in October 2018. He had no criminal record anywhere.

478. In Midland, Mr. Rosa and his wife founded Nehemiah220 Ministries and the Nehemiah School of Government, which teaches the Declaration of Independence, the Constitution and the other founding documents of the United States. He has studied those documents for more than twenty years. The press called him a civics teacher. He cannot vote, and he has never been able to, but he cared about the country and about the integrity of its elections, and before January 6 he went to rallies in Arizona and to the Million MAGA March in Washington in November 2020.

479. Mr. Rosa met Jenny Cudd, a Midland florist and former candidate for mayor, at an event in November 2020. He, his wife and Ms. Cudd spent thirty-four days that year counter-protesting on behalf of a local Chinese pastor who had been accused of being a spy for the Chinese

Communist Party, after more than a hundred protesters were bused in from Houston against him. When the President posted that supporters should be in Washington on January 6, Mr. Rosa told Ms. Cudd she needed to go. His wife asked him to look after her there. She told him, "Take care of Jenny as you would take care of me."

480. Mr. Rosa and Ms. Cudd traveled to Washington separately and stayed at the same hotel in separate rooms. He was at the Ellipse by about 5:30 a.m. on January 6 with a group of Texans, and at 5:22 a.m. he posted a photograph of himself walking toward the rally. The crowd was festive. People danced and talked and sang. The President had been scheduled to speak at 11:00 a.m. and began at about noon. Mr. Rosa listened to the speech. When it ended, he went back to the hotel to warm up and to get food and water. There he learned that the Vice President was not going to act on the electoral count, and he and Ms. Cudd walked with the crowd toward the Capitol.

481. They came to the Capitol from the west. Mr. Rosa heard people on megaphones and heard bangs, and he noticed pepper spray in the air. By the time they reached the building the doors were already open and crowds were already inside. At 2:35 p.m. he walked in through the Upper West Terrace Door with Ms. Cudd. He carried no weapon and no gear. He forced nothing and broke nothing and took nothing.

482. From 2:36 to 2:39 p.m. Mr. Rosa was in the Rotunda, where he took pictures with his phone. Around him people were praying and singing. He stayed inside the velvet ropes. From 2:39 to 2:42 p.m. he moved with the crowd through Statuary Hall and the Statuary Hall Connector, and at about 2:43 p.m. he left a crowd near the main door of the House Chamber and walked east. He was around a corner from the doors to the Speaker's Lobby when he heard the shot that killed



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Ashli Babbitt. A man walked past him with blood on his hands, saying, "They shot her." Fear spread through the hallway and people began to leave.

483. Officers told Mr. Rosa to stand against a wall, and he did. After a short time they told him to leave, and he left at once. At about 2:54 p.m. he walked out through the Upper House Door as officers escorted the crowd out of the building. The officers he saw did not push or shout. He had been inside for about twenty minutes. The government later conceded that he committed no violence and destroyed no property, that the Capitol's cameras show he did not go far into the building, and that he left when he was asked.

484. Outside, Mr. Rosa saw people who had been hit with tear gas. He prayed with groups of people on the east side of the Capitol, and when the tension rose near the tunnel on the west side he left. When his phone found a signal again it showed twenty-one missed calls from his wife. She had been watching the news and believed he had been shot.

485. Mr. Rosa posted nothing in praise of what had happened. Someone else took a photograph of him in the Rotunda, and someone else posted it to his social media timeline. The government later held that photograph up as proof that he had "proudly" documented his time inside the Capitol. He did not take it and he did not post it.

486. On January 9, 2021, three days after January 6 and before any warrant had issued and before anyone had named him as a suspect, Mr. Rosa walked into the FBI's office in Midland, told the agents that he had gone into the Capitol, and sat for an interview. He told them he blamed himself, that he was ashamed, that he had broken the law and that he would not hide. He handed over his phone. Judge McFadden later said from the bench that he had never seen a defendant surrender before he was identified as a suspect.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

487. On January 12, 2021, the government charged Mr. Rosa and Ms. Cudd by criminal complaint with two misdemeanors: entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1), disorderly and disruptive conduct in a restricted building or grounds, and disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2). On January 13, 2021, Mr. Rosa surrendered at the FBI office in Midland. Agents held him there for about three hours and took his phone. They then shackled and handcuffed him and drove him to the federal courthouse in Midland, where he was fingerprinted and photographed and held by the United States Marshals for about seven hours. He was put in a tiny cell with ten other men, all of them in prison uniforms. When the men learned why he was there, they cheered him. That afternoon a magistrate judge released him on a personal recognizance bond. Upon information and belief, the government placed him on a terrorist watchlist at about the same time.

488. On February 3, 2021 Ms. Cudd filed a motion seeking due process protection, and on February 3, 2021, the government filed a vindictive five-count indictment against Mr. Rosa and Ms. Cudd in United States v. Cudd and Rosa, No. 1:21-cr-00068-TNM (D.D.C.), before Judge Trevor N. McFadden. Count One falsely charged obstruction of an official proceeding and aiding and abetting, 18 U.S.C. §§ 1512(c)(2) and 2, a felony carrying up to twenty years in prison.

489. Mr. Rosa pleaded not guilty. On July 19, 2021, the government sent his public defender a plea offer that expired on July 29, 2021. He could plead guilty to Count Five, parading, demonstrating or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G), a Class B misdemeanor carrying up to six months in prison, pay $500 in restitution, open his social media accounts to the FBI and sit for another interview before sentencing, or he could go to trial on the felony. The offer letter told him in writing that, because he was not a citizen, a conviction made



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

his deportation very likely. He understood that if he did not sign, the felony would stay. On July 29, 2021, at a video hearing, he pleaded guilty to Count Five.

490. The government asked Judge McFadden to sentence Mr. Rosa to one month of home confinement, three years of probation, sixty hours of community service and $500 in restitution. On October 12, 2021, in Washington, Judge McFadden sentenced him to twelve months of probation, 100 hours of community service and $500 in restitution. The judge said he saw no value in home confinement. He also told Mr. Rosa that his conduct was more troubling because of what he taught and because of how he had come to this country. Mr. Rosa served the probation. He paid the restitution.

491. For months after the arrest, Mr. Rosa's face and name ran on the local news in Midland and Odessa. A trip to the supermarket, or to his minor son's school, meant being recognized as the man from the Capitol. Wells Fargo closed his bank account without explanation. Because his email address was the recovery address on his oldest son's account, the bank closed that account too, and it drove a wedge between father and son. Most of the people who had supported the ministry stopped giving.

492. With the ministry's support gone, Mr. Rosa tried for more than a year to find ordinary work to pay the rent and feed his family. Each application went the same way: when he reached the page that asked about a criminal record, it ended. The few friends who stayed with him brought food baskets and mailed small checks to cover the family's bills. He stopped going to the church he had attended. He could not relax or focus on the work of the ministry.

493. Mr. Rosa's asylum was supposed to lead to a green card after two years and to citizenship after five. Instead, after his conviction, his application for permanent residence was denied following an interview at the USCIS office in El Paso that ran more than three hours and

that, in his account, was about politics rather than about him. His immigration case has sat unresolved for about two years since then, and the pardon changed nothing. More recently the government denied his wife's asylum claim. Upon information and belief, he was the only non-citizen prosecuted for January 6 who was permitted to remain in the United States; he knew of another non-citizen who was removed within ten days of his arrest. He has another USCIS interview in El Paso in 2027, and he fears that it will end with his family being sent back to Brazil, where their house was bombed.

494. Because he is an asylee, Mr. Rosa cannot travel to Brazil. His son and daughter-in-law applied for visitor visas for his grandchildren, then three and two years old, so that he could meet them in the United States. The United States Consulate in Brazil denied the children's visas. Upon information and belief, the denial was a consequence of his January 6 case. He has never held those grandchildren.

495. Since his release, Mr. Rosa has lived with night terrors and nightmares about ICE or the FBI breaking down his door and taking him and his family away, with panic attacks, and with a hypervigilance that has not let up. He has felt abandoned by the elected officials he asked for help. He says he feels like a hostage who was not released even after the ransom was paid.

496. Mr. Rosa's prosecution terminated in his favor with the pardon of January 20, 2025, under the President's proclamation granting a full and unconditional pardon to every person convicted of an offense related to the events at the Capitol. Twenty-one months later, the government still holds his immigration status over him. Upon information and belief, the fingerprints and photographs taken from him on January 13, 2021, the contents of his phone, and his name on the watchlist remain in the government's possession.

**Kimberly Sabbagh**



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

497. The Plaintiff Kimberly Sabbagh lives in Long Beach, New York, on Long Island. She is not married, and she has a son. She has received Supplemental Security Income for many years. In January 2021 she was not working, and she lived at home with members of her family.

498. Ms. Sabbagh went to Washington for January 6, 2021, to protest peacefully. She carried a pink "Women for Trump" flag. She did not go to hear the President speak that morning. She went straight to the area around the Capitol.

499. At the Capitol she watched the Vice President arrive. Later she moved with the crowd closer to the building, and for a while she stood and waited there. Then more and more people came, and the crowd began to push and shove. Gas canisters went off in the crowd.

500. Ms. Sabbagh was caught in the crush. She was lifted onto men's shoulders and passed up from one level of the Capitol's exterior to the next. For a time she thought she had gone into the building, but what she had gone up was an outside staircase to a higher level. She never went inside the Capitol.

501. She was gassed again and again. She was hit at least twice by small round projectiles. Upon information and belief, they were rubber bullets fired by police. On one of the middle levels she passed out, fell to the ground and hit her head. When she came to, a man in a heavy gas mask was pouring water over her. She came away with cuts and bruises. Photographs were taken of her lying on the ground, and she has prints of them.

502. Ms. Sabbagh had her cell phone with her. There was no phone service in the area while she was there. That night, as she looked at her phone, the pictures she had taken that day were turning blank on the screen. She had about 300 of her photographs printed. When she got back from Washington she had the phone shut off and got a new one, because she believed it had been compromised.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

503. Upon information and belief, the government collected the location data from Ms. Sabbagh's phone through the unconstitutional general geofence warrant it obtained for the cell phones present in and around the Capitol on January 6, 2021, and that data remains in the government's files.

504. That evening she went back to the hotel in Chevy Chase where she was staying. Half of the hotel was locked down. About twenty people who had been at the Capitol gathered in the parking lot, and one man had pictures of Ashli Babbitt being shot.

505. When Ms. Sabbagh came back from Washington, her family would not let her come home, because she had been at the Capitol on January 6. She left with one small bag, her pocketbook, her wallet and her identification. Her furniture and everything else she owned was lost. She has not set foot in that house since.

506. It was the dead of winter. She stayed with friends and moved from couch to couch, and when she could she paid for a hotel room or paid people to let her sleep on their couches. Some nights she was on the street. Every dollar she had went to finding a place to sleep. With no home and a new phone, she was out of touch for a while, and she did not see the news coverage of January 6 until days afterward.

507. When she did see it, she was in it. A Newsmax program showed her pink flag. She appeared in news clips and in several films she never gave permission for, among them an HBO documentary that, as she saw it, portrayed her as a devil, as if she were a terrorist. A video posted on TikTok showed her face and told viewers to report her if they knew her and to prosecute her.

508. Her face was on television and on social media, and she had carried her phone at the Capitol.

509. In or about June 2021, federal agents contacted Ms. Sabbagh and questioned her about January 6. They asked her about a great many things. She told them that she had been there. The agents did not search any home or property of hers. By then she had no home to search.

510. Ms. Sabbagh was never arrested. No complaint, information or indictment was ever filed against her. She never appeared in court, was never held in jail and was never placed under supervision.

511. Her family disowned her over January 6. For years she had no family. Only now that she is seriously ill have some of them begun to come back.

512. Ms. Sabbagh now has an aggressive cancer that has spread through her body, and she is in treatment. She is homebound. In or about September 2026 the wheelchair she was being pushed in hit a bump in the sidewalk, and she fell out of it and fractured her skull. She has trouble remembering things now. She has good days and bad days.

513. Ms. Sabbagh was investigated and questioned by federal agents, but she was never arrested, charged or prosecuted for anything arising from January 6, 2021. There was no prosecution to terminate in her favor, and she received no pardon, commutation or dismissal under the proclamation of January 20, 2025. Upon information and belief, the government still holds the location data from her phone and the records of its investigation of her.

**Jeremy Ryan Sorvisto**

514. The Plaintiff Jeremy Ryan Sorvisto lives in Dollar Bay, Michigan, in the Upper Peninsula. He was born in Texas, was adopted as a boy, and moved to Hancock, Michigan, when he was nine or ten. On January 6, 2021, he was thirty-seven years old and lived in Hancock. He had worked as an auto mechanic for more than ten years. He had married his high school

sweetheart in 2005, and after they divorced they shared custody of their three children, who were teenagers then. His children are grown now. He works in fiberglass.

515. On January 4, 2021, Mr. Sorvisto left Hancock on a road trip to Georgia with his fiancée at the time, a close friend, and the friend's wife. They planned stops in Ohio and Virginia. None of them had ever seen a President speak, and they decided to stop near Washington on the way south to hear him. They reached Virginia on the evening of January 5 and took rooms at a hotel in Chantilly.

516. On the morning of January 6 the two women stayed at the hotel. Mr. Sorvisto and his friend got a ride into the city and were at the rally by about 10:00 a.m. It was cold, and they stood in the grass with the crowd and listened to the President. About fifteen minutes before he finished, they saw people starting to leave and went along with them.

517. On the way they came on Alex Jones speaking from a wall, and they walked the rest of the way to the Capitol in the crowd around him. When they got there the bicycle-rack barricades were already down and scattered on the ground. They went around to the side of the building where the scaffolding stood. Tear gas and flash-bangs began going off around them. They were both gassed.

518. Mr. Sorvisto and his friend climbed up through the scaffolding to the doors. At about 2:25 p.m. Mr. Sorvisto went into the Capitol through the Senate Wing doors. The doors were open, and police officers were standing at them. He shook one officer's hand as he went in.

519. Mr. Sorvisto was inside the building for about twenty-five minutes. He was in one of the first groups through, and the people around him moved along in a single-file line. He went to the Crypt and the Visitor Center and took pictures of himself and of the crowd. He picked up litter. The government's own sentencing papers later said so. At one set of doors, officers in riot



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

gear came out with shields and struck an older man. Mr. Sorvisto stepped back and recorded it on his phone.

520. After Ashli Babbitt was shot, word went through the building that there was an active shooter and that everyone had to leave. Officers ordered the crowd out, and Mr. Sorvisto followed the order. Officers had blocked the door, and furniture flew past him and his friend as they tried to get out. At about 2:50 p.m. the two men climbed out through a window. They took the Metro to the station nearest their hotel and caught a ride from there. The next day the group drove on to Georgia, and they spent most of the next week on the road before going home to Michigan.

521. Selfies Mr. Sorvisto had taken inside the Capitol were posted on Facebook. On January 20, 2021, someone sent social-media photographs that placed him in Washington to the FBI's tip line. Agents investigating his friend, who had been arrested in Michigan in January, found hotel surveillance video from Chantilly that showed a man matching Mr. Sorvisto's description walking in with the friend, and Capitol video that showed a man in a black jacket with reflective stripes and a red hat beside the friend. Mr. Sorvisto had his cell phone with him on January 6, and upon information and belief the government also obtained his phone's location data through a geofence warrant. Upon information and belief, the private group that calls itself Sedition Hunters posted his picture under the tag "#Insider1574."

522. On April 7, 2021, agents came for Mr. Sorvisto at his house in Hancock. It was early in the day. His teenage daughter was upstairs in her room doing school online, because of COVID. Mr. Sorvisto had just thrown out his back and was in his recliner, in pain, and he had fallen asleep in front of the television. He left his doors unlocked, and the agents came in through



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

both of them. He woke up with red laser sights all over him. He said, "Don't shoot, please don't shoot."

523. Agents carrying riot shields went upstairs to his daughter's room and brought her out. They kept her and her father apart and would not let them speak to each other. In the kitchen, agents tased Mr. Sorvisto three times. Then they started asking him questions. He told them he wanted a lawyer and answered nothing.

524. The agents took Mr. Sorvisto to the local jail and left him in a cell for about three to three and a half hours while they searched the house. They emptied the cupboards and pulled his belongings out, looking for the pants, shirt and shoes he had worn in Washington. They did not break down the doors, but they left the house torn apart. They took his phone and the video he had recorded on January 6.

525. FBI agents then came back for him and drove him about an hour and a half to the federal building in Marquette, chained at the wrists, waist and ankles in the back of the vehicle. He was fingerprinted and put in federal holding. He got there too late for dinner and spent the night. Upon information and belief, he was also swabbed inside the mouth for DNA. The next day he was released and got a ride home. On April 13, 2021, at his first appearance in the case in Washington, he was released on his own recognizance on conditions of pretrial supervision.

526. A criminal complaint filed on April 5, 2021, had charged Mr. Sorvisto with four misdemeanors. On April 26, 2021, the government filed an information in United States v. Sorvisto, No. 1:21-cr-00320-ABJ (D.D.C.), before Judge Amy Berman Jackson, charging the same four: entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G). No count accused him of hurting anyone, damaging anything, or taking anything.

527. Hancock is a small town, and the nearest federal supervising officer was two hours away. Mr. Sorvisto had to take mandatory drug tests, and the testing site was an hour's drive south. On test days he drove an hour south, drove home, and then drove an hour north to work. He did that for eight months and complied with every condition. After the first hearings, his court appearances were by Zoom.

528. The friend Mr. Sorvisto had traveled with was charged in a separate case and held in jail in Washington. Mr. Sorvisto assumed that was where he was headed too. He was terrified. In his words, "I thought we were all going to prison forever." He had an assistant federal public defender from Washington, and she tried to get the video that he believed showed him picking up trash inside and shaking the officer's hand at the door. The government did not produce it. As Mr. Sorvisto understood it, much of the video was held back on security grounds.

529. Mr. Sorvisto took the plea when it was offered. He signed the plea agreement on August 30, 2021, and on September 3, 2021, he pleaded guilty to Count Four, parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G), a Class B misdemeanor that carried a maximum of six months. The other three counts were dismissed. He agreed to pay $500 in restitution to the Architect of the Capitol, to sit for an interview with the government about January 6, and to open his social-media accounts to it. He did the interview.

530. The government asked for thirty days in jail. His lawyer asked for two years of probation. On December 15, 2021, at a hearing held by remote connection, Judge Jackson sentenced Mr. Sorvisto to thirty days of incarceration, $500 in restitution (for nonexistent damage),



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

and a $10 special assessment. His friend, who had pleaded guilty to the same count, had been sentenced in August 2021 to six months, all of it time he had already served.

531. Mr. Sorvisto then waited months to learn when and where he would report. When the order came he reported to the federal prison at Duluth, Minnesota, and served his thirty days.

532. Every time Mr. Sorvisto appeared in court, his picture was on the front page of the local paper, The Daily Mining Gazette, and his case was on the local television news. People in the area wrote online that insurrectionists deserved to be hanged. He could not walk into a grocery store without being recognized and talked about. His fiancée was threatened online by people who thought she had been at the Capitol. Relatives cut him off over politics, and he lost friends.

533. Mr. Sorvisto lost his job as an auto mechanic. He was out of work from January until May 2021, and then he took a seasonal job running a kitchen an hour's drive north, just to pay the bills. Later he left the area altogether. He moved to Tennessee for a while and then to another part of Michigan for a few years, where nobody knew him and he could start over. He was living there, downstate, when he was pardoned.

534. Mr. Sorvisto's prosecution terminated in his favor with the President's pardon of January 20, 2025. The government took his phone and the video he recorded on January 6, and the record does not show that either was ever returned to him. Upon information and belief, the government still holds the contents of his phone, his fingerprints, and the DNA sample taken from him after his arrest.

**Ray Stanton**

535. The Plaintiff Ray Stanton lives in Lanesville, Indiana, in the country, and he lives there because it is quiet. He was born in August 1984 and was thirty-six years old on January 6, 2021. He is married. He is a combat veteran of the Iraq war.

536. Mr. Stanton served a year in Iraq, in 2008, with the 76th Brigade Combat Team. He was stationed at Al Taqaddum air base, which soldiers called TQ, in a reconnaissance, surveillance and target acquisition unit. His unit ran night missions and escorted commanders, VIPs and equipment in and around Baghdad, Ramadi and Fallujah. He was shot at. Trucks in front of his were blown up. Half of his squad received the Purple Heart. He earned the Combat Infantryman Badge and his gold spurs.

537. He came home with post-traumatic stress disorder and depression, and the Department of Veterans Affairs has rated him unemployable because of them. By January 2021 he was taking 120 mg of sertraline and 50 mg of trazodone a day. He had trouble sleeping and was worn out most of the time. He had been in therapy with social workers for five years. He rarely left home.

538. Mr. Stanton had not planned to go to the President's rally in Washington. A crowd of thousands was about the last place he wanted to be. A close friend talked him into it and promised to stay at his side. "Hey, man, I got you," the friend told him. "We'll go to this, we'll do this." They shared the same politics and believed they had every right to stand up for them. Mr. Stanton also hoped the trip might do him some good, that a day among friendly people would show him the world was not as dangerous as it felt.

539. The two men stayed at a hotel in Washington. On the morning of January 6 they went to the rally near the Washington Monument and stood a few feet to the left of the media area. The size of the crowd made Mr. Stanton uneasy, but the people around him were kind to him, and with his friend beside him he stayed calm. They listened to the speakers and stayed for the whole of the President's speech. Their plan was to leave Washington afterward.

540. When the speech ended they walked with a group toward the Capitol. Nothing seemed out of the ordinary. On the way, some people began to unroll a huge American flag, and Mr. Stanton joined them and helped carry it toward the Capitol. He did not know whose flag it was. To him it stood for what the crowd had come to say.

541. Mr. Stanton went up the steps with the crowd, under the flag. The steps were narrow, with people standing along both sides. He saw no barricade and no sign telling anyone to stay back, and he believed he was allowed to be there. In the press of people on the steps he lost his friend.

542. At the top Mr. Stanton was in no shape to do anything but get out. He saw the flag at the middle of the wall and helped the others fold it. He never went inside the Capitol.

543. Then an order came for everyone to disperse. Mr. Stanton wanted nothing more than to leave. As he turned to go, police officers formed a line in riot gear, and one officer near the end of the line raised his baton at him as if to strike him. Mr. Stanton had done nothing to him. He looked at the officer and said, "Thank you for your service, sir." The officer stopped where he stood, said nothing, and turned back toward the crowd. Upon information and belief, the officer's body camera recorded the exchange.

544. Going down, Mr. Stanton heard that a woman had been shot. With the gas, the explosions and the crowd, he felt, in his words, as if he had been "magically transported back into war." The tear gas burned him, and his ears rang for a long while after from the flash-bangs.

545. At the bottom of the steps he tried to call his friend. The cell signal was jammed, and his calls went to voicemail or did not go through. He called about sixteen times before he reached him. When his friend finally came down, the two of them walked back to their hotel past

scuffles on the side streets and police closing off blocks with barricades, and they left. On the drive home they hardly spoke.

546. Back in Indiana, the people at the Capitol were being called terrorists on every channel. Mr. Stanton told no one but his wife and a handful of his closest friends that he had been there. He deleted some of his social media accounts and went, as he put it, completely dark. He has stayed quiet about January 6 ever since.

547. Over the next four years he watched others who had been at the Capitol arrested and their homes raided. At first the arrests were of people who had gone inside the building. Later they reached people who had stayed outside, near the building, as he had. His wife lived with the fear that agents would raid their home and take her husband to jail.

548. Mr. Stanton had his cell phone with him at the Capitol and used it there. Upon information and belief, the government obtained the location data from his phone through the geofence warrant it served on Google for the phones present in and around the Capitol on January 6, 2021, and that data remains in the government's files.

549. The FBI never came to Mr. Stanton's door or called him. He was never arrested or charged, and he was never photographed, fingerprinted or swabbed for DNA by federal agents.

550. January 6 made his anxiety worse, and the VA prescribed him medication for it. He still cannot speak about that day easily. When he told the story in a telephone call in October 2026, he had to stop several times before he could go on.

551. Mr. Stanton was never arrested, charged or prosecuted for anything arising from January 6, 2021. There was no prosecution to terminate in his favor, and he received no pardon, commutation or dismissal under the proclamation of January 20, 2025. The government took no



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

property, DNA or fingerprints from him. Upon information and belief, the government still holds the location data from his phone.

**Kimberly Ann Sylvester**

552. The Plaintiff Kimberly Ann Sylvester lives in Auburn, Maine. She was born in Maine. She is a registered nurse. She began as a licensed practical nurse and went on to work in oncology, orthopedic and neurological nursing, dementia care, physical rehabilitation and general medical-surgical nursing. She is divorced and has two grown daughters and grandchildren. On January 6, 2021, she was fifty-six years old and had no criminal record.

553. Both of Ms. Sylvester's parents served in the Army in World War II, and her father fought in the Battle of the Bulge. Since 2008 she has organized trips that take the families of World War II veterans to France to retrace the steps their fathers and grandfathers took. She volunteered on the medical team of Honor Flight, which brings veterans to Washington to see their memorials. When a sheriff's deputy she knew was shot in the line of duty, she helped nurse him through his recovery.

554. Ms. Sylvester had never been to a protest. She went to Washington on January 5, 2021, with another nurse she worked with, to attend a prayer vigil. The two women spent the whole day outdoors at the vigil and went back that night to a small brownstone her friend had rented.

555. On January 6 they got up late and reached the Ellipse after President Trump had begun to speak. They stood toward the back of the crowd. Ms. Sylvester heard the President tell the crowd to march peacefully to the Capitol. She and her friend walked there with everyone else, taking a couple of pictures along the way, and stood around on the lawn talking with people. She saw no barriers. They walked up toward the foot of the steps.

556. Then munitions began to be fired into the crowd by the police. Ms. Sylvester saw people struck and hurt by them. There were grandmothers and grandfathers in that crowd, and small children. Where she stood, nothing had been happening before the firing started. She wanted to see what was going on. She and her friend walked up under the scaffolding and climbed the stairs to the upper level, where her friend decided to stay outside.

557. At about 2:22 p.m., Ms. Sylvester walked into the Capitol through the Senate Wing Door, which was open, in a stream of other people. She followed the crowd. She was wearing a purple winter coat and a red, white and blue knit hat. She told Capitol Police officers inside that she was a registered nurse and that she could help if anyone needed it.

558. The crowd carried her to an alcove where a man lay on the floor beside the officers taking photographs of everyone. When she tried to make her way out, she walked into a hall full of statues, and it filled with gas or smoke. She got into a corner, then went back to the officers in the next room and waited until it cleared.

559. Later, in a crowded part of the building, Ms. Sylvester went to a middle-aged police officer at the top of a staircase and told him she was trying to get out. He told her to follow him and walked her down a back staircase to a door, but the doorway was full of officers and he could not get her through. They went back up. She later saw video of that walk on the local news. She left the building through the Senate Wing Door and found her friend outside while the curfew alerts were going off on their phones, and went back to the brownstone.

560. Ms. Sylvester was identified and targeted by the government's general geofence warrant. According to the government's charging papers, a search warrant served on Verizon returned her number as one that had used a cell site serving the inside of the Capitol that afternoon. On January 10, 2021, four days later, an FBI agent texted that number a photograph of a woman



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

inside the Capitol and asked her to confirm or deny that it was her. She answered from the same phone that it was. The government had no probable cause to accuse her of any crime.

561. In December 2021 two FBI agents came to Ms. Sylvester's house and sat at her kitchen table. She told them she had been inside the Capitol and answered their questions. They asked to see the photographs and videos on her phone. She told them the files were in cloud storage and she did not know how to get them out, and the agents left. Upon information and belief, one of the two agents was a man she had seen, some time before, standing about ten feet behind her and her adult daughter, listening to them, at a public meeting at the State House in Augusta where people spoke against the COVID-19 vaccine mandates. Ms. Sylvester had photographed him that day without knowing who he was, and she had pointed out to her daughter that someone across the street was videotaping them.

562. Two more years went by. On December 11, 2023, nearly three years after January 6, the government charged Ms. Sylvester by criminal complaint, No. 1:23-mj-00344-GMH (D.D.C.), with four misdemeanors: entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G). The complaint did not accuse her of assaulting anyone or of damaging or taking anything.

563. About a week before Christmas 2023, Ms. Sylvester found an urgent voicemail from the FBI agent. When she called back, he told her he had a warrant for her arrest and that she could turn herself in or he and another agent would come and pick her up. She said she would come in. He wanted her at the FBI's office in Portland at about 6:30 the next morning. A close friend who had been a federal marshal and a Portland police officer for many years was with her,

and she took the phone and asked him why so early, when Ms. Sylvester would only end up sitting in a cell all day. The agent told her that Ms. Sylvester would be processed right away.

564. On December 13, 2023, Ms. Sylvester turned herself in at the FBI's office in Portland. The agent called her straight into his office and took her DNA. She was fingerprinted and booked, and then she sat alone in a holding cell for most of the day. She did not see or hear anyone else. She was handcuffed, then put in ankle chains to be taken to the probation office, then driven by the agent to another yard where a chain was locked around her waist. She was in restraints for about six hours. When the door to the courtroom opened, the room was full of people, the agents were standing in the back, and she shuffled in wearing the chains.

565. The prosecutor asked the court to take Ms. Sylvester's passport and to put restrictions on her. She had a trip to France planned for that June with at least ten members of World War II veterans' families, and she asked to keep her passport. She was allowed to keep it. She was released on her own recognizance and put on pretrial supervision. She could not leave Maine without permission, and a probation officer came to her house and went through it.

566. Ms. Sylvester told pretrial services that she smoked marijuana at night, which is legal in Maine, to help her eat. She was sent to a drug counselor, a young man of about twenty who spent two or three weeks telling her about his own problems before he told her she did not need to be there. She was kept on random drug testing anyway. Every evening at about 5:00 or 6:00 she called a number that told her whether to report for a test the next morning. She did that every day until she was sentenced. She went in for fifteen to twenty tests. None of them found anything.

567. Ms. Sylvester was appointed a lawyer from the public defender's office. In their first call the lawyer told her she had been arguing with the government all morning and that the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

government wanted her to plead guilty to all four charges. Ms. Sylvester said no. The lawyer was angry and cut the call short. That same day Ms. Sylvester emailed her to ask what the FBI had taken from her phone. The answer came back with a subject line in capital letters: "You were there, you know what you did."

568. At the same time, the lawyer was posting on Facebook that she hated President Trump and the January 6 defendants and that she approved of the judges who were coming down hard on them. Ms. Sylvester took screenshots. Her blood pressure that day was 240 over 120. She borrowed a large sum from a friend to hire a private lawyer, and she still owes it.

569. After her arrest Ms. Sylvester gave her phone to the FBI. The consent form the agent put in front of her covered five days before January 6 and five days after. She understood that the magistrate judge had allowed less, about two days on either side, and she would not sign it. The agent said he would call and check. He came back and wrote in three days on either side. She does not believe he made the call. The government later quoted text messages taken from that phone when it asked the court to send her to jail. When she got the phone back it never worked right, and she had to buy a new phone and get a new number.

570. Ms. Sylvester asked for the video of her time inside the Capitol, and in particular the time she spent standing with the officers. She received a few clips, including the officer trying to walk her out. None showed her standing with the officers. Upon information and belief, the government concealed that footage and did not produce it because it was exculpatory.

571. On February 27, 2024, the government filed an information in United States v. Sylvester, No. 1:24-cr-00102-JEB (D.D.C.), before Chief Judge James E. Boasberg, charging two misdemeanors: disorderly conduct in a Capitol building, 40 U.S.C. § 5104(e)(2)(D), and parading, demonstrating, or picketing in a Capitol building, 40 U.S.C. § 5104(e)(2)(G). On March 7, 2024,



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

she pleaded guilty to both counts. The two § 1752 charges from the complaint were dropped. She agreed to pay $500 in restitution.

572. Before sentencing Ms. Sylvester sat for a presentence interview of about two and a half hours, with her lawyer on the telephone. The interviewer went through her life from the day she was born. Within the week the interviewer emailed eight or ten more questions. One asked for the names and ages of her grandchildren. One of them was seven years old. She answered, because she understood that refusing would count against her at sentencing.

573. The government asked the court to sentence Ms. Sylvester to twenty-one days in jail, thirty-six months of probation, sixty hours of community service and $500 in restitution. On June 13, 2024, by videoconference, Chief Judge Boasberg sentenced her to twelve months of probation on each count, to run concurrently, $500 in restitution and a $20 special assessment. She was not sent to jail.

574. Ms. Sylvester has been diagnosed with post-traumatic stress disorder, and she has stopped working as a nurse and is on disability. When she renewed her nursing license, the board asked whether she had been convicted of any misdemeanors, and when she sent the papers it asked for more. The license was renewed. She does not expect any employer to hire her. She can no longer volunteer with veterans as she did before.

575. Her local newspaper put her on its front page. Its coverage told the town that her first husband had beaten her, something she had never told her children. Her youngest daughter did not speak to her for two years. Upon information and belief, her son-in-law, who works for the sheriff in her county, was questioned about her. Her name, the details of her case and photographs from it were posted on X, and she appears in a book about January 6. She has locked down all her



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

accounts. She will not volunteer for anything, and she does not give people her name, for fear it will end up in the paper again. When a car sits outside her house, she thinks she is being watched.

576. The President pardoned Ms. Sylvester on January 20, 2025, while she was still on federal probation, and the Office of the Pardon Attorney has listed her among the recipients of a certificate of pardon under the proclamation of that date. Her prosecution terminated in her favor with that pardon. Upon information and belief, the government still holds her DNA sample, her fingerprints and the data it took from her phone.

## CLAIMS FOR RELIEF

### Count I – Malicious Prosecution
### (FTCA: All the Plaintiffs Against United States)

577. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 576, above and incorporate them in this Count as though they are fully restated herein.

578. United States' employees (including all the officials described above) initiated criminal proceedings against all of the Plaintiffs.

579. The proceedings were initiated without probable cause.

580. The proceedings were continued with actual malice and for improper purposes (political persecution, retaliation, and to deter protected First Amendment activity).

581. The proceedings terminated in the Plaintiffs' favor.

582. The Plaintiffs suffered damages as a direct and proximate result.

583. The United States is liable under the FTCA for these torts committed by its investigative and law enforcement officers within the scope of their employment. 28 U.S.C. §2680(h). The United States' officers and agents fabricated and exaggerated evidence, withheld



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

exculpatory material, and pursued the cases despite the absence of probable cause that the Plaintiffs had committed the crimes alleged.

584. The criminal proceedings have terminated in the Plaintiffs' favor through acquittals, dismissals, and presidential pardons issued on January 20, 2025, which constitutes a favorable termination for purposes of a malicious-prosecution claim.

585. As a direct and proximate result of the Government's tortious conduct, each Plaintiff has suffered and continues to suffer damages in excess of $1 million, including but not limited to medical expenses, lost wages, pain and suffering, emotional distress, loss of liberty, loss of consortium, and other consequential damages.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

i. A grant of U.S. citizenship for Mr. Rosa.

**Count II – Selective Prosecution/Abuse of Process**
**(FTCA – All Plaintiffs Against United States)**

586. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 576, above and incorporate them in this Count as though they are fully restated herein.

587. The United States used the legal process improperly (to wit: criminal prosecutions) in a manner that is not justified by the underlying legal action.

588. The United States had ulterior motives and used the legal system to harass, intimidate, coerce, and inflict emotional distress upon the Plaintiffs rather than to achieve a legitimate legal objective.

589. The Plaintiffs suffered harm as a result of the misuse of the legal process. This harm included economic injury, emotional distress, and other damages as described in this complaint.

590. The defendant United States acted intentionally or with a reckless disregard for the consequences of its actions.

591. The prosecutions described in this complaint were selectively and vindictively initiated, maintained and pursued against the Plaintiffs because of the Plaintiffs' political affiliation, viewpoint, and association with the Trump candidacy or movement, while similarly situated individuals of opposing political views were not prosecuted. This constitutes selective and vindictive prosecution and abuse of process under District of Columbia common law and violates the Fifth Amendment's equal protection and due process guarantees.

592. As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

593. The abovenamed employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

594. The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

595. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and mental injury, including, but not limited to: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

596. The Plaintiffs suffered damages as a direct and proximate result.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

i. A grant of U.S. citizenship for Mr. Rosa.

**Count III - Federal Tort Claims Act – Negligence involving Personal Property**
**(All Plaintiffs Against the United States of America)**

597. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 576, above and incorporate them in this Count as though they are fully restated herein.

598. The United States had a duty to exercise reasonable care in handling the Plaintiffs' seized property.

599. The FBI, an agency of the United States government, seized the Plaintiffs' personal property following the events of January 6, 2021.

600. The FBI seized cell phones, computers, mail and other items of property from the Plaintiffs.

601. The United States breached its duty by failing to exercise reasonable care in handling the Plaintiffs' property.

602. While in federal custody, the Plaintiff's property was damaged, lost, or stolen.

603. The United States' breach of its duty caused damage to, loss of, or theft of the Plaintiffs' property.

604. As a direct and proximate result of the United States' breach of its duty, the Plaintiffs have suffered damages in the amounts to be established at trial.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

i. A grant of U.S. citizenship for Mr. Rosa.

**Count IV - Federal Tort Claims Act – Intentional Infliction of Emotional Distress**
**(All Plaintiffs Against the United States of America)**

605. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 576, above and incorporate them in this Count as though they are fully restated herein.

606. The United States and its officers described in Paragraphs 1 through 576 engaged in extreme and outrageous conduct.

607. The United States' officers engaged in this conduct intentionally.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

608. The Plaintiffs each suffered public ridicule, mockery, and severe humiliation due to the branding of them as insurrectionists, rioters, being anti-American, seditionists, traitors, violent, and besmirching the label of J6er and attaching that label to the J6ers with the negative ramification, imprisonment, wrongful arrest, from which the Plaintiffs have suffered emotional pain, a loss of enjoyment of life, lost income, loss of their choices of means of earning a living, loss of revenue from failed businesses and unobtainable employment.

609. The conduct of the conspirators was outrageous.

610. As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

611. The abovenamed employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

612. The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

613. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and mental injury, including, but not limited to: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

614. The United States' conduct caused the Plaintiffs to have severe emotional distress.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

615. The Plaintiffs demand trial to show and establish the evidence of such severe emotional distress.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

i. A grant of U.S. citizenship for Mr. Rosa.

**Count V –Abuse of Process/ Vindictive Prosecution**
**(FTCA – all plaintiffs against the United States)**

616. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 576, above and incorporate them in this Count as though they are fully restated herein.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

617. The United States and its prosecutors retaliated against plaintiffs for defending themselves by filing vindictive, malicious, bogus superseding felony indictments or punishing them for exercising their constitutional rights.

618. This was in accordance with a knowingly unconstitutional pattern and practice of the Garland Justice Department in J6 cases. The majority of J6ers who exercised their right to misdemeanor trials were similarly punished with false felony charges.

619. Word of this unconstitutional program and abuse of process spread widely among J6ers, compelling other accused J6ers to falsely plead guilty to crimes they didn't commit.

620. The United States implemented, directed, or failed to adequately train and supervise a policy, custom, or practice within the DOJ and U.S. Attorney's Office for the District of Columbia whereby federal prosecutors were encouraged or permitted to file superseding indictments adding felony charges against January 6 Defendants who were initially charged only with misdemeanors and who refused to plead guilty and instead demanded their constitutional right to trial.

621. This policy constituted abuse of process and vindictive prosecution in violation of the Fifth Amendment's Due Process Clause and was the moving force behind the unconstitutional actions against the Plaintiffs.

622. These false felony prosecutions were vindictively initiated and pursued against the majority of similarly situated J6 Defendants because they exercised their constitutional right to refuse a misdemeanor plea and demand a trial. Misters Garland and Graves, through unwritten policy, custom, directive, or deliberate indifference in training and supervision, caused federal prosecutors to file superseding false felony indictments in retaliation. Garland and Graves failed



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

to properly train and supervise prosecutors regarding the prohibition on retaliatory charging decisions, despite the obvious risk of tortious and constitutional injury.

623. In each case, the criminal proceeding terminated in the Plaintiffs' favor, either by dismissal, acquittal on key counts, or executive clemency that nullified the convictions and restored the Plaintiffs' rights.

624. The United States is liable under the FTCA for these torts (abuse of process and malicious prosecution) committed by its investigative and law enforcement officers within the scope of their employment. 28 U.S.C. § 2680(h).

625. In every essence, this insidious practice deprived J6ers of their constitutional right to demand that allegations be subjected to fair adversarial trials.

626. As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

627. The above-named employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

628. The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

629. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and mental injury, including, but not limited to: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5)



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

630. The Plaintiffs suffered damages as a direct and proximate result.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

i. A grant of U.S. citizenship for Mr. Rosa.

**Count VI - Tortious Civil Conspiracy (under law of District of Columbia)**
**(All Plaintiffs versus the United States of America)**

631. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 576, above and incorporate them in this Count as though they are fully restated herein.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

632. The United States and its officers described in Paragraphs 1 through 576 forged a cooperation and meeting of minds between two or more of its officers to commit a wrongful act, and an overt act in furtherance, resulting in damages.

633. The United States is liable for the tortious conspiracy of its employees, including all branches of government which resulted in the wrongful arrest, the wrongful imprisonment, the wrongful branding as criminals, insurrectionists, seditionists, traitors, impeding their rights by such labeling or by making records and including the Plaintiffs on lists which made it difficult to travel, to run a business, or earn a living.

634. Wrongful acts by the United States include Malicious Prosecution, Abuse of Process, Intentional Infliction of Emotional Distress, and Trespass to Chattels.

635. Overt acts by United States officers include:

a. Brady violations and the withholding of exculpatory evidence on a mass scale.

b. Unlawful searches and seizures (and trespasses) based on bogus general "geofence warrants" whereby the government seized every cell phone number at the Capitol on January 6th.

c. Falsifying evidence and the notion that the Secret Service had restricted vast areas of the U.S. Capitol on January 6, 2021—while knowing the Secret Service had never cast such restrictions.

d. Intentionally destroying, stealing, or breaking the property of J6ers, including that of the plaintiffs.

e. The imposition of a bogus "obstruction of official proceedings" statute, knowing that the statute was never intended to apply to disorderly conduct by protestors.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

f. The rigging of trials so that J6ers could not prevail.

g. The false placement of court venue in the courthouse where every judge in the courthouse was an interested witness to the events.

h. The burying of terabytes of discovery in databases which were inaccessible to the vast majority of J6ers. i. The control and monitoring of defense attorneys' use of discovery databases. j. The monitoring of attorney/client communications of J6ers. k. The concealment of hundreds of undercover government operators and provocateurs among the crowds on January 6th.

636. As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

637. The abovenamed employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

638. The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

639. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and mental injury, including, but not limited to: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

640. The United States' conduct caused the Plaintiffs to have severe emotional distress.

641. The Plaintiffs demand trial to show and establish the evidence of such severe emotional distress.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

i. A grant of U.S. citizenship for Mr. Rosa.

Respectfully submitted, Dated: November 3, 2026

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (954) 570-6757

_/s/ *Peter Ticktin*_________
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
Serv512@LegalBrains.com
ROGER ROOTS, ESQUIRE
Rhode Island Bar No. 6752
Serv517@LegalBrains.com